**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re PLUG POWER INC. SECURITIES LITIGATION | Case No. 1:23-cv-0409 (MN) |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS AND TO STRIKE</u>**

Of Counsel:

John J. Clarke, Jr.*
Richard Zelichov*
Yan Grinblat*

\* Admitted *pro hac vice*

DLA PIPER LLP (US)
Ronald N. Brown, III (Bar No. 4831)
ronald.brown@dlapiper.com
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Tel.:  (302) 468-5700

*Counsel for Defendant
 Plug Power Inc.*

RICHARDS, LAYTON, & FINGER P.A
Rudolf Koch (Bar No. 4947)
koch@rlf.com
Jason J. Rawnsley (Bar No. 5379)
rawnsley@rlf.com
920 North King Street
Wilmington, Delaware 19801
Tel.:  (302) 651-7700

*Counsel for Defendants
 Andrew Marsh, Paul B. Middleton,
 David Mindnich, and Sanjay Shrestha*

Dated:  December 14, 2023

Table of Contents

Page

PRELIMINARY STATEMENT ........................................................................................... 1

SUMMARY OF ALLEGATIONS ........................................................................................ 3

      A.      Plug Discusses Its Goals for the Year (January 2022) ........................................ 4

      B.      Plug Provides Updates (March and May 2022) .................................................. 4

      C.      Plug Reports Progress, But Reduces Expectations
            (August to November 2022) ............................................................................... 5

      D.      Plug Reports Missed Forecasts for 2022 ........................................................... 6

      E.      Plaintiffs' Claims ............................................................................................... 6

LEGAL STANDARD............................................................................................................ 7

ARGUMENT: THE COMPLAINT SHOULD BE DISMISSED ......................................... 7

I.       The Failure to Provide PSLRA Notice Requires Dismissal of Claims Before
         August 9, 2022 and Claims Concerning Plug's Future Hydrogen Capacity. ................... 8

II.      The Complaint Should Be Dismissed as an Impermissible "Puzzle Pleading." ............... 9

III.    The Court Should Strike All Allegations Attributed to "Witness 1." ............................. 10

IV.    Plaintiffs Have Not Alleged an Actionable Misstatement or Omission. ......................... 11

      A.      Most Challenged Statements Are Forward-Looking Statements That Are
            Subject to Dismissal Under the PSLRA Safe Harbor. ....................................... 11

            1.      The Statements Were Forward-Looking.................................................. 12

            2.      The Company Provided Appropriate Cautionary Language. .................. 13

            3.      The "Actual Knowledge" Prong of the Safe Harbor Also Applies. ........ 15

      B.      The Complaint Does Not Plausibly Allege Falsity for Other Reasons................ 16

            1.      Statements Concerning Plug's Revenue Goal for 2022.......................... 16

            2.      Statements Concerning Supply Chain Challenges................................... 18

            3.      Statements Concerning Hydrogen Production Capacity.......................... 20

            4.      Statements Concerning New Manufacturing Facilities. .......................... 22

C.     Many Challenged Statements Are Puffery. ......................................................... 23

D.     Mr. Mindnich Was Not the "Maker" of Any Allegedly False Statement............ 23

V.    Plaintiffs Have Not Alleged Facts Supporting a Strong Inference of Scienter................ 24

A.     The Complaint Relies on Impermissible Group Pleading. ................................. 24

B.     There Are No Motive Allegations. .................................................................... 25

C.     The Complaint Does Not Plead Circumstantial Evidence of Scienter. ............... 25

     1.     Challenged Statements Concerning 2022 Revenue Goal. ....................... 25

     2.     Challenged Statements Concerning Future Hydrogen Capacity. ............ 29

     3.     Plaintiff Does Not Allege Conscious Misbehavior or Recklessness. ...... 32

     4.     The "Core Operations Doctrine" Does Not Support Scienter. ................ 34

     5.     The Complaint Does Not Plead Corporate Scienter. .............................. 34

VI.    The Complaint Does Not Plead a Scheme to Defraud.................................................... 34

VII.   The "Controlling Person" Claim Also Should Be Dismissed......................................... 35

CONCLUSION............................................................................................................................ 35

Table of Authorities

Page(s)

Cases

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) .................................................................................31, 32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................................7

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)............................................................................26, 27, 30, 31

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*,
   908 F.3d 872 (3d Cir. 2018)...................................................................................................7

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)..................................................................................................21

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
   442 F. App'x 672 (3d Cir. 2011) .......................................................................................34

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)....................................................................................................3

*Gaines v. Guidant Corp.*,
   2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) .........................................................................33

*Howard v. Arconic Inc.*,
   395 F. Supp. 3d 516 (W.D. Pa. 2019).....................................................................................16

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010).................................................................................................23

*In re Amarin Corp. PLC Sec. Litig.*,
   2021 WL 1171669 (D.N.J. Mar. 29, 2021)............................................................................24

*In re Amarin Corp. PLC., Sec. Litig.*,
   2015 WL 3954190 (D.N.J. June 29, 2015) ...........................................................................34

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)....................................................................................16

*In re Biogen Idec, Inc. Sec. Litig.*,
   2007 WL 9602250 (D. Mass. Oct. 25, 2007),
   *aff'd*, 537 F.3d 35 (1st Cir. 2008) ........................................................................................12

iii

Page(s)

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
__ F. Supp. 3d __, 2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023)..............................................16

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).................................................................................................27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).....................................................................................................24

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)...................................................................................................34

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223 (D.N.J. Apr. 27, 2017) .............................................................................32

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................................21, 22, 27, 30

*In re Level 3 Comm., Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ......................................................................................18, 23

*In re Marriott Int'l, Inc.*,
31 F.4th 898 (4th Cir. 2022) ..................................................................................................16

*In re Millennial Media, Inc. Sec. Litig.*,
2015 WL 3443918 (S.D.N.Y. May 29, 2015) .........................................................................11

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)..........................................................................17

*In re Newell Brands, Inc. Sec. Litig.*,
837 F. App'x 869 (3d Cir. 2020) ..............................................................................................8

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) .........................................................................................25

*In re Sandridge Energy, Inc. Sec. Litig.*,
2015 WL 3652526 (W.D. Okla. May 11, 2015).........................................................................9

*In re Select Comfort Corp. Sec. Litig.*,
2000 WL 35529101 (D. Minn. Jan. 27, 2000)...........................................................................8

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006)...................................................................................28

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
2021 WL 4191467 (D.N.J. Sept. 15, 2021) ............................................................................26

iv

Page(s)

*Inst. Investors Group v. Avaya*,
    564 F.3d 242 (3d Cir. 2009)................................................................................. *passim*

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).....................................................................................................23

*Lewakowski v. Aquestive Therapeutics, Inc.*,
    2023 WL 2496504 (D.N.J. Mar. 14, 2023).......................................................24, 25

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...................................................................................31

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2017 WL 3891676 (D. Del. Sept. 6, 2017)..................................................................9

*Martin v. GNC Holdings, Inc.*,
    757 F. App'x 151 (3d Cir. 2018) ...............................................................................34

*Nat'l Jr. Baseball League v. Phamanet Dev. Group Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ...............................................................14, 25, 34

*New York State Teachers' Ret. Sys. v. Fremont*,
    2009 WL 3112574 (C.D. Cal. Sep. 25, 2009)...........................................................34

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)........................................................................................12

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016)..................................................................11, 12, 16, 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................................17, 20

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
    2023 WL 1800963 (D. Ariz. Feb. 7, 2023)..............................................................32

*Ortiz v. Canopy Growth Corp.*,
    537 F. Supp. 3d 621 (D.N.J. 2021) ...........................................................................13

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*,
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ..........................................................33

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ........................................................................................35

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................33

Page(s)

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) .......................................................................................19

*S.E.C. v. Rio Tinto*,
 41 F.4th 47 (2d Cir. 2022) ...........................................................................................35

*Slayton v. Am. Exp. Co.*,
 604 F.3d 758 (2d Cir. 2010).................................................................................24, 25

*Smith v. Antares Pharma, Inc.*,
 2019 WL 2785600 (D.N.J. July 2, 2019).......................................................9, 10, 11

*Tanaskovic v. Realogy Holdings Corp.*,
 2021 WL 211049 (D.N.J. Jan. 21, 2021).....................................................................12

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
 83 F.4th 514 (6th Cir. 2023) ........................................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)................................................................................................3, 24

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
 273 F. Supp. 3d 650 (N.D. Tex. 2017) .......................................................................32

*VanLeeuwen v. Keyuan Petrochemicals, Incl.*,
 2013 WL 2247394 (C.D. Cal. May 9, 2013) ................................................................9

*Williams v. Globus Medical, Inc.*,
 869 F.3d 235 (3d Cir. 2017)................................................................................ *passim*

*Winer Family Tr. v. Queen*,
 503 F.3d 319 (3d Cir. 2007)....................................................................................25, 33

*Wochos v. Tesla, Inc.*,
 985 F.3d 1180 (9th Cir. 2021) ............................................................................ *passim*

*Woolgar v. Kingstone Companies, Inc.*,
 477 F. Supp. 3d 193 (S.D.N.Y. 2020)............................................................18, 21, 26, 28

<u>Statutes, Rules, and Regulations</u>

15 U.S.C. § 78j...........................................................................................................11, 35

15 U.S.C. § 78u-4 ........................................................................................... *passim*

15 U.S.C. § 78u-4(a)(3) ..................................................................................................8

Page(s)

15 U.S.C. § 78u-4(b)(1) ..................................................................................................1, 9

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................................24

15 U.S.C. § 78u-5 ..........................................................................................................11, 12

15 U.S.C. § 78u-5(c)(1)(A) .....................................................................................................1

15 U.S.C. § 78u-5(c)(1)(A)(i) ...............................................................................................13

15 U.S.C. § 78u-5(c)(1)(B)(i) ...............................................................................................16

15 U.S.C. § 78u-5(i)(1) .........................................................................................................13

15 U.S.C. § 78u-5(i)(1)(A) ...................................................................................................13

15 U.S.C. § 78u-5(i)(1)(B).....................................................................................................13

17 C.F.R. § 240.10b-5 .....................................................................................................7, 34

Fed. R. Civ. P.  9(b) ................................................................................................................7

Fed. R. Civ. P. 12(b)(6)...........................................................................................................7

Fed. R. Civ. P. 12(f) ......................................................................................................2, 5, 11

## Legislative History

H.R. Conf. Rep. No. 104-369 (1995) ...................................................................................12

S. Rep. No. 104-98 (1995) ...................................................................................................12

## PRELIMINARY STATEMENT

This is a stock-drop case filed soon after Plug Power Inc. ("Plug" or the "Company") reported "disappointing financial results" for the fourth-quarter and full-year 2022. ¶ 234. Plaintiffs assert claims on behalf of an alleged class of purchasers of Plug common stock between January 19, 2022 and March 1, 2023, alleging that Plug and the individual defendants committed securities fraud – *lied* to Plug investors – because stated goals for the Company's 2022 revenues and for commissioning hydrogen production facilities turned out to be too optimistic. Instead of meeting its original goal of $900-925 million in annual revenue, the Company ended up generating revenue of $701.4 million – a Company record that reflected a *40% increase* from 2021.[1] *Id.*

Public companies fall short of their goals and targets every day. But a lack of clairvoyance is not fraud. Congress made that clear when it added a statutory safe harbor precluding liability for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially[.]" 15 U.S.C. § 78u-5(c)(1)(A). By itself this safe harbor, added by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), requires dismissal of claims based on *almost all* of the challenged statements.

Faced with this obvious hurdle, plaintiffs have dug deep into their playbook of pleading tactics in their effort to evade dismissal. For one, the complaint block-quotes lengthy passages from various challenged statements without attempting to "specify" the parts that were "misleading" or stating with particularity why they were. 15 U.S.C. § 78u-4(b)(1). The PSLRA prohibits that kind of "puzzle pleading." For another, countless paragraphs discuss supply chain challenges the Company not only regularly and accurately disclosed but also endured along with

---

[1] In addition to the Company, the defendants are Andrew Marsh, Paul B. Middleton, David Mindnich, and Sanjay Shrestha. Citations to "¶ __" refer to the complaint [D.I. 45]. Citations to "Exh." refer to exhibits to the defendants' Request for Judicial Notice filed with this motion.

*most other manufacturers* during the post-pandemic period in 2021 and 2022. *See, e.g.*, ¶¶ 135, 148, 159, 167, 170, 176, 186, 192, 199, 228, 237-38.

Most glaringly, however, the complaint for the first time adds allegations purportedly gathered from 17 unnamed "witnesses" ("CWs") contacted by plaintiffs' "investigators." The first of them, quoted in the opening pages of the complaint, *already disavowed* allegations attributed to them, expressed "anger" at having been included, and said that if called they would testify that "the information attributed to [them] and to others in the [c]omplaint *are 'lies.'*" Nov. 3, 2023 Letter from Plaintiffs' Counsel ("Disavowal Letter") [D.I. 49] at 2-3 (emphasis added).[2] Those allegations should be stricken. Fed. R. Civ. P. 12(f). But in addition, the faulty "process" that preceded plaintiffs' decision to include the disavowed allegations in their complaint raises substantial concerns about all of the CW allegations. Those allegations do not support any plausible inference of fraud in any event. They are, at best, undated speculation and personal opinions disconnected from any defendant or challenged statement.

The complaint is long on bombastic assertions but short on plausible inferences that any defendant engaged in *fraud*. There are no allegations of stock sales or other personal motives to defraud. Nor are there plausible allegations of contemporaneous facts in conflict with challenged statements. What the complaint alleges instead is that Plug set aggressive but attainable goals for 2022 that ultimately were not met. Far from hiding that reality, the Company provided periodic updates on its performance during the year, revised its forecasts downward as the year unfolded, and invited securities analysts to a factory tour and symposium at one of the new manufacturing facilities the complaint falsely suggests was not ready for business.

---

[2] The gender of the CWs is not stated. Defendants therefore use "they" or "their" in referring to all CWs, instead of "she" and "her" as plaintiffs chose to do. *See* ¶ 47 n.1.

2

To be sure, the Company experienced challenges and setbacks during 2022 as it transitioned from a smaller company focused on producing hydrogen fuel cells for industrial customers to the operator of the world's first "end-to-end green hydrogen ecosystem," ¶ 278, which will produce and transport its own liquid hydrogen to customer facilities, manufacture more, and more sophisticated, hydrogen fuels cells, and build hydrogen electrolyzers on a size, and at a scale, not previously attempted by anyone.

None of that amounts to fraud. The complaint fails to state a claim under the federal securities laws and should be dismissed in its entirety.

## SUMMARY OF ALLEGATIONS[3]

Plug is a hydrogen energy company founded in 1997 and based in Latham, New York. ¶ 28. Its core business historically was to manufacture and sell hydrogen fuel cells to power material handling vehicles, such as forklifts; it also has supplied hydrogen to fuel cell customers, typically purchased from suppliers. ¶ 29. In the years preceding 2022, Plug was focused on expanding its business by developing its capacity to manufacture electrolyzers, which convert water into hydrogen and oxygen, and by obtaining and developing its own hydrogen production facilities in order to insulate its business from the volatile market price for hydrogen. ¶¶ 36-42.[4]

Before the putative class period, Plug made a number of strategic acquisitions, including an electrolyzer manufacturing company, a hydrogen production facility, a company that makes trucks to transport liquid hydrogen, and a company that designs and builds energy plants. ¶¶ 37,

---

[3] Well pleaded factual allegations are assumed to be true solely for purposes of this motion. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The Court also may consider documents incorporated by reference or filed with the SEC as more fully explained in defendants' Request for Judicial Notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[4] Plaintiffs allege Plug was losing money on hydrogen sales. *See* ¶¶ 65-71; 142, 195. But the complaint does not challenge any statement on that issue, which Plug disclosed. Exh. 6 at 43-45 (revenue for "fuel delivered to customers" was lower than cost of such services).

42. Plug also opened its Rochester, New York "gigafactory" for manufacturing electrolyzer stacks and announced plans to build liquid hydrogen production facilities in Kingsland, Georgia and Alabama, New York. ¶¶ 38-39. (To expand existing fuel cell manufacturing capacity in Latham, New York, Plug broke ground on a second fuel cell facility, based in Slingerlands, New York, in March 2022. ¶ 209.)

### A.    Plug Discusses Its Goals for the Year (January 2022)

In a business update call with securities analysts on January 19, 2022, Plug discussed its goals for the year ahead, including to generate annual revenue of $900-925 million (compared with $502 million in 2021), ¶ 131; to ship 155 megawatts of electrolyzer products in 2022, ¶ 133; and to develop liquid hydrogen production capacity of 70 tons per day by year-end, ¶ 137. These forward-looking targets are at the heart of plaintiffs' claims.

### B.    Plug Provides Updates (March and May 2022)

On March 1, 2022, Plug announced its results for fourth quarter and full-year 2021. During a conference call, Plug reiterated its 2022 revenue goal of $900-925 million. ¶ 156. It reported that its Rochester factory was not yet "fully online," with "production ramp" delayed until early April. ¶ 158; Exh. 4 at 1. It also disclosed that its future hydrogen production facilities in Georgia and New York were now expected to "start to ramp at the end of 2022." ¶ 150. The same day, Plug filed its Form 10-K for 2021, which included extensive disclosures of risk factors that could affect its ability to reach its targets. ¶¶ 163, 164-65, 167; *see* Exh. 6 at 3-6, 15-34.

On May 9, 2022, Plug reported $140.8 million in revenue for Q1 2022 – nearly double its reported revenue in Q1 2021. *See* Exh. 7 at 1. The Company reaffirmed its 2022 revenue goal of $900-925 million, ¶ 170; projected that the Rochester factory would be producing electrolyzers at a rate of 2.5 gigawatts per year by later in 2022, ¶ 171; and repeated its goal to have liquid hydrogen production capacity of 70 tons per day by the end of the year, ¶¶ 177-78.

C.    **Plug Reports Progress, But Reduces Expectations (August to November 2022)**

On August 9, 2022, Plug reported revenue for Q2 2022 of $151.3 million, bringing its revenue for the year to $292 million. Exh. 9 at 1, 12. Historically, Plug earned significantly more revenue in the second half of any given year than it did in the first half. *See* Exh. 9 at 12. The reported results therefore were on track for Plug to meet its full-year revenue goal; the Company reaffirmed its $900-925 million revenue target. ¶ 190. Plug also said its Rochester factory was on track to produce 100 megawatts per month by the fall. *See* Exh. 9 at 9. At the same time, the Company reported that it no longer expected to have 70 tons per day of liquid hydrogen capacity by year-end. It provided an update on the status of its facilities in Georgia (in site preparation) and western New York (delayed by power substation "permitting dynamics") and discussed an alternative approach to reaching its year-end 70 tons per day production capacity goal through a different mix of liquid and gaseous hydrogen. ¶¶ 185, 186; *see* Exh. 9 at 5, 7.

On October 14, 2022, just after the third quarter ended but weeks before it reported quarterly results, Plug issued a press release lowering by 5-10% its revenue goal for the full year. ¶ 199. In announcing the revision to its goal, Plug explained it was being impacted by "broader supply chain issues" in that quarter and that some customers' projects it had expected to deliver in 2022 had been postponed to 2023. *Id.*; *see* Exh. 11 at 1.

On October 19, 2022, Plug hosted a symposium for securities analysts at its new Rochester gigafactory, which included a tour of the plant in operation. ¶¶ 202, 206, 208. In remarks made during the symposium, Plug provided an update on the timing of hydrogen production capacity with a new, lower goal of having 50 tons per day of liquid and gaseous production capacity by year-end. ¶¶ 203-05.

On November 8, 2022, Plug reported results for Q3 2022 and reaffirmed its lowered revenue goal of $810-880 million for the year. ¶ 218. It reported that its gross margins had

5

worsened due to the market price of hydrogen. ¶ 214. The Company also disclosed that it expected to produce only 60-100 megawatts of electrolyzer stacks during the fourth quarter and did not expect to reach a monthly production rate of 100 megawatts of electrolyzers until 2023. *See* Exh. 14 at 7. The Company reduced its goal for hydrogen production capacity to 45-50 tons per day of liquid and gaseous hydrogen by year-end. ¶ 220.

### D.      Plug Reports Missed Forecasts for 2022

In a conference call with analysts on January 25, 2023, Plug disclosed that it expected to report year-over-year revenue growth of ~45-50%, which was lower than its revised 2022 goal. ¶ 227. Plug explained that during Q4 2022 it encountered manufacturing and supply chain issues for new products and some customers had delayed projects into 2023. ¶ 228. In a Form 10-K filed on March 1, 2023, Plug reported full-year revenue of $701.4 million, ¶ 234, an increase of $200 million compared with 2021 but less than its revised forecast.

### E.      Plaintiffs' Claims

The complaint asserts securities fraud claims on behalf of an alleged class of purchasers of Plug's common stock between January 19, 2022 and March 1, 2023 against the Company and four of its officers: chief executive officer Andrew Marsh; chief financial officer Paul B. Middleton; executive vice president of global manufacturing David Mindnich; and chief strategy officer Sanjay Shrestha, who also is general manager of Energy Solutions.

Plaintiffs primarily challenge Plug's forecasts of full-year 2022 revenues of $900-925 million on January 19, March 1, May 9, and August 9. *See* ¶¶ 131-32, 143, 156, 170, 172, 187, 190. They also challenge statements regarding Plug's goals for production of electrolyzer stacks, *see* ¶¶ 133-34, 157-58, 164-65, 171-74, 191-92, 218; the timing of its introduction of fuel cell manufacturing capacity at a new facility in Slingerlands, New York, *see* ¶¶ 171, 190-91, 209; and the Company's ability to manage its supply chain, *see* ¶¶ 135, 148, 159, 167, 169, 170, 176,

186, 192, 199, 210, 228, 237-38.  Plaintiffs separately challenge statements concerning Plug's future hydrogen production capacity.  *See* ¶¶ 137-39 141, 143, 146-49, 152, 156-57, 164-65, 170, 172, 176-78, 181, 184-87, 191, 194, 203, 220, 222, 236.  The complaint also asserts that statements about Plug's future margins were misleading because they depended on anticipated production of hydrogen, electrolyzers, and fuel cells.  *See* ¶¶ 141, 150-52, 156, 170, 176, 178, 181, 187, 194.

## Legal Standard

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  Securities fraud claims are subject to the particularity requirements of Rule 9(b) and the PSLRA.  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 879 (3d Cir. 2018).  Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  *Id.* (quoting Fed. R. Civ. P. 9(b)).  The PSLRA demands even "greater particularity," requiring plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "all facts on which" any "information and belief" allegation is based.  *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).  It also requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## ARGUMENT

## THE COMPLAINT SHOULD BE DISMISSED

"To state a claim under Rule 10b-5, a plaintiff must demonstrate: (1) [a] material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation."  *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020).  The complaint does not plausibly allege any material misrepresentation

7

or omission or the required "strong inference" of scienter.  It also suffers from additional pleading defects that warrant dismissal.  Even if not dismissed in the first instance, allegations attributed to "Witness 1" should be stricken with a new complaint to be filed.

## I.     The Failure to Provide PSLRA Notice Requires Dismissal of Claims Before August 9, 2022 and Claims Concerning Plug's Future Hydrogen Capacity.

"The PSLRA does not contemplate the unapproved addition of new claims or new classes of plaintiffs after . . . a lead plaintiff or plaintiffs are appointed." *In re Select Comfort Corp. Sec. Litig.*, 2000 WL 35529101, at *8 (D. Minn. Jan. 27, 2000).  Plaintiffs' failure to comply with that rule requires dismissal of claims pre-dating August 9, 2022 and all claims based on statements concerning Plug's future hydrogen production capacity, which were not a subject of the required PSLRA notice in this case.

On April 12, 2023, a press release provided notice of the filing of this action and the timing for filing applications to serve as lead plaintiff, as the PSLRA requires.  *See* 15 U.S.C. § 78u-4(a)(3).  According to the press release, the complaint asserted claims on behalf of investors who purchased or acquired Plug common stock "between August 9, 2022 and March 1, 2023." During that alleged class period, the press release explained, defendants purportedly:

> misrepresented and/or failed to disclose that Plug was unable to effectively manage its supply chain and product manufacturing, resulting in reduced revenues and margins, increased inventory levels, and several large deals being delayed until at least 2023, among other issues.

D.I. 12-1.

The press release did not mention any statements concerning Plug's future hydrogen production capacity, nor was there any mention of claims for the period from January 19, 2022 until August 9, 2022 – *the first seven months* of the alleged class period now.  ¶ 1.  Putative class members therefore received no notice that this action would concern those claims and had no opportunity to compete for appointment as lead plaintiff on that basis.

At a minimum, plaintiffs should have filed a new PSLRA notice disclosing their new allegations and the far longer class period at the time they filed the amended complaint, but they did not do so. *VanLeeuwen v. Keyuan Petrochemicals, Incl.*, 2013 WL 2247394, at \*5 (C.D. Cal. May 9, 2013) (collecting cases). The new claims based on hydrogen production estimates and statements between January 19 and August 9, 2022 therefore should be dismissed. *In re Sandridge Energy, Inc. Sec. Litig.*, 2015 WL 3652526, at \*5, 11 (W.D. Okla. May 11, 2015) (dismissing claims outside scope of original PSLRA notice). In the alternative, the Court should require a new notice establishing a new lead plaintiff deadline based on the current allegations with proceedings on this or any further amended complaint to follow such appointment.

## II.      The Complaint Should Be Dismissed as an Impermissible "Puzzle Pleading."

The complaint should be dismissed because it is an impermissible puzzle pleading requiring conjecture to determine plaintiffs' theory of fraud. *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at \*3 (D. Del. Sept. 6, 2017); *see also Smith v. Antares Pharma, Inc.*, 2019 WL 2785600, at \*11 (D.N.J. July 2, 2019). The PSLRA requires far more specificity in pleading allegedly false or misleading statements. *See* 15 U.S.C. § 78u-4(b)(1).

Just as in the cited decisions, the complaint in this case block quotes lengthy statements and uses inconsistent italicization to create confusion as to which parts of the statements plaintiffs are claiming were false or misleading. *See ¶¶* 132, 135, 138-39, 141, 146-52, 156-59, 164-65, 167, 170-74, 176-78, 181, 185-87, 190-92, 194, 208-09. This permits plaintiffs unfairly to pick and choose the portions of these lengthy quotations to focus on in response to the defendants' dismissal arguments, creating their own version of the game "whack-a-mole."

In addition, as in *Antares*, the complaint repeats a litany of "reasons" why challenged statements purportedly were false, even when those "reasons" do not relate to the subject of the statements at issue. ¶¶ 136, 160, 175, 193; *see also ¶¶* 140, 153, 179, 188. For example, it is

9

unclear how a statement about a revenue target could be false because Plug "was forced to warehouse incomplete products"; how any statements about electrolyzer manufacturing were false based on alleged issues with fuel cell manufacturing; or how any statement about Plug's goals for hydrogen production capacity were misleading because the projects were allegedly "over budget." ¶¶ 134, 136(g), 156-58, 160(d), (h), (i), 178, 179(a).  Plaintiffs should be required to file a new pleading that remedies this critical pleading defect.

### III.    The Court Should Strike All Allegations Attributed to "Witness 1."

On November 3, 2023, five weeks after filing the complaint, plaintiffs filed the Disavowal Letter in which they reported that a person they labelled "Witness 1" had "*disavow[ed]" statements* attributed to them in the complaint and said that if called to testify in the case they would state "that the information attributed to [them] and to others in the [c]omplaint *are 'lies*.'" Disavowal Letter at 2 (emphasis added).

The Disavowal Letter explains that this alleged witness never confirmed allegations attributed to them and, instead, disputed those allegations when made aware of them.  The rejected allegations include that Witness 1 supposedly "told Plug senior management that their projections for hydrogen production were 'hilariously off' and that the facilities they were constructing were 'three years out of service,'" ¶ 84, that "Plug spent a lot of time 'covering their tracks,'" ¶ 88, and that Witness 1 "left the Company in mid-2022 because [they] 'refused to let this all fall on [them],'" ¶ 92, when in fact they left for another opportunity.

Remarkably, plaintiffs' counsel asserted in the Disavowal Letter that they "believe that the allegations concerning Witness 1, like all of the factual allegations in the [c]omplaint, should be accepted as true for purposes of [d]efendants' forthcoming motion to dismiss."  Disavowal Letter at 4.  The defendants disagree.  Allegations attributable to "Witness 1" can be found throughout a pleading that *falsely* accuses the defendants of *fraud*.  *See* ¶¶ 47, 72, 80, 84, 88, 92, 140, 153, 179,

188, 258, 261.  This Court may "strike from a pleading" any "immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  An order striking all allegations attributable to Witness 1 is warranted, because the recantations described in the Disavowal Letter "significantly undermine the integrity of the [complaint]."  *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at \*10 (S.D.N.Y. May 29, 2015).  Plaintiffs should be required to file a new complaint in which every allegation attributable to the recanting "witness" – whether directly or indirectly – has been removed.  That relief almost certainly would leave "a materially thinner [c]omplaint for the Court to review on a motion to dismiss."  *Id.*[5]

**IV.    Plaintiffs Have Not Alleged an Actionable Misstatement or Omission.**

    **A.    Most Challenged Statements Are Forward-Looking Statements That Are Subject to Dismissal Under the PSLRA Safe Harbor.**

The federal securities laws include a statutory "safe harbor" that "immunizes certain 'forward-looking' statements from § 10(b) liability."  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016); *see* 15 U.S.C. § 78u-5.  Under the safe harbor, a forward-looking statement cannot give rise to liability if – as in this case – it was "identified as [forward-looking], and [was] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *Cooper Tire*, 834 F.3d at 490.  This first prong of the safe harbor requires dismissal of most of the claims here.  *See* 15 U.S.C. § 78u-5.[6]

---

[5] The "process" described in the Disavowal Letter for confirming information gleaned by plaintiffs' "investigators" from the CWs raises substantial doubt about those allegations generally. Plaintiffs' apparent designation of these individuals "as CWs, without their foreknowledge, also raises issues of fairness to these witnesses."  *Millennial Media*, 2015 WL 3443918, at \*12.

[6] Congress enacted the provision to "encourage[] companies to disclose forward-looking information" and not "fear that those projections, if they did not materialize, would result in an action for fraud."  *Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at \*15 (D.N.J. Jan. 21, 2021) (quoting S. Rep. No. 104-98, at 14-15 (1995)); *In re Biogen Idec, Inc. Sec. Litig.*, 2007 WL

### 1.      The Statements Were Forward-Looking.

Nearly every statement challenged in the complaint is forward-looking.  These include statements concerning Plug's revenue goals for 2022, its future hydrogen production capacity, the future manufacturing output at its new facilities in Rochester (for electrolyzers) and Slingerlands (for fuel cells), and the effects on the Company's margins that these future developments were expected to have.  The Company consistently identified all these statements as forward-looking. *See* Exh. 2 at 4; Exh. 3 at 15; Exh. 4 at 15; Exh. 5 at 4; Exh. 6 at 3-6, 15-34; Exh. 7 at 12-13; Exh. 8 at 4; Exh. 9 at 14-15; Exh. 10 at 4; Exh. 11 at 1-2; Exh. 12 at 1-2; Exh. 13 at 38-39; Exh. 14 at 16; Exh. 15 at 4; Exh. 16 at 4; Exh. 17 at 3-6, 16-36; Exh. 18 at 14; Exh. 19 at 4.

For purposes of the statutory safe harbor, the term "forward-looking statement" is "broadly defined" to include statements "'containing a ***projection of revenues*** . . .'; statements of 'the ***plans and objectives of management for future operations***, including plans or objectives relating to the products or services of the issuer'; or statements of '***future economic performance***,'" including "any statement of the assumptions underlying or relating to" the foregoing.  *Inst. Investors Group v. Avaya*, 564 F.3d 242, 255 (3d Cir. 2009) (quoting 15 U.S.C. § 78u–5(i)(1)) (emphasis added).

Challenged statements concerning Plug's revenue goals for 2022 – the central focus of the complaint – are classically forward looking.  ¶¶ 131, 132, 143, 156, 170, 172, 190; *see* 15 U.S.C. § 78u-5(i)(1)(A) (statutory definition includes "projection of revenues"); *Avaya*, 564 F.3d at 246-47, 255-57 (statements concerning revenue growth were protected by safe harbor).

Similarly, statements concerning the Company's future production of green hydrogen and statements concerning the ramp-up of electrolyzer and fuel cell manufacturing at new facilities in

---

9602250, at *10 (D. Mass. Oct. 25, 2007) (citing H.R. Conf. Rep. No. 104-369, at 43 (1995)), *aff'd*, 537 F.3d 35 (1st Cir. 2008).

Rochester and Slingerlands, respectively, were "plans and objectives of management for future operations," 15 U.S.C. § 78u-5(i)(1)(B), that fall squarely within the meaning of "forward-looking statements." ¶¶ 130, 137-39, 141, 148, 152, 154, 185 (future hydrogen capacity); ¶¶ 133-34, 157-59, 171-72, 190-92, 208-10 (manufacturing); *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (goal to "produce 5,000 vehicles per week" was forward-looking, even when accompanied by statements that company was "on track" and "there are no issues" that "would prevent" achieving the goal); *Avaya*, 564 F.3d at 255 (statements that company was "on track" could not "meaningfully be distinguished from the future projection of which they are a part").

Statements concerning Plug's future margins also clearly are within the scope of the statutory safe harbor. ¶¶ 141, 146, 148, 150, 152, 156, 170, 176, 178, 181, 183, 187, 194, 218, 222; *see* 15 U.S.C. § 78u-5(i)(1) (statement of "future economic performance"); *Avaya*, 564 F.3d at 246-47, 256-57 (statements concerning future margins were protected by safe harbor).

### 2.      The Company Provided Appropriate Cautionary Language.

The challenged forward-looking statements were accompanied by meaningful cautionary language that identified "important factors that could cause actual results to differ materially[.]" 15 U.S.C. § 78u-5(c)(1)(A)(i).  To satisfy the statute, "cautionary language" need not list "every factor" or "even the particular factor that ultimately causes the forward-looking statement not to come true." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 645 (D.N.J. 2021).  Disclosures are sufficiently cautionary if they are "substantive and tailored" to the subject of the statement. *Nat'l Jr. Baseball League v. Phamanet Dev. Group Inc.*, 720 F. Supp. 2d 517, 533 (D.N.J. 2010).  That standard is easily met here.

The complaint alleges that Plug missed its revenue and product-related targets because of supply chain issues, manufacturing delays, and delayed customer contracts, ¶¶ 136, 160, 175, 193, and that Plug missed its targets for growing hydrogen production capacity (therefore delaying

future reduction of gross margins) because it lacked experience and faced supply chain issues for its electrolyzers, ¶¶ 140, 153, 179, 188.  But the Company warned that its results might differ from its forward-looking statements because of the very same risks, including that:

- "We have not achieved operating profitability in any quarter since our formation and we will continue to incur net losses until we can produce sufficient revenue to cover our costs."

- "We anticipate that we will continue to incur losses until we can produce and sell our products and services on a large-scale and cost-effective basis. We cannot guarantee when we will operate profitably, if ever."

- "We may be unable to successfully execute and operate our green hydrogen production projects and such projects may cost more and take longer to complete than we expect."

- "Our hydrogen production projects are dependent, in part, on the Company's ability to meet our internal demand for electrolyzers required for such projects."

- "The timing and cost to complete the construction of our hydrogen production projects are subject to a number of factors outside of our control and such projects may take longer and cost more to complete and become operational than we expect."

- "The failure of a supplier to develop and supply components in a timely manner or at all, or to develop or supply components that meet our . . . requirements . . . could impair our ability to manufacture our products or could increase our costs of production."

- "Our ability to source parts . . . from our suppliers could be disrupted or delayed in our supply chain which could adversely affect our results of operations."

- "We expect that these challenges [posed by global supply chains] will continue to have an impact on our business for the foreseeable future."

- "We may not be able to achieve our growth strategy and increase production capacity as planned during the foreseeable future."

- "Delays in or not completing our product development goals may adversely affect our revenue and profitability."

- "The failure of a supplier to develop and supply components in a timely manner or at all . . . could impair our ability to manufacture our products."

14

- "Some of the orders we accept from customers . . . may be cancelled" and "[a] slowdown, delay, or reduction in a customer's orders could result in . . . unexpected quarterly fluctuations in our operating results."

- "[T]ime periods from receipt of an order to shipment date and installation vary widely and are determined by a number of factors, including . . . the customer's deployment plan."

Exh. 6 at 3-6, 15-34; *see* ¶¶ 164-67.  Each challenged statement referenced and incorporated these risk factor disclosures.  *See* Exh. 2 at 4; Exh. 3 at 15; Exh. 4 at 15; Exh. 5 at 4; Exh. 6 at 3-6, 15-34; Exh. 7 at 12-13; Exh. 8 at 4; Exh. 9 at 14-15; Exh. 10 at 4; Exh. 11 at 1-2; Exh. 12 at 1-2; Exh. 13 at 38-39; Exh. 14 at 16; Exh. 15 at 4; Exh. 16 at 4; Exh. 17 at 3-6, 16-36; Exh. 18 at 14; Exh. 19 at 4.[7]

Similar cautionary language has been a basis for dismissal of securities fraud complaints in the past.  *See Avaya*, 564 F.3d at 257 (affirming dismissal where defendants "explicitly warned that Avaya's forward-looking statements 'may turn out to be wrong'"); *Tesla, Inc.*, 985 F.3d at 1193 n.3 (citing "detailed and specific" language cautioning that results could "differ materially from those projected").  Moreover, plaintiffs' contention that the risk factors were themselves misleading misses the point.  ¶¶ 164-68.  Risk factor disclosures are warnings about the future, not disclosures about the present.  They are not actionable for allegedly omitting harms "currently affecting the company."  *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 555 (W.D. Pa. 2019); *see In re Marriott Int'l, Inc.*, 31 F.4th 898, 904 n.2 (4th Cir. 2022) (same).

### 3.    The "Actual Knowledge" Prong of the Safe Harbor Also Applies.

Plaintiffs devote substantial space in the complaint to CW allegations apparently intended to suggest the defendants had "actual knowledge" that the challenged forward-looking statements

---

[7] The Company's discussion of its goals for the year in January 2022 referred to equally robust risk factor disclosures in Plug's Form 10-K filed in May 2021.  *See* Exh. 3 at 2; Exh. 1 at 4-8, 14-31.

were false or misleading.  15 U.S.C. § 78u-5(c)(1)(B)(i).  The allegations do not support such an assertion; the safe harbor *also* requires dismissal because the complaint does not plead "actual knowledge" of falsity for reasons discussed below.  *See infra* at 16-23.  But regardless, the "actual knowledge" prong is a separate and independent *defense*, not a universal exception to the first prong of the safe harbor.  *Cooper Tire*, 834 F.3d at 491 ("That disjunctive statutory test provides two distinctive entrances to the safe harbor").  To construe the safe harbor otherwise "would 'rip a large hole in [the PSLRA]' and result in an exception swallowing the rule."  *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, __ F. Supp. 3d __, 2023 WL 2308151, at *8 (S.D.N.Y. Mar. 1, 2023) (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 211 (S.D.N.Y. 2022)).

### B.      The Complaint Does Not Plausibly Allege Falsity for Other Reasons.

#### 1.      <u>Statements Concerning Plug's Revenue Goal for 2022.</u>

Even if the PSLRA safe harbor did not require dismissal, which it does, plaintiffs' claims based on statements concerning the Company's revenue goal for full-year 2022 should be dismissed because the complaint does not plausibly allege that those statements of opinion concerning "expectations about the future" were false or misleading when made.  *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018).

Opinion statements cannot provide a basis to impose securities liability unless "the speaker did not hold the belief she professed" or "the supporting facts she supplied were untrue."  *Id.* at 754 (citations omitted); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).  An opinion statement also can be actionable if the speaker omits information "whose omission makes the opinion statement at issue misleading to a reasonable" investor.  *Omnicare*, 575 U.S. at 194.  However, establishing liability on an omission theory is "no small task for an investor."  *Id.*  It is available only when an "undisclosed fact made it impossible for the

16

speaker's opinion to be correct." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*13 (W.D. Pa. May 18, 2023). There are no such allegations here.

The complaint does not plausibly allege that statements concerning the Company's revenue goals for 2022 were actionably false under *Omnicare*. The Company had exceeded its goals for gross billing (the forward-looking metric it discussed before 2021) in each of the previous two years. Exh. 20 at 14; Exh. 22 at 1; Exh. 21 at 8; Exh. 4 at 1 ($337 million in gross billing achieved vs. $300 million projected in 2020; $502 million in revenue achieved vs. $475 million in gross billing projected in 2021). Moreover, based on its historical pattern, in which more revenues have been generated during the second half of the year, the Company's revenue through Q2 2022 was in line with its goal for the full year. *See* Exh. 9 at 12. Then, on October 14, 2022, Plug announced that it was lowering its revenue goal by 5-10%, ¶ 199, because it "recently became aware of the potential impact" of "broader supply chain issues" and the deferral of some customer orders to 2023. Exh. 11 at 1. Later, in a call with analysts on January 25, 2023, the Company again lowered expectations when it reported that year-over-year revenue growth would be only 45-50%. ¶ 227.

The complaint does not provide any contemporaneous fact that conflicted with these opinion statements at the time they were made. Plaintiffs allege that the revenue targets were misleading because of "operational problems," including "supply chain issues," "manufacturing delays," and customers that "scaled-back or pushed-out orders," ¶¶ 136, 144, 160, 175, 193. But the complaint does not allege that the defendants failed to take those issues into account, much less allege specific facts demonstrating that Plug's supply chain and production issues rendered its revenue targets *knowingly* unachievable when made.

Plaintiffs' CW allegations do not fill this glaring hole. Nearly all of the assertions attributed to CWs are undated. Therefore, they are not a basis to "plead contemporaneous falsity." *Woolgar*

17

*v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020); *see Williams v. Globus Medical, Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (allegations "must be sufficient to show that the challenged statements were actionably unsound when made").   Further, as the complaint acknowledges, Plug provided updates to its revenue goal during Q4 2022.   The undated CW allegations cannot be compared against revenue targets discussed in January 2022, May 2022, August 2022, or November 2022 to assess whether there was any contradiction at the time.[8]

In brief, dismissal is warranted because none of plaintiffs' allegations shows a mismatch between the Company's stated revenue goal and undisclosed facts at the time of any challenged statement. *See Tesla, Inc.*, 985 F.3d at 1194 (opinions not actionable where plaintiffs had not alleged that defendants "knew their year's end goal was impossible to achieve"); *In re Level 3 Comm., Inc. Sec. Litig.*, 667 F.3d 1331, 1340, 1341 n.9 (10th Cir. 2012) (statement that project was "tracking within expectations" not actionable even though project "was behind schedule and over budget" because defendants can express optimism in their ability to successfully fix those problems); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("[p]roblems and difficulties are the daily work of business people.  That they exist does not make a lie out of" positive statements).

### 2.    Statements Concerning Supply Chain Challenges.

Allegations concerning supply chain issues appear to have been included primarily as a way to challenge statements concerning the Company's 2022 revenue goal.   *See* ¶¶ 95-122. However, to the extent plaintiffs purport to base their securities fraud claims on public statements

---

[8] The only specific date alleged in the complaint, attributed to a single short-term former employee, is a comment purportedly made by Mr. Marsh during a "company-wide Zoom call[]" sometime "between late-August and late-September 2022" that Plug "was behind on either its sales or revenue targets." ¶¶ 128, 176.  That vague recollection, not corroborated by any other source, is not entitled to deference.  Even if credited, the supposed remark allegedly occurred *after* statements about a year-end revenue goal of $900-925 million (in January, March, May, and August) and soon before Plug's October press release lowering the goal by 5-10%. ¶ 199.

18

concerning the Company's supply chain challenges, the complaint does not plausibly allege that those statements were false or misleading when made.  ¶¶ 135, 159, 192.

According to plaintiffs' allegations, the Company repeatedly acknowledged during the alleged class period that it was dealing with challenges in its supply chain, in common with other manufacturers in the wake of the COVID-19 pandemic.  ¶ 135 ("one of the reasons I have Dave [Mindnich] and supply chain people who worked at Tesla is they were really good at working through getting components during the crisis.  And we work it every day.  We're on the phone every day.").  Indeed, the complaint alleges that Mr. Marsh, the Company's chief executive officer, was frank in acknowledging the challenges.  ¶ 135 ("I don't want to downplay the supply chain issues."); ¶ 159 (discussing "this very difficult supply chain" and the "very, very difficult climate we exist in today"); ¶ 192 ("I'm not trying on this call, [to] downplay that we don't fight supply chain issues every day.  We do.").

The complaint describes the steps Plug was taking to manage this challenge.  *See* ¶¶ 97-98 (alleging "daily calls" and "daily meetings" "in which supply chain issues were discussed"); ¶ 104 (Plug would "alter older versions of components to meet new specifications" to work around parts shortages); ¶ 106 ("Plug went to great lengths and expended significant resources to retrieve components from suppliers to mitigate their supply chain problems"); ¶ 108 (Plug purchased excess parts when available); ¶ 122 (Plug held "bi-weekly team meetings" to discuss parts availability).  The complaint demonstrates that the Company did not conceal or minimize its supply chain problems.  Nor is there any factual allegation from which a plausible inference could be drawn that supply chain challenges were an undisclosed reason that any other challenged statement – whether concerning the Company's revenue goal for the year, its green hydrogen production forecasts, or the opening of new manufacturing facilities – was false or misleading when made.

19

**3.    Statements Concerning Hydrogen Production Capacity.**

The complaint similarly fails to allege falsity with respect to challenged statements concerning the Company's future hydrogen production capacity both because they were opinion statements concerning the future and because the complaint does not plausibly allege contemporaneous facts that conflict with them.  For the same reason, challenged statements concerning the impact of future hydrogen production on the Company's gross margins in the future are inactionable opinions about future events.  ¶¶ 141, 150-52, 176-78, 181, 191, 194, 218.

In a January 2022 call with securities analysts, the Company stated its goal of 70 tons per day of liquid hydrogen capacity by the end of 2022.  ¶¶ 139, 143.  Most of that future capacity would come from a site in western New York (projected 45 tons per day) and a site in Georgia (projected 15 tons per day).  ¶ 138.  As the year progressed, however, the Company updated its forecasts, first by acknowledging delays in bringing liquid hydrogen capacity online in New York and Georgia and therefore substituting future gaseous hydrogen capacity, ¶¶ 185-86, and later by reducing its capacity forecast to 45-50 tons per day by the end of 2022, ¶¶ 203-05.  In addition to being subject to the statutory safe harbor, these statements of future plans were opinions as to which plaintiffs have not pleaded falsity under *Omnicare*.  *See supra* at 16-23.[9]

The complaint glosses over the changes in the Company's forecasts and the detailed updates on the status of its construction activities provided in disclosures in August, October, and November 2022.  ¶¶ 186, 203, 204, 220; *see* Exh. 9 at 5-8, Exh. 11 at 1.  But plaintiffs cannot avoid dismissal by ignoring the clear import of Plug's statements as a whole.  *See Cooper Tire*,

---

[9] Plug also explained that these complex projects take time to ramp up even after being commissioned.  For example, its Tennessee plant reached 93% of its expanded capacity six months after commissioning.  ¶ 178; *see* Exh. 4 at 2; Exh. 8 at 6.

834 F.3d at 489 ("[o]ne purpose of the [PSLRA] is to prevent disappointed investors from treating every imprecise statement . . . as an invitation to file a lawsuit").

Plaintiffs also challenge these opinion statements based on CW allegations that some people believed Plug's schedule for commissioning hydrogen facilities were "unrealistic," "hilariously off," "three years out in service," and "impossible." *See* ¶¶ 6, 7, 46, 75, 78, 80, 84, 85, 92, 94, 140, 153, 179, 188, 244. The primary source for these allegations was "Witness 1," who now has disavowed them and denies having discussed the issues with any individual defendant. Disavowal Letter at 2-3; s*ee supra* at 10-11. In any event, internal "differences of opinion" or "disagreements" are not a basis to infer securities fraud. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) (internal "difference of opinion" does not show a lack of reasonable basis); *see also Tesla, Inc.*, 985 F.3d at 1194 (plaintiffs failed to allege that defendants ever accepted former employee views that goals were "impossible").

The CW allegations also are mostly undated. Yet the complaint acknowledges there were several revisions to the Company's year-end target for hydrogen production capacity as 2022 progressed. Such allegations cannot support any plausible inference of falsity. *Globus Medical*, 869 F.3d at 244; *Woolgar*, 477 F. Supp. 3d at 221. The only allegation with a date asserts that unidentified "senior management knew by June or July 2022 that their published hydrogen production targets were impossible to meet." ¶ 85. But the complaint does not allege how the CW providing this information supposedly came to know it, and it is entitled to no weight. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007) (discounting CW allegations based on "hearsay rather than personal knowledge") (internal citation omitted). The complaint acknowledges that Plug revised its public forecasts for hydrogen production soon after July, undermining any inference of falsity even as to that allegation. ¶¶ 185-86.

Separately, plaintiffs appear to challenge two assertions about Plug's hydrogen projects that are not forward-looking. But the complaint does not plead contemporaneous facts that would support a plausible inference of falsity for either of them. First, based on a comment made in a "promotional video" issued in May 2023, plaintiffs assert that a March 1, 2022 statement falsely claimed that the Georgia site already was "under construction for a 15 TPD liquid plant" by that date even though an engineering, procurement, and construction ("EPC") contract for the site was not issued until later. ¶ 154. But there is no contradiction: construction could have begun even if the EPC contract was not yet signed. The complaint itself alleges that Plug learned that incorrect pipes had been installed at the site "in or around mid-May 2022." ¶ 86.

Finally, plaintiffs challenge a statement in August 2022 that "2.5 TPD Green gaseous production" was "online at [the] Georgia facility." ¶ 89, 185. The complaint asserts this was false because one CW heard about testing of that machinery from a "mechanical inspector." ¶ 89. But the same CW allegedly acknowledged that they "did not know whether the information relayed to [them] . . . served as the basis for the Company's public announcement." ¶ 89. Hearsay such as that allegation is entitled to no deference on this motion. *Intelligroup*, 527 F. Supp. 2d at 360-61.

### 4.    Statements Concerning New Manufacturing Facilities.

As with allegations concerning supply chain challenges, plaintiffs appear to have included allegations concerning alleged delays in ramping up production at the Rochester electrolyzer factory and the Slingerlands fuel cell factory primarily as a basis for challenging statements concerning the Company's 2022 revenue goal. ¶¶ 109-13. Plaintiffs do not allege that the status of the two new manufacturing facilities was overlooked or not taken into account in developing the 2022 revenue goal or the revisions to that goal disclosed near the end of the year.

Plaintiffs' separate contention that the Rochester electrolyzer factory was "not operational" during 2022 is in conflict with other allegations in the complaint. *See* ¶¶ 110, 113. Plaintiffs

22

acknowledge that Plug hosted "an all-day symposium" at the Rochester factory in October 2022, ¶ 202, and that a securities analyst reported that operations were underway even though the facility was "still ramping" with "more equipment" on order, ¶ 206.  In addition, there is no explanation of what is meant by "not operational."  *See Level 3*, 667 F.3d at 1345 (terms open to "multiple interpretations" are not sufficient).  The complaint further alleges that the Slingerlands plant, begun in March 2022, was producing large numbers of "Class 3 GenDrive lines" by November.  ¶ 109.

### C.    Many Challenged Statements Are Puffery.

In addition to the foregoing, many snippets of challenged statements are puffery recognized by the courts to be inactionable.  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) ("[S]tatements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism" are "too vague to be actionable").[10]

### D.    Mr. Mindnich Was Not the "Maker" of Any Allegedly False Statement.

It is unclear why defendant David Mindnich was named in the complaint.  He did not make any statements that plaintiffs categorize as false or misleading.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (only the "maker" of allegedly false statement can be liable).  For this reason alone, the claims against Mr. Mindnich should be dismissed in their entirety.  The only statements attributed to him were made at the October 2022 symposium, when he allegedly said "we're going to stay ahead of" supply chain issues, ¶ 210, and that the Slingerlands fuel cell facility was about to begin "validation and commissioning activities," ¶ 209.

---

[10] *See* ¶ 133 ("unique in the industry"); ¶ 134 ("we could be one of the largest electrolyzer companies in the world); ¶ 138 ("good pace"); ¶ 148 ("actively managing supply chain"); ¶ 157 ("global leader"); ¶ 173 ("pipeline is growing and scaling"); ¶ 186 ("meaningful progress"); ¶ 194 ("moving quickly to ramp"; "big progress"); ¶ 208 ("high-volume production"); ¶ 209 (progress "pretty staggering"); ¶ 210 ("we have the designs and we know what we're doing") ¶ 210 ("supply chain team" is "world-class"); ¶ 220 ("production at scale"); *see also* ¶¶ 132, 135, 141, 147, 150-52, 156, 158, 170-72, 174, 176-78, 181, 191-92, 218.

Both statements were accurate.  The complaint asserts in conclusory fashion that these statements "exaggerated Plug's manufacturing capabilities while omitting Plug's . . . supply chain problems," ¶ 211, but it does not offer any facts to support those conclusory assertions.[11]

## V. Plaintiffs Have Not Alleged Facts Supporting a Strong Inference of Scienter.

The complaint also should be dismissed given the failure to plead facts giving rise to the required "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  A court evaluating scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 310.  The inference drawn from the factual allegations must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  This requires factual allegations of both "motive and opportunity" to commit fraud and "conscious misbehavior or recklessness," *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *11-12 (D.N.J. Mar. 14, 2023), or in the case of forward-looking statements, actual knowledge of falsity, *Globus Medical*, 869 F.3d at 244.  "[W]here the plaintiffs cannot make a motive showing . . . their circumstantial evidence of fraud must be correspondingly greater." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010); *see In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *19 (D.N.J. Mar. 29, 2021).  The complaint falls far short of these demanding scienter pleading requirements.

### A. The Complaint Relies on Impermissible Group Pleading.

A plaintiff alleging securities fraud must plead facts giving rise to the requisite "strong inference" of fraudulent intent for *each* defendant.  *Winer Family Tr. v. Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007).  Plaintiffs have disregarded this requirement.  They group the individual

---

[11] The complaint asserts the symposium statements were a partial corrective disclosure but also that the statements were misleading.  ¶ 203.  Plaintiffs cannot assert both.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009).

defendants together in a single defined term, the "Individual Defendants," and make accusations with the Company as an undifferentiated group, the "Defendants." *See* ¶¶ 279-282. That kind of "group pleading" is "no longer viable[.]" *Winer Family Tr.*, 503 F.3d at 337.

### B. There Are No Motive Allegations.

It is telling that plaintiffs have made no attempt to allege that any of the defendants had any personal motive to commit fraud in discussing Plug's business and goals for 2022. There are no stock transactions alleged, nor are there any other allegations that the individual "defendants stood to gain in a concrete and personal way from one or more of the allegedly false and misleading statements and wrongful nondisclosures." *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 414 (D.N.J. 2004). Courts "have consistently weighed" the lack of such allegations "against an inference of scienter." *Lewakowski*, 2023 WL 2496504, at *12 (collecting cases); *Nat'l Jr. Baseball League*, 720 F. Supp. 2d at 550 ("no strong inference of scienter" given absence of stock sale allegations); *see Slayton*, 604 F.3d at 776 (no scienter where "plaintiffs have not alleged any theory as to why the defendants would knowingly mislead investors").

### C. The Complaint Does Not Plead Circumstantial Evidence of Scienter.

Given the absence of motive allegations, plaintiffs were required to plead "correspondingly greater" circumstantial evidence of each defendant's knowing misconduct. *Slayton*, 604 F.3d at 776. Since most challenged statements are forward-looking, recklessness is not sufficient. Dismissal is required absent allegations supporting a strong inference that such statements were made with actual knowledge of falsity. *Globus Medical*, 869 F.3d at 244; *Avaya*, 564 F.3d at 274. The complaint does not include such allegations.

#### 1. Challenged Statements Concerning 2022 Revenue Goal.

With regard to challenged statements regarding Plug's 2022 revenue goal, the complaint does not plausibly allege that any of these statements was false, much less knowingly so. *See*

*supra* at 16-23.  According to plaintiffs, supply chain problems and their effects on the Company's manufacturing operations allegedly undermined Plug's stated revenue target for 2022.  ¶¶ 136, 160, 175, 193.  But there are no factual allegations that any defendant knew Plug's revenue goal to be *false* on that basis, much less allegations supporting a strong inference of such knowledge.

For these contentions, plaintiffs rely primarily on confidential witness allegations.  The Court must evaluate these witnesses' claimed "basis of knowledge, the reliability of the sources," and the "coherence and plausibility of the allegations[.]"  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  "If anonymous source allegations are found wanting with respect to these criteria, then [courts] must discount them steeply . . . consistent with *Tellabs*'s teaching that 'omissions and ambiguities count against inferring scienter' under the PSLRA's particularity requirements.  *Avaya*, 564 F.3d 242, 263 (3d Cir. 2009) (citing *Tellabs*, 551 U.S. at 310).  The anonymous source allegations in the complaint here must be steeply discounted.

Almost none of the CWs allegedly interacted with the individual defendants, and none in connection with the preparation or revision of the Company's 2022 revenue goal.  The complaint alleges that CW7 "was aware that supply chain issues were communicated to [d]efendant Marsh," ¶ 53, but that allegation must be steeply discounted given the lack of any alleged interaction directly with Mr. Marsh.  *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *18 (D.N.J. Sept. 15, 2021); *see Woolgar*, 477 F. Supp. 3d at 220 (allegations insufficient where majority of CWs had no direct contact with individual defendants and did not "know what information they possessed.").  Similarly inadequate are plaintiffs' allegations that "challenges in obtaining needed supplies for the manufacturing process" were "common knowledge," ¶ 99, and were reported up the "chain of command," ¶ 121.  *Intelligroup*, 527 F.

26

Supp. 2d at 360-61; *see Chubb Corp.*, 394 F.3d at 155 (discounting unsupported allegations of supposed common knowledge as "speculation").

CW5 allegedly said "supply chain issues" were discussed on calls with Mr. Mindnich and that, in summer 2022, the Company suffered from constant shortages. ¶ 97 (alleging supply chain challenges for Latham fuel cell production); *see* ¶¶ 98, 268-70 (allegations from CW5 and others regarding electrolyzer manufacturing delays due to component shortages). However, the complaint does not say these alleged shortages had an impact on the Company's ability to meet its 2022 revenue target or that the challenges were any worse than 2020 and 2021, when the Company exceeded its annual gross billing goals.[12] The allegation does not support any plausible inference that defendants knew the Company's revenue goal for 2022 was false. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997); *Avaya*, 564 F.3d at 275 (meeting or exceeding expectations in prior periods undermine inference of scienter for revenue targets).

CW6 also allegedly "attended daily supply chain meetings with" Mr. Mindnich but offered no information about what supposedly was discussed. ¶ 52. Daily meetings are unsurprising: the complaint asserts Mr. Mindnich was hired ***based on*** his experience managing supply chain issues, which Plug acknowledged it was facing. ¶ 135. Far from supporting an inference of fraud, allegations that he was involved in calls and meetings about the supply chain and manufacturing challenges demonstrates "a pursuit of truth rather than reckless indifference to the truth," which is "a very great distance from . . . intent to deceive." *Higginbotham*, 495 F.3d at 758; *see In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 904 (N.D. Ohio 2006) (no scienter where defendants "acted diligently in remedying problems").

---

[12] During this period, Plug had non-cash charges related to vesting of warrants held by third parties that were recorded as a reduction to revenue under GAAP which made projecting revenue impossible. *See* Ex. 6 at 56.

As for CW12, they supposedly attended meetings where Mr. Marsh "provided updates on the status of the Company's projects," but there are no allegations that Mr. Marsh said or heard anything that conflicted with any challenged public statement in those meetings. ¶ 58. All of these allegations suffer from the additional problem that plaintiffs do not allege "the particular dates on which the relevant information was acquired." *Synchronoss*, 705 F. Supp. 2d at 401; *see Woolgar*, 477 F. Supp. 3d at 220-21 (discounting similar vague, undated allegations).

Nor can any inference of scienter be drawn from allegations attributed to CW5 that sometime "in the summer of 2022," they began to see downward adjustments to a production plan for fuel cell units for 2022 and 2023 "due to supply chain issues and customer order 'push outs.'" ¶ 124-25. It is unclear from these allegations whether the alleged production plan included both of the Company's fuel cell manufacturing facilities or only the new facility in Slingerlands. *Id.* According to CW5, at some unidentified time, Mr. Mindnich and another senior manager "saw the Production Plans." ¶ 125. But the complaint acknowledges that Plug updated its 2022 revenue goal on October 14, 2022 and "attributed this revised guidance to 'some larger projects potentially being completed in 2023 instead of 2022 due to timing and broader supply chain issues,'" ¶ 199, the same factors allegedly mentioned by CW5. The "production plan" allegations do not show any conflict with the challenged statements, much less "actual knowledge" by any of the defendants that the statements were false. *See Avaya*, 564 F.3d at 274; *Globus Medical*, 869 F.3d at 246; *Tesla, Inc.*, 985 F.3d at 1185-90.

More generally, allegations that some customers delayed or cancelled orders also do not support any inference of fraudulent intent. *See* ¶¶ 114-22. Even putting aside the failure to plead facts about the timing of those developments, nothing in the complaint suggests they were different from the business challenges that led Plug to reduce its 2022 revenue goal in the press release

28

issued on October 14, 2022. *See Globus Medical*, 869 F.3d at 246 ("knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false" and "does not mean that [the company] failed to account for this drop in its projections"); *Avaya*, 564 F.3d at 274 (plaintiffs' "failure to identify the precise means by which [defendants] would have learned of the" alleged issue was "determinative" in finding no scienter for forward-looking statements) (collecting cases). The Company's strong reported revenues for the first two quarters of 2022 also "fatally weaken any inference of scienter" for statements concerning the revenue goal through August 9, 2022. *Id.* at 275 (no liability for future revenue targets made prior to and "on the same day as the release of [quarterly] results, which . . . were 'in line with, or better than, analysts' expectations'").

### 2.    Challenged Statements Concerning Future Hydrogen Capacity.

Plaintiffs' failure to plead a strong inference of actual knowledge of falsity for statements concerning the Company's hydrogen production capacity by the end of 2022 is equally apparent. (This also applies to challenged statements concerning the effect of future hydrogen production on the Company's gross margins, which would not be seen before 2023 in any event. ¶ 150.) For those allegations, the complaint relies on allegations attributed to CW1, CW2, and CW3. But CW1 has *disavowed* the allegations attributed to them, and none of those CWs offered facts that would support a strong inference of fraudulent intent in any event.

The complaint alleges that "Witness 1" claimed schedules for new hydrogen facilities were "hilariously off," and that they "made it known to senior management that Plug's projections for hydrogen production were unattainable[.]" ¶¶ 7(b), 46, 84, 140, 153, 179, 188, 258  In reality, however, those were just "Witness 1's" "own opinion" and were "not said to anyone in particular." Disavowal Letter at 2.  The complaint further alleges that, according to "Witness 1," the Company's hydrogen plants were "three years out of service," ¶¶ 7(b), 84, 140, 153, 179, 188,

29

258, which they "told Defendant Marsh" in a meeting, ¶ 84. In reality, however, that was only their "opinion," and "Witness 1" does not know whether Mr. Marsh ever "received this information." Disavowal Letter at 2. But even if "Witness 1" had expressed these views to Mr. Marsh, there are no allegations that Mr. Marsh "shared" such a "gloomy view" about the Company's developing hydrogen plants, and there can be no inference of scienter based on these allegations. *Tesla, Inc.*, 985 F.3d at 1194.

The complaint alleges that CW2 "interacted extensively with [Mr.] Shrestha," ¶ 48, and "had some interaction with [Mr.] Middleton," ¶ 73. But there is no allegation that CW2 ever told either of those defendants anything related to the Company's goals for year-end hydrogen capacity, much less information that conflicted with challenged public statements about those goals or the Company's margins in the future when it would be producing more hydrogen. Nor is there any allegation that any defendant agreed with CW2's negative assessment. *Tesla, Inc.*, 985 F.3d at 1194. General allegations that "senior management knew" information, ¶ 85, or that unnamed project managers "would review schedules with senior management," ¶ 76, are insufficient. *Chubb Corp.*, 394 F.3d at 155; *In re Intelligroup*, 527 F. Supp. 2d at 360–61 (refusing to credit conclusory allegations of supposed common knowledge). CW2's assertions also are inconsistent and not credible. CW2 states that there was one electrolyzer at the Georgia facility when CW2 left Plug but also that the five electrolyzers there had to be replaced; CW2 alternately states that the Georgia facility had "not received its first electrolyzer by February 2022" and that the "stacks . . . arrived[d] at the site [in] April 2021." *Compare* ¶¶ 78 *and* 90.[13]

---

[13] The complaint alleges that in "April or early May 2021," eight months before the alleged class period began, CW2 told Mr. Marsh that Plug's *prior year* hydrogen production "schedules were not realistic." ¶ 259. Even if that allegation were credited, a meeting "months before the class period began, as well as before the executives' public disclosures," is irrelevant. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1240 (10th Cir. 2016).

30

As for CW3, the complaint alleges that a "master deficiency list" indicated that a "May 2022 completion date" for the Georgia hydrogen plant "was not going to be met." ¶¶ 263-64. But there is no allegation the Company ever said the Georgia plant would be completed by May 2022, and to the extent plaintiffs suggest the facility was behind schedule based on these allegations they are "wholly conclusory and lack data to support" them. *Chubb Corp.*, 394 F.3d at 147 (refusing to credit internal memorandum describing alleged business "failure"); *see Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient"). There are no allegations that any defendant knew of the "master deficiency list" or that, even if known, its contents would have rendered knowingly false the Company's forecasts for hydrogen production. *Spirit Aerosystems*, 827 F.3d at 1240; *Avaya*, 564 F.3d at 274; *Globus Medical*, 869 F.3d at 246.

Finally, plaintiffs' allegations that certain employees resigned in response to the refusal by "senior management" to accept realistic schedules does not support any plausible inference of fraud, much less a strong one. ¶¶ 91-93. "Witness 1," one of the employees alleged to have quit in protest, expressly disavowed that allegation and told plaintiffs' counsel they left the Company "for another job" ***after being promoted two weeks earlier***. Disavowal Letter at 2, 3. That post-complaint information casts grave doubt on other allegations about employees quitting in protest.

But even if credited, those allegations do not support a plausible inference of fraud, much less the required "strong" one. A company is permitted to push employees to meet difficult objectives, even when employees think they cannot be met. *Tesla, Inc.*, 985 F.3d at 1186 (affirming dismissal despite allegation that one employee claiming production goals were "unattainable" was told to "look for new employment" and another was "forc[ed] [] out"); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017)

31

("creat[ing] a pressurized environment to meet sales goals" is not securities fraud); *see Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at \*14 (D. Ariz. Feb. 7, 2023) (similar); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 685 n.31 (N.D. Tex. 2017) (dismissing claims where "[e]xecutive defendants set 'unrealistic' and 'totally unattainable' sales goals . . . [d]espite repeated push-back from" employees).

### 3.  Plaintiff Does Not Allege Conscious Misbehavior or Recklessness.

To the extent any challenged statements are not forward-looking, the complaint does not plead circumstantial evidence of conscious misbehavior or recklessness.  Recklessness for this purpose is more than "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42.  Allegations of "corporate mismanagement" do not suffice.  *Id.*

Read most charitably, the complaint offers no more than "general reports of delay and mismanagement," and it does not offer facts that would connect those matters to the individual defendants or any challenged statements. *Spirit Aerosystems*, 827 F.3d at 1243.  Such allegations cannot support the inference that "executives *must have long known*" about undisclosed issues with supply chain, manufacturing operations, or similar problems. *Id.* (emphasis added).

The Company's frequent updates on the relevant issues also factor strongly against any inference of scienter. *See Winer Family Tr.*, 503 F.3d at 332 (given pattern of updates, "most plausible inference" was that company revised estimates in response to new information and timely disclosed revised estimates).  With respect to the 2022 revenue goal, the complaint acknowledges that, weeks before its Q3 2022 financials were due, Plug publicly lowered its revenue target by 5-10% based on recent developments. ¶ 199.  It did the same soon after the end of Q4 2022, reducing on January 25, 2023 its forecast to ~45-50% more than 2021 revenue. ¶¶ 227-28.  Those updates,

before disclosures were required, significantly weaken any assertion that the defendants were lying or "behaved recklessly." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).

The Company similarly updated disclosures about its anticipated production rate at the Rochester gigafactory. In May 2022, the Company said it expected the facility to reach a run rate of 2.5 gigawatts in electrolyzer stacks per year by the second half of 2022. ¶ 171. In August, it reduced that expectation to 100 megawatts per month by October. Exh. 10 at 11. In November, it said that production rate would not be reached before 2023. Exh. 15 at 19. These updates about the effect of "delays . . . militate against an inference of scienter." *Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at *19 (E.D.N.C. Mar. 22, 2013); *see Gaines v. Guidant Corp.*, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004) (disclosure of negative information "substantially undercut an inference that Defendants were . . . attempting to mislead the investing public"). Further, Plug invited securities analysts to a symposium and tour at the Rochester factory in October 2022, further defeating any inference that the defendants had anything to hide.

Finally, the Company provided regular updates about its development of hydrogen production capacity, adjusting its target from 70 tons per day of liquid hydrogen by the end of 2022, ¶¶ 137-39, to 70 tons per day of liquid and gaseous hydrogen by year-end in August, ¶¶ 185-86, to 45-50 tons per day of liquid and gaseous hydrogen by year-end during the October symposium, Exh. 15 at 19; *see* ¶ 203. These updates also are inconsistent with any inference of fraud. *New York State Teachers' Ret. Sys. v. Fremont*, 2009 WL 3112574, at *14 (C.D. Cal. Sep. 25, 2009) ("[t]he public disclosure of the company's problems and its efforts to address those problems (no matter how inadequate the efforts ultimately proved to be) weighs against a conclusion that [the defendants] knowingly or recklessly made misleading public statements").

33

### 4.   The "Core Operations Doctrine" Does Not Support Scienter.

Plaintiffs' conclusory assertion that the challenged statements "concerned Plug's core operations," ¶ 278, does not support an inference of scienter because there are no allegations "of specific information conveyed to management and related to the fraud." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018); *see Nat'l Jr. Baseball League*, 720 F. Supp. 2d at 556 (rejecting core operations doctrine given lack of "other individualized allegations"); *In re Amarin Corp. PLC., Sec. Litig.*, 2015 WL 3954190, at *12 (D.N.J. June 29, 2015) (same).

### 5.   The Complaint Does Not Plead Corporate Scienter.

Because plaintiffs do not "raise a strong inference of scienter" as to the individual defendants, they also have not pleaded a basis to infer scienter as to the Company. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011). Nor does the complaint set forth plausible allegations of fraud sufficient to invoke the doctrine of corporate scienter. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 (3d Cir. 2018) (rejecting corporate scienter where alleged "errors were [not] so obvious that only an attitude of reckless disregard" could have explained them).

## VI.   The Complaint Does Not Plead a Scheme to Defraud.

To the extent the complaint purports to assert a "scheme" claim under Rule 10b-5(a) and (c), ¶¶ 280-81, that claim should be dismissed because there is no support for it in any of plaintiffs' allegations. *See, e.g.*, *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). In addition, scheme claims require "something beyond misstatements and omissions," and there are no such allegations here. *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). The complaint also fails to allege scienter for the reasons already discussed. *See Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525-26 (6th Cir. 2023).

34

## VII.    The "Controlling Person" Claim Also Should Be Dismissed.

Because plaintiffs have not alleged a primary violation under section 10(b) of the Exchange Act, the "controlling person" claims against the individual defendants also should be dismissed. *Globus Medical*, 869 F.3d at 246.

## CONCLUSION

The Court should dismiss all claims asserted in the complaint against all of the defendants. In the alternative, the Court should strike allegations attributable to "Witness 1" and order plaintiffs to file a new complaint that removes those allegations.

Dated: December 14, 2023                     Respectfully submitted:

                                             **DLA PIPER LLP (US)**

Of Counsel:

                                             By:   */s/ Ronald N. Brown, III*
John J. Clarke, Jr.*                                Ronald N. Brown, III (D.E. Bar No. 4831)
Richard Zelichov*                                   1201 North Market Street, Suite 2100
Yan Grinblat*                                       Wilmington, Delaware 19801
                                                    Tel.: (302) 468-5700
* Admitted *pro hac vice*                           ronald.brown@dlapiper.com

                                             *Counsel for Defendant Plug Power Inc.*


                                             **RICHARDS, LAYTON, & FINGER P.A**


                                             By:   */s/ Rudolf Koch*
                                                    Rudolf Koch (Bar No. 4947)
                                                    koch@rlf.com
                                                    Jason J. Rawnsley (Bar No. 5379)
                                                    rawnsley@rlf.com
                                                    920 North King Street
                                                    Wilmington, Delaware 19801
                                                    Tel.: (302) 651-7700

                                             *Counsel for Defendants*
                                             *Andrew Marsh, Paul B. Middleton,*
                                             *David Mindnich, and Sanjay Shrestha*

35