**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE PLUG POWER INC. SECURITIES LITIGATION | C.A. No. 23-409 (JLH) CONSOLIDATED |

## LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AND TO STRIKE

<table>
<tr><td>

**ROBBINS GELLER RUDMAN & DOWD LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted pro hac vice)
Desiree Cummings (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
(212) 432-5100

</td><td>

**FRIEDLANDER & GORRIS, P.A.**
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE  19801
(302) 573-3500

</td></tr>
<tr><td>

*Lead Counsel for the Class*

</td><td>

*Liaison Counsel for the Class*

</td></tr>
</table>

Dated:  February 12, 2024

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

SUMMARY OF FACT ALLEGATIONS.....................................................................................2

I.      Plug Launched a Vertical Integration Plan in an Effort to Become Profitable...................2

II.     Defendants Dramatically Overstated Plug's Progress in Achieving Its Plan .....................3

        A.      Defendants' Statements Concerning Plug's Hydrogen Production
                Status and Projections Were False and Misleading ................................................3

        B.      Plug's Manufacturing Plants and Material Handling Business Suffered
                Serious, Undisclosed Problems...............................................................................5

        C.      Internally, Plug Knew Its 2022 Revenue Guidance Was Unrealistic .....................6

III.    Investors Suffered Massive Losses When the Truth Was Revealed....................................7

ARGUMENT.................................................................................................................................7

I.      Defendants' False and Misleading Statements of Purportedly Existing Fact.....................7

II.     Defendants' Projections Were Materially False and Misleading .....................................12

        A.      Defendants' False and Misleading Hydrogen Production Projections ..................12

        B.      Defendants' False and Misleading Revenue Projections......................................14

        C.      Safe Harbor Does Not Shelter the False and Misleading Projections ..................16

                1.      No Meaningful Cautions on or before January 19, 2022...........................17

                2.      Plug's Purported Cautionary Language Was Not Meaningful ..................17

        D.      Defendants' Projections Are Not Inactionable Opinion Statements......................21

        E.      Defendants' Misstatements Are Not Inactionable Puffery ...................................22

III.    The Complaint Alleges a Strong Inference of Defendants' Scienter...............................23

        A.      Defendants Knew Information that Contradicted Their Statements.......................24

        B.      The Complaint's Witness Allegations Are Reliable and Compelling ...................28

        C.      The Complaint Establishes a Strong Inference of Plug's Scienter .......................30

**Page**

IV.    Scheme Liability Is Properly Pleaded..................................................................................31

V.    Control Person Liability Is Properly Pleaded .......................................................................31

VI.    Defendants' "Puzzle Pleading" Suggestion Is Inapplicable ...............................................31

VII.    Allegations Attributed to Witness 1 Are Properly Considered on this Motion .................32

VIII.    The PSLRA Does Not Require Republication of Notice....................................................33

CONCLUSION...............................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................... *passim*

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)...................................................................................10, 29

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ........................................................................30

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523
(D.N.J. July 31, 2019)..................................................................................................29

*Christian v. BT Grp. PLC*,
2017 WL 3705804
(D.N.J. Aug. 28, 2017)..................................................................................................12

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)..........................................................................................22

*City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*,
2008 WL 4058690
(E.D. Pa. Aug. 29, 2008)...............................................................................................19

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
2011 WL 2650717
(W.D. Mich. July 6, 2011) .............................................................................................32

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755
(S.D.N.Y. Mar. 25, 2013) ..................................................................................22, 23, 28

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
442 F. App'x 672 (3d Cir. 2011) ..................................................................................31

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ..........................................................................................21

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)...........................................................................10

**Page**

*Curran v. Freshpet, Inc.*,
2018 WL 394878
(D.N.J. Jan. 9, 2018) ...................................................................................................19

*Dep't of Treasury of the State of N.J. v. Cliffs Nat'l Res., Inc.*,
2015 WL 6870110
(N.D. Ohio Nov. 6, 2015) ............................................................................................33

*Gaines v. Guidant Corp.*,
2004 WL 2538374
(S.D. Ind. Nov. 8, 2004)...............................................................................................28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ........................................................................................20

*Gorlamari v. Verrica Pharms., Inc.*,
2024 WL 150341
(E.D. Pa. Jan. 11, 2024) .........................................................................................23, 27

*Greenberg v. Bear Stearns & Co., Inc.*,
80 F. Supp. 2d 65 (E.D.N.Y. 2000) ..............................................................................34

*Halford v. AtriCure, Inc.*,
2010 WL 8973625
(S.D. Ohio Mar. 29, 2010) ...........................................................................................33

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019)............................................................................20

*Howard v. Liquidity Servs. Inc.*,
322 F.R.D. 103 (D.D.C. 2017)......................................................................................12

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543
(D. Del. Feb. 7, 2020) ......................................................................................12, 22, 26

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) ..............................................................................28

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)..........................................................................................23

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................................................20

**Page**

*In re AT&T Corp. Sec. Litig.*,
    2002 WL 31190863
    (D.N.J. Jan. 30, 2002) ................................................................................................16, 23

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)......................................................................................13, 23

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002).............................................................................................29

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2018 WL 3772675
    (D.N.J. Aug. 8, 2018)......................................................................................................33

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2020 WL 3026564
    (D.N.J. June 5, 2020) ......................................................................................................31

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
    2019 WL 1299673
    (D.N.J. Mar. 21, 2019)...............................................................................................27, 30

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065
    (D.N.J. Dec. 15, 2015) ...............................................................................................18, 19

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020)........................................................................19, 24

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ...........................................................................................20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).............................................................................................12

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018)...........................................................................................31

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223
    (D.N.J. Apr. 27, 2017) ...................................................................................................30

**Page**

*In re Horsehead Holding Corp. Sec. Litig.*,
  2018 WL 4838234
  (D. Del. Oct. 4, 2018), *adopted*, 2019 WL 1409454
  (D. Del. Mar. 28, 2019)..................................................................................................19, 27

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128
  (E.D. Pa. Mar. 25, 2020)...........................................................................................17, 18, 26

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794
  (C.D. Cal. May 23, 2008) ....................................................................................................35

*In re Intelligroup Securities Litigation*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ....................................................................................10

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ..........................................................................................20

*In re Marriott Int'l, Inc.*,
  31 F.4th 898 (4th Cir. 2022) ...............................................................................................20

*In re Measurement Specialties, Inc.*,
  2003 WL 27398420
  (D.N.J. Sept. 29, 2003) .......................................................................................................25

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)................................................................................................24

*In re Millennial Media, Inc. Sec. Litig.*,
  2015 WL 3443918
  (S.D.N.Y. May 29, 2015).....................................................................................................33

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371
  (W.D. Pa. May 18, 2023)......................................................................................................30

*In re Par Pharm. Sec. Litig.*,
  2009 WL 3234273
  (D.N.J. Sept. 30, 2009) ......................................................................................................33

*In re Rite Aid Corp. Sec. Litig.*,
  1999 WL 34807713
  (E.D. Pa. Dec. 21, 1999)......................................................................................................35

**Page**

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341
  (S.D.N.Y. Apr. 22, 2016) ........................................................................................19

*In re Sandridge Energy, Inc. Sec. Litig.*,
  2015 WL 3652526
  (W.D. Okla. May 11, 2015) ................................................................................34, 35

*In re Select Comfort Corp. Sec. Litig.*,
  2000 WL 36097395
  (D. Minn. May 12, 2000) .......................................................................................34

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ...................................................................30

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  629 F. Supp. 2d 1233 (D.N.M. 2009) ...................................................................35

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882
  (D.N.J. Dec. 6, 2018) ............................................................................................29

*In re Tyco Int'l, Ltd.*,
  2004 WL 2348315
  (D.N.H. Oct. 14, 2004) ..........................................................................................32

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) .........................................................14, 27, 29

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. Aug. 11, 2022) .............................................10, 14, 19

*Inst. Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ............................................................................. *passim*

*Ito-Stone v. DBV Techs. S.A.*,
  2020 WL 6580776
  (D.N.J. Nov. 9, 2020) ..........................................................................................34, 35

*Lewakowski v. Aquestive Therapeutics, Inc.*,
  2023 WL 2496504
  (D.N.J. Mar. 14, 2023) ..........................................................................................23

**Page**

*Li v. Aeterna Zentaris, Inc.*,
  2016 WL 3583821
  (D.N.J. June 30, 2016) ................................................................................................30

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675
  (D. Del. June 14, 2011)..........................................................................................19, 26

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  2017 WL 3891676
  (D. Del. Sept. 6, 2017) ................................................................................................32

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)............................................................................29

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ......................................................................................18

*Marsden v. Select Med. Corp.*,
  2006 WL 891445
  (E.D. Pa. Apr. 6, 2006), *vacated in part on other grounds*, 2007 WL 518556
  (E.D. Pa. Feb. 12, 2007)..............................................................................................10

*Moshell v. Sasol Ltd.*,
  2021 WL 3174414
  (S.D.N.Y. Jul. 24, 2021) .............................................................................................33

*N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*,
  2009 WL 3112574
  (C.D. Cal. Sept. 25, 2009)...........................................................................................28

*Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*,
  2018 WL 6137169
  (C.D. Cal. Aug. 29, 2018)............................................................................................28

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)........................................................................................18

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) .......................................................................................29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................21, 22

**Page**

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
  2023 WL 1800963
  (D. Ariz. Feb. 7, 2023) ......................................................................................30

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021) ............................................................14, 22, 23

*Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*,
  2013 WL 1192004
  (E.D.N.C. Mar. 22, 2013) ..................................................................................28

*Ravens v. Republic N.Y. Corp.*,
  2002 WL 1969651
  (E.D. Pa. Apr. 24, 2002) ....................................................................................28

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) .............................................................................20

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229
  (D.N.J. July 27, 2018)................................................................................11, 23, 27

*S.E.C. v. Desai*,
  145 F. Supp. 3d 329 (D.N.J. 2015) ....................................................................25

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) .................................................................19

*SEC v. Razmilovic*,
  822 F. Supp. 2d 234 (E.D.N.Y. 2011), *aff'd in rel. part*,
  738 F.3d 14 (2d Cir. 2013)................................................................................12

*Selbst v. McDonald's Corp.*,
  2005 WL 2319936
  (N.D. Ill. Sept. 21, 2005) ...................................................................................26

*Steamship Trade Ass'n of Balt. v. Olo, Inc.*,
  2023 WL 8287681
  (S.D.N.Y. Nov. 30, 2023) ...................................................................................10

*Sun v. Han*,
  2015 WL 9304542
  (D.N.J. Dec. 21, 2015) .......................................................................................30

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................23, 24

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017) ...................................................................30

*Union Asset Mgmt. Holding AG v. Sandisk LLC*,
    227 F. Supp. 3d 1098 (N.D. Cal. 2017) .................................................................33

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    2013 WL 2247394
    (C.D. Cal. May 9, 2013) .........................................................................................34

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).............................................................................14, 18

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)....................................................................................28

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ..........................................................................20, 30

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)....................................................................14

*Yoshikawa v. Exxon Mobil Corp.*,
    2023 WL 5489054
    (N.D. Tex. Aug. 24, 2023) ......................................................................................31

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)......................................................................................................................21
    §78t(a)......................................................................................................................31
    §78u-4(a)(3)(A)........................................................................................................34
    §78u-5 .....................................................................................................................16
    §78u-5(c)(1) ............................................................................................................16

Federal Rules of Civil Procedure
    Rule 12(f)................................................................................................................32

**Page**

17 C.F.R.
    §240.10b-5(a) ........................................................................................................31
    §240.10b-5(c)........................................................................................................31

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
    Pub. L. No. 104-67, 109 Stat. 737 (1995)................................................................34

**PRELIMINARY STATEMENT**

Plug Power Inc. ("Plug") and its most senior executives (together, "Defendants") misled Plug's investors about the company's existing operations and near-term prospects. Throughout the January 19, 2022 to March 1, 2023 class period (the "Class Period"), Defendants touted Plug's purported accomplishments in hydrogen production and electrolyzer and fuel cell manufacturing—the core of Plug's business. Defendants also repeatedly claimed that Plug would reach 70 tons per day of liquid hydrogen production by the end of 2022 and $900-925 million in revenue for 2022, and emphasized the significance of these projections to Plug's business strategy. But as *seventeen* well-placed witnesses have made clear, Defendants' assertions had no basis in reality. Plug's hydrogen production and manufacturing plants had not reached the milestones that Defendants asserted. Delays, cost overruns, and other critical problems meant that Plug had no ability to produce any material quantity of liquid hydrogen in 2022—or even in 2023. And Plug acknowledged internally that its 2022 revenue would be far lower than its public projections. Defendants knew the truth when they were misleading investors, and Defendants were fully informed about Plug's pervasive deficiencies. According to witnesses, Defendants put Plug's project managers in an "impossible situation" by touting production schedules that those project managers had internally made clear were unrealistic. Multiple employees resigned in protest.

Defendants do not challenge the materiality of the misrepresentations and omissions detailed in the Complaint.[1] Nor do Defendants challenge the elements of loss causation or damages. Thus, for pleading purposes, it is undisputed that there were material facts, unknown to

---

[1] The "Complaint" and "¶" refer to the Amended Class Action Complaint (D.I. 45). "MTD" refers to the Opening Brief in Support of Defendants' Motion to Dismiss and to Strike (D.I. 57). "MTD Ex." refers to exhibits filed in support of Defendants' motion (D.I. 58). All emphasis is added and internal quotation marks are omitted unless otherwise specified. All capitalized terms not defined herein have the same meanings ascribed to them in the Complaint.

the public, that caused massive investor losses once they were revealed. These material facts also fatally undermine the principal arguments Defendants advance in their motion. In light of the adverse, then-existing, material facts that Defendants misrepresented and misleadingly omitted, Plug's purported cautionary language was overly general and itself misleading, and insufficient to invoke the safe harbor for forward-looking statements. For similar reasons, Defendants' attempt to characterize their misleading statements as inactionable opinions fails. Because the true facts were well-known to Plug's executives—to the point that employees resigned in protest when internal warnings were not heeded—Defendants' scienter arguments have no purchase. And Defendants have little to say about their non-opinion, non-forward-looking statements concerning Plug's existing operations, which materially misled investors as well.

Defendants resort to distractions, seeking a new lead plaintiff by requesting a wholly unnecessary additional notice to class members, and baselessly asking the Court to strike allegations attributed to Witness 1 that should, instead, be fully credited at the pleading stage. The particularized allegations, including witness statements that strongly corroborate each other, make clear that Defendants knowingly and materially misled investors when describing Plug's supposed progress and near-term projections. This case should therefore proceed to discovery.

<strong>SUMMARY OF FACT ALLEGATIONS</strong>

**I.      Plug Launched a Vertical Integration Plan in an Effort to Become Profitable**

Plug is a hydrogen energy company with three primary operations: (1) manufacturing hydrogen fuel cells (which convert hydrogen fuel into energy) for use in material handling vehicles (*e.g.*, forklifts); (2) selling hydrogen fuel to its fuel cell customers; and (3) manufacturing electrolyzers (which generate hydrogen). ¶¶28-31. Plug derives most of its revenues from selling hydrogen fuel cells. ¶¶32, 36. Because Plug did not *produce* liquid hydrogen, it was forced to purchase hydrogen at high prices from others and resell it to customers at a loss. ¶¶30, 36, 65-71.

- 2 -

Desperate to end years of losses, in 2019 Plug announced a vertical integration plan which would involve producing its own liquid hydrogen, manufacturing electrolyzers, and increasing fuel cell manufacturing. ¶¶30, 37-38. As part of this initiative, Plug announced plans to open a "gigafactory" in Rochester, New York that would increase its manufacturing capabilities. ¶38. Plug also announced plans to construct a green hydrogen production plant in Georgia to generate both gaseous and easier-to-transport liquid hydrogen using Plug's own electrolyzers, followed by additional hydrogen plants. ¶¶33, 38-40. Plug told investors that ramping up its liquid hydrogen production and manufacturing were key to making Plug profitable. *E.g.*, ¶¶41, 133-134, 139.

## II.      Defendants Dramatically Overstated Plug's Progress in Achieving Its Plan

During the Class Period, Defendants issued lofty revenue and hydrogen production projections, touted Plug's supposed progress towards meeting them, and trumpeted Plug's manufacturing capabilities. The accounts of 17 former Plug employees reveal that these public statements were materially misleading, as Plug's revenue and hydrogen production targets lacked a reasonable basis, and its operations were marred by significant, undisclosed setbacks.

### A.      Defendants' Statements Concerning Plug's Hydrogen Production
### Status and Projections Were False and Misleading

From January through August 2022, Defendants repeatedly told investors that Plug would generate "70 tons a day" of liquid hydrogen, or green hydrogen generally, by year end 2022, ¶¶137, 139, 143, 146-151, 176, 177, 185-187, and that this hydrogen production would yield significantly improved profit margins in 2022 and future years. ¶¶141, 150-152, 170, 176-178, 181, 194, 218. In addition, Defendants affirmed that the construction of Plug's hydrogen generation plants was already "on a good pace" to achieve this goal. ¶138; *see also* ¶¶146, 148, 185-186. For example, Defendants claimed on January 19 and March 1, 2022 that Plug's critical Georgia liquid hydrogen facility was "under construction." ¶¶138, 148. Plug also described as merely hypothetical the risk

- 3 -

that it would be unable to successfully and timely execute its hydrogen production projects. ¶164.

These statements were materially false and misleading. Later disclosures—including a Plug press release issued just weeks ago, *see infra* n.2—make clear that Plug's Georgia liquid hydrogen plant was not, in fact, under construction in January or March 2022, as Defendants asserted. ¶¶154, 243, 245. Moreover, in reality, Plug had no ability to produce any material amount of liquid hydrogen at its facilities in 2022. ¶¶30, 64, 66-67, 72-87, 245. Witness accounts make clear that *all* of Plug's hydrogen plants were beset by serious problems that made the 2022 production target unrealistic, including insufficient electrolyzer production; a lack of formal construction processes, causing constant plan changes and an inability to maintain budgets and timetables; budgets that assumed unachievable component discounts of 30-40%; assumptions that schedules could be accelerated even though the schedules prepared by Plug's project managers represented the "absolute shortest path"; and a lack of qualified employees. ¶¶72-83.

These facts were well-known to Plug's senior management. ¶¶84-93, 257-266. Witness 2 explained that Shrestha was regularly updated about these cost overruns and delays, and that Plug's Project Group told Shrestha that Plug's production target was unrealistic. ¶¶85, 91. Witness 3 tracked construction deficiencies, and recalled a "strong awareness" that the May 2022 projected completion date for the gaseous hydrogen component of the Georgia plant was unattainable. ¶86. Witness 2 explained that Witness 1 gave senior management the most realistic hydrogen production schedule, which did not support Plug's projections. ¶91. The next day, Shrestha and Marsh disregarded that warning and publicly stated that Plug would meet its hydrogen projection. *Id.* According to Witness 2, Witness 1 left Plug due to her disagreements with Plug's public statements, and told Witness 2 she was "not going to jail for anybody." *Id.* Witness 3 recounted Witness 1 saying that Witness 1 was leaving Plug because executives were "bullying" her to sign

off on unrealistic completion dates. ¶92. Witness 2 similarly left Plug because she was put in an "impossible situation" when senior management disregarded evidence she and others provided showing that Plug's targets were not attainable. ¶93. Defendants' statements were so far from reality that, in fact, Plug was unable to produce *any* liquid hydrogen at its initial Georgia plant by August *2023*, ¶245, or indeed any time in 2023.[2]

Rather than disclose the truth about Plug's hydrogen production plants, Defendants actively worked to conceal it. Witness 2 explained that because Plug could not obtain necessary electrolyzers and the plants were so far behind schedule, Plug constructed empty frames, without the electrolyzers, just "to show progress." ¶88. Additionally, Plug deemed the gaseous hydrogen portion of its Georgia plant "operational" and publicly described it as in-service after simply turning on the electrolyzer and transformer that powered the plant, registering changing numbers on the transformer's display panel, and then immediately shutting off power, even though Plug did not produce any measurable amount of hydrogen through this process. ¶¶89-90, 185, 189.

### B.    Plug's Manufacturing Plants and Material Handling Business Suffered Serious, Undisclosed Problems

Defendants also claimed that Plug was successfully scaling fuel cell and electrolyzer manufacturing. For example, on August 9, 2022, Defendants highlighted supposed progress at two key factories, claiming that "[m]anufacturing buildout continues with gigafactory ramp on track," and that Plug's Slingerlands, New York factory was "starting GenDrive [fuel cell] assembly in the fall." ¶190; *see also* ¶¶133-134, 157-159, 171, 173-174, 191-192, 208-210, 218. The same day, Defendants downplayed supply chain issues, claiming they had become "less intense." ¶192; *see also* ¶¶135, 167, 176, 210. Marsh also touted Plug's "manufacturing capability" and "know how,"

---

[2] Plug did not announce the start of liquid hydrogen production at its Georgia plant until January 23, 2024 (*see* Ex. A to Lead Plaintiffs' Request for Judicial Notice filed herewith).

¶174, and Plug described manufacturing difficulties as a mere hypothetical risk. ¶167.

These statements were materially misleading. In fact, Plug's manufacturing operations suffered major undisclosed setbacks throughout the Class Period. Numerous witnesses described Plug's debilitating supply chain deficiencies, leading to constant parts shortages. ¶¶95-100, 104-105. As a result, Plug had to ship unfinished products to customers, warehouse unfinished units, use makeshift parts, shut down production lines, and pay millions in air freight charges to secure some necessary components. ¶¶101-106. Compounding these issues, Plug had poor inventory control, leading it to over-order parts, many of which were incorrect. ¶¶107-108. As a result, Plug's manufacturing capacity was hamstrung, and it was unable to achieve its financial targets. For example, Plug's Rochester gigafactory and Slingerlands facility were significantly delayed, ¶¶109-113, 124, rendering Defendants' representations touting gigafactory production, ¶¶157-158, and purported progress at Slingerlands, ¶209, highly misleading.

Plug's material handling business also suffered significant undisclosed problems. ¶¶115-122. Witnesses recounted that critical "pedestal" customers Defendants misleadingly touted, ¶¶31, 212, grew increasingly dissatisfied with Plug, and pushed out contracts and scaled back orders as a result. For example, Witnesses 14, 15, and 16 recalled that Plug struggled to keep its fuel cells sufficiently operational, resulting in penalties for equipment downtime and leading customers to postpone or scale back orders, curtailing Plug's revenue. ¶¶116-120. These issues were known internally and discussed in "town hall" meetings with senior management. ¶¶121-122, 273.

### C. Internally, Plug Knew Its 2022 Revenue Guidance Was Unrealistic

Defendants repeatedly reaffirmed Plug's 2022 revenue projection of $900-925 million. ¶¶131, 132, 143, 148, 156, 170, 172, 190. In reality, Plug's undisclosed manufacturing and materials handling problems severely undermined its ability to generate revenue *in 2022*. ¶127 (*contra* MTD at 27). Per Witness 5, in 2Q2022, Plug reduced its *internal* projection for 2022

production of GenDrive fuel cell units, Plug's primary revenue source, from 15,000-16,000 to just over 10,000 due to customer push-outs and supply chain issues, slashing Plug's revenue. ¶¶125-126, 238. Further, because Plug could not produce liquid hydrogen in 2022, it had to supply customers with costly liquid hydrogen sourced from third parties, crushing its revenues and margins. ¶¶65-71. Moreover, Witness 17 explained that in late-August to late-September 2022, Marsh announced internally that Plug was behind on its $900 million target, and *at that time*, Plug projected ending 2022 with ~$700 million in revenue. ¶128.

### III.     Investors Suffered Massive Losses When the Truth Was Revealed

The truth began to be revealed on October 14, 2022, when Plug announced that its 2022 revenue could be 5-10% below its guidance (*i.e.*, $810-880 million, still above the $700 million Marsh acknowledged internally). ¶199. On October 19, 2022, Plug slashed its year-end 2022 hydrogen target of 70 tons per day to a still-unrealistic 50 tons. ¶¶72, 203. Further revelations took place on November 8, 2022 (when Marsh also reaffirmed the misleading $810-880 million revenue figure, ¶218), and January 25, 2023. ¶¶213-214, 227. Finally, on March 1, 2023, Plug announced 2022 revenue of only $701.4 million, matching the internal projection Defendants had concealed, along with delays in building hydrogen production plants, significantly worse gross margins, and GenDrive fuel cell revenue declines. ¶¶234-238. Plug's stock price plunged in response to each of these disclosures. ¶¶201, 207, 217, 233, 242. Analysts were taken aback, with one writing that Plug's failure to "deliver[] on its promises" had shattered "investors' confidence[.]" ¶¶239-241.

**ARGUMENT**

### I.     Defendants' False and Misleading Statements of Purportedly Existing Fact

Defendants made numerous statements about Plug's then-existing operations that were materially false and misleading. None of these statements is forward-looking for safe harbor purposes, even if made in conjunction with forward-looking statements. *See Inst. Invs. Grp. v.*

- 7 -

*Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). Defendants' attempts to support these statements fail and, at most, raise fact issues that cannot yet be resolved.

First, on March 1, 2022, Defendants falsely asserted that Plug's Georgia site was "under construction for a 15 TPD [tons per day] liquid plant." ¶148. As Defendants acknowledge, this statement was not forward-looking. MTD at 22. Marsh's January 19, 2022 statement that Plug had a "site that's being constructed in Georgia" that "will be 15 tons, a little more by the end of the year," ¶138, is similarly non-forward-looking in asserting that the plant was "being constructed" at that time. Defendants do not and cannot dispute the materiality of these statements, as making progress at Plug's Georgia plant was critical to its efforts to begin much-needed liquid hydrogen production. ¶40. This is distinct from *Avaya*, 564 F.3d at 255, where the defendants "[did] not justify the . . . projections in terms of any particular aspect of the company's current situation[.]"

Defendants' claims that Plug's Georgia liquid hydrogen plant was under construction were false and misleading when made.  In addition to witness allegations that this facility was hopelessly delayed, *e.g.*, ¶78, multiple later admissions belie these statements. In a May 9, 2023 video, Plug stated that its Georgia liquid plant "is being completed in eleven months," meaning its construction could not have begun until eleven months prior (June 2022) at the earliest. ¶¶154, 243. Defendants do not dispute the blatant contradiction between this video and their earlier statements. Then, on August 9, 2023, Shrestha acknowledged that liquid hydrogen production had not begun at the Georgia plant, but indicated the "plant is still coming online in 12 months since we actually issued the [engineering, procurement, and construction, *i.e.* EPC] contract." ¶¶154, 245. Thus, that contract could not have been issued until August 2022 at the earliest—seven months after Defendants first represented the plant was under construction. Defendants respond that

- 8 -

"construction *could have* begun even if the EPC contract was not yet signed," MTD at 22, but Defendants are not entitled to a pleading-stage inference that construction (much less meaningful construction) began well before the construction contract was issued. And when Plug finally began liquid hydrogen production in Georgia in *January 2024* (Ex. A at 2; *see supra* n.2), Plug announced that the plant had been finished in "18 months," placing the start of construction in summer 2022.

Defendants note that Plug learned that faulty pipes had been installed "at the site 'in or around mid-May 2022,'" apparently to imply that construction at the Georgia liquid plant must have been underway. MTD at 22, quoting ¶86. But learning of faulty pipes in *mid-May 2022* does not suggest the plant was "under construction" as of *January 19 or March 1, 2022* as represented. Moreover, Defendants are playing games by referring generally to pipes "at the site." Plug installed the wrong pipes at the Pathfinder *gas* project that was supposed to be finished in May 2022—not the co-located *liquid* hydrogen project that was supposed to be finished by the end of 2022 and is the subject of this misrepresentation. ¶¶86, 189. For the same reason, Witness 2's statements are internally consistent: five electrolyzers arrived incomplete and had to be replaced at the *gas* project, while Plug had not received the first electrolyzer for the *liquid* project (which had only one "functioning" electrolyzer when Witness 2 left Plug in 4Q2022). ¶¶78, 90; *contra* MTD at 30.

Second, on August 9, 2022, Plug asserted that it had "2.5 TPD [tons per day] Green gaseous production online at Georgia facility." ¶185. Defendants acknowledge that this statement was not forward-looking, and do not challenge its materiality. MTD at 22. This statement was highly misleading because this facility was "online" in only the narrowest sense, and was not materially in production. Witness 3 stated that, in August 2022 or later, an inspector at the Georgia facility "informed her that the Company had turned on the electrolyzer and a transformer that powered the plant, and that the readings on the transformer's display panel changed numbers"; "explained that

- 9 -

the Company immediately shut off the power and concluded from this change on the display panel that hydrogen had been produced"; and "told her that based on this event, Plug deemed the Pathfinder project to be 'in service.'" ¶¶89, 189. Witness 2 also corroborated this account. ¶90.

Defendants focus on Witness 3's caveats that she did not have personal knowledge of the relationship between this event and Plug's public statements. MTD at 22. But courts credit witness statements, even if based on hearsay or indirect knowledge, when the complaint contains sufficient information to "support the probability that a person in the position occupied by the [witness] would possess the information alleged." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186-87 (D.N.J. Aug. 11, 2022) (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004)); *see also Steamship Trade Ass'n of Balt. v. Olo, Inc.*, 2023 WL 8287681, at *11 (S.D.N.Y. Nov. 30, 2023) (same).[3] Here, Witness 3 worked for Plug as a project engineer from 2Q2022 until 3Q2022; "worked on the Pathfinder project" at the Georgia plant; "reported to the Director of Execution, who reported to the Director of Project Management"; and "was responsible for identifying items that needed to be completed at the Pathfinder project in order to bring it online." ¶49. It is entirely reasonable that Witness 3 would have learned about the process by which Pathfinder purportedly entered service.

Third, Defendants' statements concerning Plug's then-existing manufacturing and materials handling operations were highly misleading and were not forward-looking. For example, on May 9, 2022, Marsh responded to a question about Plug's electrolyzer production as follows:

---

[3] *See also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (same); *Marsden v. Select Med. Corp.*, 2006 WL 891445, at *13 (E.D. Pa. Apr. 6, 2006) (same), *vacated in part on other grounds*, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007). By contrast, in *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007), the court did not credit a witness's vague allegation that it was "common knowledge" that the defendant was "always playing fast and loose with the numbers," and allegations dismissed as "speculation" in *Chubb*, 394 F.3d at 155, were "attributed to no source" at all. MTD at 22, 27.

> I think the second item that folks look at is that who can put all the parts together and actually support the build-out of the plant. . . . we have manufacturing capability, and we know how to make the products. That may seem basic. But the fact of the matter is, Plug has been doing this for a long time in one industry and the fact you actually know how to buy components, do drilling, build things make things that work, understand those issues uniquely qualify us.

¶174. Such "basic" manufacturing capability is exactly what Plug lacked, as numerous witnesses make plain (*see supra* at 5-6). Other misrepresentations also fall into this category. *See* ¶192 (supply chain issues were supposedly "less intense"); ¶208 ("[T]his is all a reality, as Andy [Marsh] says. We are actually putting things into production and we're putting them into high-volume production."); ¶210 (Plug has "been able to build the skill sets to build electrolyzer units" and has "the expertise that allows us to reduce the cost of the systems, as we built things at scale"). Likewise, Marsh misleadingly touted Plug's "pedestal customers" without disclosing major, then-existing issues in delivering and servicing fuel cells for those customers. ¶¶115-122, 212.

Fourth, Defendants made non-forward-looking misstatements that Plug's "gigafactory" had begun production in 2021, when it did not even begin meaningful electrolyzer production by the end of *2022*. On March 1, 2022, Plug asserted that it "has established itself as a global leader in the electrolyzer business in 2021. . . . The gigafactory in Rochester, N.Y. began production in the fourth quarter." ¶157. And Marsh responded to a question about gigafactory production: "Production ramp really starts heavy in early April . . . We have started making some electrolyzer stacks there." ¶158. But "[t]he law does not permit corporate executives to mislead investors through half-truths." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018). Witnesses 10, 12, and 17 detail the substantial, undisclosed delays and shortages at the gigafactory that rendered it "not operational." ¶¶110-113; *contra* MTD at 23. This is underscored, not contradicted, by Plug's October 19, 2022 symposium, when analysts were "underwhelm[ed]" by gigafactory production due to equipment shortages. ¶¶202, 206; *contra* MTD at 22-23, 33.

- 11 -

<u>Fifth</u>, Mindnich misled investors concerning the then-existing status of Plug's Slingerlands fuel cell factory (*contra* MTD at 23-24). On October 19, 2022, Mindnich asserted Plug had made "pretty staggering" progress in building the plant, had developed the capacity to manufacture fuel cells there "at high volume," and was "taking the right steps right now" to resolve supply chain issues. ¶¶209-210. In fact, Plug was facing pervasive supply chain problems, and per Witness 5, who worked directly with Mindnich, and Witness 10, who worked with one of Mindnich's direct reports, those problems, customer "push outs," and permitting issues were severely delaying Slingerlands construction, which Mindnich misleadingly omitted, and *no* GenDrive units were produced at Slingerlands until November 2022. ¶¶109, 124. The full scope of Plug's manufacturing shortfalls was only revealed via later disclosures. ¶¶213, 227-228, 234-238.[4]

## II.   Defendants' Projections Were Materially False and Misleading

### A.   Defendants' False and Misleading Hydrogen Production Projections

Defendants' repeated statements that Plug would produce 70 tons per day of hydrogen fuel by the end of 2022 were misleading when made, lacked a reasonable basis, and omitted existing facts, the materiality of which is not disputed. "Courts have found that projections lack a reasonable basis where defendants were aware of contradictory internal forecasts." *In re Advance*

---

[4] Defendants' contention that a statement cannot be misleading and partially corrective, MTD at 24 n.11, is wrong. For example, if a company first represents that its bank account contains $10 million, then $5 million, then admits the truth that it had always been empty, the middle ($5 million) disclosure would be both misleading and partially corrective. By contrast, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) rejected an in-and-out trader as class representative on loss causation grounds when there was *no* later corrective disclosure before the plaintiff sold his stock. *Flag Telecom* "was decided on its unique facts," *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 130 n.16 (D.D.C. 2017), and is not relevant here. *See Christian v. BT Grp. PLC*, 2017 WL 3705804, at *5, *7 (D.N.J. Aug. 28, 2017) (distinguishing *Flag Telecom*, "where an earlier, partial disclosure did not actually reveal the alleged fraud at all"); *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 265-66 (E.D.N.Y. 2011), *aff'd in rel. part*, 738 F.3d 14 (2d Cir. 2013) (*Flag Telecom* inapposite where plaintiff was not "incongruously claiming" that a statement was both misleading and "constituted a total, as opposed to only partial, disclosure of the truth").

*Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *1, *3 (D. Del. Feb. 7, 2020) (citing cases) ("projected increased sales and operating margins" were actionable when defendants "knew those projections were unattainable"); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997) (projections actionable when "made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology").

The critical, undisclosed facts that made Plug's hydrogen production projections misleading *when made* were reported by multiple witnesses. This includes Witness 2, a senior member of the team responsible for developing all of Plug's hydrogen production plants from 2Q2021 until 4Q2022. ¶48. Witness 2 explained that *all* of Plug's hydrogen plants were behind schedule, many by more than a year, and over budget, generally by 30-70%. ¶¶73-74. This is because Plug lacked a formalized construction process, constantly changed plans, purchased components piecemeal, assumed it would obtain unrealistic discounts, lacked qualified employees, and lacked sufficient electrolyzer manufacturing capabilities to supply its hydrogen plants. ¶¶74-78. Yet when project managers presented schedules "reflecting the absolute shortest path"—assuming favorable weather—Plug senior management baselessly responded that construction would take less time, even when told it was "impossible." ¶76. For example, Plug senior management knew in February 2022 that Plug would be unable to power its New York hydrogen plant until late *2024*. ¶¶81, 265. Witness 2 made clear that "no amount of liquid hydrogen production was possible by the end of 2022 based on the actual state of Plug's hydrogen production facilities in 2022." ¶85. This is consistent with the statements of Witnesses 1 and 3, as well as the reality that Plug was still not producing any liquid hydrogen as of August 2023, ¶245, and beyond (*see supra* n.2). Witness 2 left Plug because her team had been put in an "impossible situation" when Plug made hydrogen production projections that she and others had told senior management

- 13 -

were impossible to meet. ¶93. And when Witness 1 gave senior management the most realistic hydrogen production schedule, which did not support the 70 ton per day target, Marsh and Shrestha publicly affirmed that figure *the very next day*, leading Witness 1 to quit in protest. ¶¶84, 91-92. In short, Plug executives knew there was "no chance in hell" Plug would meet its targets. ¶93.

This is a paradigmatic case in which projections were misleading when made, with no "clairvoyance" necessary (*contra* MTD at 1). The sequence of events, including well-pled allegations that Defendants disregarded internal warnings, amply demonstrates that Defendants' hydrogen projections were misleading when made, and witnesses are not required to supply precise dates (*contra* MTD at 17, 21). *See Becton*, 620 F. Supp. 3d at 193-94 ("precise date" of witness allegation not required); *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 659 (D.N.J. 2021) (Third Circuit does not "require plaintiffs to plead specific dates or categorically rule out allegations by confidential witnesses which relied on second-hand knowledge; the inquiry is a more holistic, multifactor assessment"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 648 (E.D. Pa. 2015) (same).[5] Moreover, Defendants' purported "updates," MTD at 20-21, did not somehow make their prior misstatements accurate, and were themselves misleading, ¶¶72, 84, as Defendants belatedly reduced Plug's hydrogen projection to a still-unrealistic 50 tons per day, rather than acknowledging that material production of liquid hydrogen in 2022 was not possible.[6]

### B.    Defendants' False and Misleading Revenue Projections

Defendants' repeated projections that Plug would reach $900-925 million in 2022 revenue

---

[5] *Cf. Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (mere "conjecture based on subsequent events" inadequate); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020) (timing need only be "approximate" to establish falsity) (MTD at 21).

[6] Defendants' attempt to characterize their August 9, 2022 statements as a good-faith update likewise fails, MTD at 20, 33, as Defendants misleadingly asserted that Plug remained "on track to achieve [its] target of commissioning 70TPD [tons per day] by YE 2022." ¶¶185-188.

were likewise misleading due to undisclosed material facts. *See, e.g.*, ¶132 (Marsh: "we look at the $900 million, $925 million, and I can sit here and say, 'I'm not going to be debating with you guys whether we made it or not.' . . . I think we all look to this number and said, we're not going to be sweating it. And so I wouldn't be surprised if gradually throughout the year, we've increased the numbers."). Witnesses 5, 6, 7, 8, 9, 11, 16, and 17 all made clear that Plug's manufacturing operations suffered constant, critical shortages throughout 2022, ¶¶97-100, 105, resulting in products missing parts, ¶101, or being warehoused for months, ¶102. Plug also suffered major, undisclosed delays at its Rochester gigafactory, ¶¶110-113, and Slingerlands plant, ¶114. Witnesses 14, 15, and 16 explained that Plug could not keep its fuel cells sufficiently operational and had to pay penalties to customers as a result. ¶¶116-120.  Additionally, Witness 5 stated that, in 2Q2022, Plug *internally* slashed its projections for manufacturing GenDrive fuel cell units—Plug's primary source of revenue—from 15,000-16,000 to just over 10,000. ¶¶125-126. Plug did not reveal this information publicly as it continued touting its 2022 revenue projection. ¶¶187, 190. In fact, Plug sold only 8,274 GenDrive units in 2022, as announced on March 1, 2023. ¶238.

Further, Witness 17 recalled that, in late-August to late-September 2022, Marsh announced *internally* that Plug was behind on its "$900 million" target (*i.e.*, its $900-925 million revenue target for 2022) and that "*at the time of the meeting*, Plug was projecting to end 2022 at around $700 million based on its performance to date and projections for the rest of the year." ¶128. This corresponds almost exactly to the $701.4 million in 2022 revenue that Plug did not publicly disclose until half a year later, on March 1, 2023. *Id.* Rather than disclosing this to investors, Plug misleadingly asserted on October 14, 2022 that its revenue "could be 5%-10% lower for the year" (*i.e.*, approximately $810-880 million). ¶199. Then, on November 8, 2022, Plug misleadingly reaffirmed that guidance. ¶218. Analysts seized on those misleading updates, with one noting on

November 8, 2022 that Plug's revenue guidance "impl[ied] a big ramp into 4Q." ¶¶223-226.

Defendants respond with irrelevant comparisons to Plug's projections and results in prior years, MTD at 17, when Plug was "a smaller company focused on producing hydrogen fuel cells," *id.* at 3, and was not attempting to ramp up hydrogen and electrolyzer production. Defendants also claim (citing only their own assertion) that Plug has historically earned greater revenue in the second half of the year, *id.* at 17, but that does not explain why Defendants' internal projections did not match their public statements. And if the second half of the year is more important for Plug, that only undermines the significance of the first-half figures Defendants cite in support of their revenue projections. *Id.* at 29 (asserting, without support, that Plug's first half 2022 results were "strong"). Additionally, Defendants' contention that Plug theoretically *could* have built delays and cost overruns into its projections, *id.* at 17, 22, 28-29, conflicts with witness statements that the projections were known to be unrealistic, and raises fact issues that cannot be decided on the pleadings. *See In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *20 (D.N.J. Jan. 30, 2002) (where plaintiffs alleged that build-out "was over budget and behind schedule and . . . provided reasons for these delays which they claim make defendants' statements false," defendants' argument that "plaintiffs failed to allege that AT&T had failed to incorporate such additional costs into its build-out budget" raised fact issues "beyond the scope of a motion to dismiss").

###### C.     Safe Harbor Does Not Shelter the False and Misleading Projections

As discussed *supra* at 7-12, many of the false and misleading statements at issue are not covered by the safe harbor for forward-looking statements, 15 U.S.C. §78u-5, because they are not forward-looking. Defendants' remaining misrepresentations, consisting of near-term hydrogen production and revenue projections, do not fall within the safe harbor because they were not "accompanied by meaningful cautionary statements" and were made with "actual knowledge" that they were false and misleading. 15 U.S.C. §78u-5(c)(1). This section concerns the absence of

meaningful cautions; "actual knowledge" is addressed *infra* as part of the scienter element.

### 1. No Meaningful Cautions on or before January 19, 2022

Defendants' argument that they made sufficient cautionary statements to invoke the safe harbor does not apply to their January 19, 2022 misstatements, ¶¶130-145, because Defendants fail to identify any cautions they issued on or before that date. Rather, Defendants only identify specific cautionary statements that appear in Plug's 2021 Form 10-K, filed on March 1, 2022. MTD at 22-23. In a footnote, Defendants allude to supposedly "equally robust risk factors" in Plug's 2020 10-K (filed on May 14, 2021), broadly cite 23 pages from that 10-K without specifying the language upon which they rely (MTD Ex. 1 at 4-8, 14-31), and cite a largely illegible "safe harbor" slide from a January 19, 2022 Form 8-K (MTD Ex. 3 at 2). MTD 15 at n.7. This does not provide sufficient information to the Court or fair notice to Plaintiffs of any specific cautions at issue. In any event, Plug's 2020 10-K and January 19, 2022 slide lack even the insufficient cautions Defendants cite from the 2021 10-K, including the cited language about hydrogen production, and do not even contain the word "electrolyzer." Thus, Defendants have not shown that their January 19, 2022 misstatements—which relate in substantial part to hydrogen production and electrolyzer manufacturing—were accompanied by meaningful cautionary language.

### 2. Plug's Purported Cautionary Language Was Not Meaningful

The cautions that Defendants do identify, MTD at 14-15, were not meaningful in context because they were overly general, misleadingly described risks that were already materializing as hypothetical, and omitted material, adverse facts. "Cautionary language must be extensive and specific," and a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Avaya*, 564 F.3d at 256; *see also In re Innocoll*

*Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at \*18 (E.D. Pa. Mar. 25, 2020) ("generic warning" that is "inherently true" of every company in industry is not meaningful, particularly where company "did not develop its disclosures in an attempt to tailor its risks over time").[7]

Among the cautions that are far too general to be meaningful are those that warn that Plug "will continue to incur net losses until we can produce sufficient revenue to cover our costs," "will continue to incur losses until we can produce and sell our products and services on a large-scale and cost-effective basis," and "may not be able to achieve our growth strategy and increase production capacity as planned during the foreseeable future," and that "[d]elays in or not completing our product development goals may adversely affect our revenue and profitability." MTD at 14. On their face, these statements are not meaningful, as they merely reflect the truism that results could be unfavorable. *See, e.g.*, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*10-\*11 (D.N.J. Dec. 15, 2015) (rejecting cautions applicable to "*any* company in *any* industry") (emphasis in original); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 599 (7th Cir. 2006) ("generalized statements" of risk not meaningful).

The remaining cautions are likewise overly general and non-meaningful, and are themselves misleading, *see* ¶¶163-168, because they described as hypothetical risks that had already materialized, and omitted critical, then-existing facts. "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading. . . . Consistent with this principle, courts are skeptical of companies treating as hypothetical in their disclosures risks that have already materialized." *Globus Med.*, 869 F.3d at 241-42; *see also Enzymotec*, 2015 WL

---

[7] *Cf. OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 502 & n.23 (3d Cir. 2016) (cautions that included "considerable detail" regarding the facts at issue were adequate, where plaintiff did not claim cautions were misleading) (MTD at 11).

- 18 -

8784065, at *11 (cautions not meaningful when risks warned of "had already come to pass").

Accordingly, courts in the Third Circuit have made clear that omitting material, adverse, then-existing facts when touting corporate projections—as Defendants did here—renders cautionary language non-meaningful and the safe harbor inapplicable. *See Becton*, 620 F. Supp. 3d at 191-92 (no safe harbor for sales projections "unmoored from the [c]ompany's immediate reality" due to undisclosed facts; cautions were "not meaningful in nature" because "the risks the 10-K warned of had already materialized"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 (W.D. Pa. 2020) (no safe harbor for projections when "knowable, quantifiable facts" made them "impossible" to meet); *In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *13 (D. Del. Oct. 4, 2018), *adopted*, 2019 WL 1409454 (D. Del. Mar. 28, 2019) (no safe harbor when cautions did not disclose "*then-existing* bottlenecks . . . would absolutely prevent" company from meeting production goal); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4-*5 (D.N.J. Jan. 9, 2018) (no safe harbor when projections were "misleading by virtue of omission of existing facts").[8]

Here, Plug's putative cautions were insufficient because they were overly general, omitted critical existing facts, were themselves misleading because they described as hypothetical risks that had already materialized, and were not updated after March 1, 2022, even as Plug's situation

---

[8] *See also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 902 (E.D. Pa. 2018) (no safe harbor when cautions omitted existing adverse facts); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9, *12 (S.D.N.Y. Apr. 22, 2016) (safe harbor "does not protect material omissions"; repeating stale cautions "renders them meaningless in light of the changing circumstances and risks"); *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *10, *13 (D. Del. June 14, 2011) (no safe harbor for projections that defendants had been informed were not accurate; cautions did not warn of "the issue that [p]laintiff here claims [d]efendant failed to disclose"); *City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2-*4 (E.D. Pa. Aug. 29, 2008) (no safe harbor where cautions were "not meaningful in light of [d]efendants' alleged failure to disclose then-existing material facts," namely, the reasons defendants' projections "were unreasonable at the time they were made").

deteriorated.[9] As Plug's hydrogen production delays and cost overruns mounted, Defendants repeatedly invoked the same formulaic warnings that "[w]e *may be* unable to successfully execute and operate our green hydrogen production projects and such projects may cost more and take longer to complete than we expect," "[o]ur hydrogen production projects are *dependent*, in part, on the Company's *ability* to meet our internal demand for electrolyzers required for such projects," and "[t]he timing and cost to complete the construction of our hydrogen production projects are subject to a number of factors outside of our control and such projects *may* take longer and cost more to complete and become operational than we expect." MTD at 14. While Defendants made and repeated these statements, Plug's hydrogen production plants were already far behind schedule and over budget, and Plug was already unable to manufacture the electrolyzers necessary to supply those plants. Likewise, as undisclosed manufacturing debacles piled up, Defendants referred generally to the "impact" of supply chain issues, "which *could* adversely affect our results of

---

[9] By contrast, in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193, 1196 (9th Cir. 2021) (MTD at 15), the plaintiff did not dispute the adequacy of Tesla's cautions, which expressly acknowledged that the company had *already* experienced the very challenges at issue. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) (distinguishing *Tesla* on this basis; holding that warning that a risk "could" or "may" occur was misleading when risk had already materialized); *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949-51 (9th Cir. 2023) (risk disclosure misleading and not protected by safe harbor even when extent of harm was unknown); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 779-81 (9th Cir. 2023) ("Defendants cannot rely on boilerplate language describing *hypothetical* risks to avoid liability for the failure to disclose that the company *already* had [contrary] information") (emphasis in original); *cf. Avaya*, 564 F.3d at 257-59 (in context, cautions were "extensive and specific"; not addressing scenario in which cautionary language "identifies possible risks that defendants know have already eventuated"); *In re Marriott Int'l, Inc.*, 31 F.4th 898, 904 n.2 (4th Cir. 2022) (MTD at 15) (addressing materiality of risk disclosures, which Defendants here do not dispute); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 555 (W.D. Pa. 2019) (MTD at 15) ("no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred") (MTD at 15); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1345 (10th Cir. 2012) (MTD at 17) (finding "difficulty . . . in determining whether a conflict actually existed between the reports and defendants' statements"); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (finding "[t]he circumstances are not inconsistent with the statements" in question) (MTD at 17).

- 20 -

operations" and "*could* impair our ability to manufacture our products." *Id.* And as Plug struggled to keep the fuel cells in its materials handling equipment sufficiently operational for its key customers, the Company generally observed that "[s]ome of the orders we accept from customers . . . *may* be cancelled" and that time periods from order to shipment "vary widely." *Id.* at 15.

In light of Plug's pervasive, then-existing, undisclosed problems, none of the cautions Defendants identify was meaningful for safe harbor purposes. A reasonable investor would have understood Plug's publicly-stated projections, together with its cautionary language, to represent the company's best understanding at the time—not that Plug's *internal* revenue projections were materially lower, or that numerous employees had made clear *internally* that Plug's publicly-stated hydrogen projections were wildly unrealistic. By ignoring the voluminous case law that the safe harbor does not protect omissions of then-existing material facts, Defendants would turn the safe harbor into a license to deceive and take the "meaning" out of "meaningful cautionary statements."

### D.      Defendants' Projections Are Not Inactionable Opinion Statements

Defendants' misstatements of then-existing fact are not opinion statements, and Defendants do not contend otherwise. Rather, Defendants argue that their projections concerning hydrogen production and revenue are inactionable opinion statements. MTD at 16, 20. Defendants do not explain why a projection that does not fall into the safe harbor should be separately re-analyzed as an opinion. Regardless, an opinion statement is actionable if it "omits material facts about the [speaker's] inquiry into or knowledge concerning" the opinion, and those facts "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 685 (3d Cir. 2023) (*Omnicare* applies to §10(b) claims). Here, as detailed *supra*, Defendants omitted such facts when touting their unrealistic hydrogen production and revenue forecasts. *See Allegheny Cnty. Emps.' Ret. Sys. v.*

- 21 -

*Energy Transfer LP*, 532 F. Supp. 3d 189, 212 (E.D. Pa. 2021) (opinion statements as to construction timeline actionable due to "numerous facts on the ground that directly contradicted the statements"); *Ortiz*, 537 F. Supp. 3d at 672 (undisclosed, adverse facts rendered opinion statement actionable); *Advance*, 2020 WL 599543, at *4-*5 (sales projections that omitted adverse facts were actionable opinions); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *15 (S.D.N.Y. Mar. 25, 2013) (opinion statements actionable when defendants allegedly "well knew that their half-true expressions of optimism were both overly rosy and highly unlikely").

As detailed above, the Complaint sets out material, undisclosed facts that rendered Defendants' projections unrealistic when made. These are not mere "differences of opinion" or "disagreements"; an investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188-89 (*contra* MTD at 21). Even if isolated facts supported Defendants' opinion statements, which they do not, this would only raise fact issues to be assessed after discovery. *See Advance*, 2020 WL 599543, at *4 ("it is plausible to find that a projection lacks a sound methodology where it is based on a single data point in a sea of contrary data points").[10]

In addition, opinion statements are actionable when they are not actually believed by the speaker. *Omnicare*, 575 U.S. at 184; *see also Energy Transfer*, 532 F. Supp. 3d at 212 (adequately alleged that projections were not believed). Given the well-pled allegations that Defendants knew that their projections were unreasonable, and the mismatch between Plug's internal and external projections, the sincerity of Defendants' purported beliefs is squarely at issue.

**E.    Defendants' Misstatements Are Not Inactionable Puffery**

---

[10] By contrast, in *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (MTD at 21), a statement concerning a drug trial was not actionable when it was supported by evidence of efficacy for an "important patient subgroup," a fact that has no parallel here.

Defendants assert that "snippets of challenged statements" are puffery, and collect adjectives to craft out-of-context "snippets." MTD at 23 & n.10. In context, these statements are not "obviously so unimportant" as to be immaterial, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010), as they are "connected to factual assertions regarding [the company's] prospects" such that a "reasonable investor could have relied" on them. *Ortiz*, 537 F. Supp. 3d at 649; *see also Aeropostale*, 2013 WL 1197755, at *15 ("rosy predictions that might otherwise be puffery are rendered problematic [by] . . . material omissions"); *AT&T*, 2002 WL 31190863, at *23 ("statements in their entirety do not constitute mere puffery," notwithstanding "some of the verbiage"). Defendants also ignore the many securities analysts who relied on their statements.

## III.   The Complaint Alleges a Strong Inference of Defendants' Scienter

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud . . . and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252. A plaintiff "must sufficiently plead defendants' knowledge of facts or access to information contradicting their public statements . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Papa*, 2018 WL 3601229, at *18. Motive allegations are not necessary, *Avaya*, 564 F.3d at 276,[11] and "circumstantial evidence of reckless or conscious misbehavior" is sufficient. *Burlington Coat Factory*, 114 F.3d at 1422. Scienter allegations need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. At issue is "whether *all* of the facts

---

[11] Defendants' assertion that scienter "requires" allegations of "motive and opportunity," MTD at 24-25, is thus wrong. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007); *see also Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *10 (E.D. Pa. Jan. 11, 2024) ("While motive is relevant, it is not the only way to establish scienter."). In *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *12 (D.N.J. Mar. 14, 2023) (MTD at 24), the court held only that a lack of insider stock sales weighs against motive and opportunity, and separately analyzed the allegations of conscious misbehavior and recklessness. *Id.* at *10-*12.

alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original); *see id.* at 326-27 (requiring "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true"). "The inference . . . need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.*

## A.    Defendants Knew Information that Contradicted Their Statements

Plaintiffs properly allege scienter by pleading that each Defendant "knew facts or had access to information suggesting that their public statements were not accurate," *EQT*, 504 F. Supp. 3d at 497. This includes detailed allegations concerning hydrogen production. ¶¶84-93, 257-266. For example, prior to the Class Period, in late April or early May 2021, Witness 2 specifically informed Marsh during a trip to one of Plug's New York facilities that Plug's hydrogen production schedules were not realistic. ¶259.[12] By February 2022, Plug executives knew the first phase of targeted production for its New York plant was unattainable because the project was behind schedule, and by March 2022 knew there would be no power to that plant until *2024*. ¶¶81, 265. Shrestha was regularly updated about cost overruns and delays, and was informed by Witness 2 and the Project Group that Plug's hydrogen projections were unattainable. ¶¶85, 91, 259. Witness 2 explained that Witness 1 gave Plug's senior management the most realistic hydrogen production schedule—which did not support 70 tons per day by year-end 2022—yet Marsh and Shrestha publicly reaffirmed Plug's unattainable target the very next day. ¶¶91, 260. *See EQT*, 504 F. Supp. 3d at 497-98 (repeated warnings that projections were "grossly exaggerated" and "unattainable" meant defendants "were, at least, aware that their statements . . . could potentially be false").

---

[12] Witness 2's account is not limited to 2021, as Defendants incorrectly claim. MTD at 30 n.13 (citing ¶259). In any event, pre-class period data "confirm[s] what a defendant should have known during the class period." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005).

The aftermath of these events further supports a strong inference of scienter. First, multiple employees resigned in protest. ¶¶91-93, 260-261.[13] *See In re Measurement Specialties, Inc.*, 2003 WL 27398420, at *16 (D.N.J. Sept. 29, 2003) (resignation in protest bolstered inference of scienter). Second, Defendants concealed Plug's setbacks by constructing empty frames without electrolyzers just "to show progress," ¶88, and by declaring a gaseous hydrogen facility "operational" when a display panel changed numbers without producing a measurable amount of hydrogen, ¶¶89-90. *See S.E.C. v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) ("effort to mask . . . violations of federal securities law demonstrates a high degree of scienter").

Defendants were also aware of the pervasive issues impacting Plug's manufacturing plants. ¶¶267-272. Witness 5 stated that, in 2Q2022, Plug significantly reduced its internal 2022 fuel cell production projections due to customer push-outs and supply chain issues, and Mindnich received the revised production forecast. ¶¶125-126, 238, 275. Mindnich also led daily meetings, sometimes attended by Marsh, in which Plug's supply chain and other issues undermining production were discussed. ¶¶268-269. Witnesses 5 and 6 made clear that supply delays, missing parts, and delayed orders were discussed at those meetings. ¶¶52, 98; *contra* MTD at 27.[14] Witness 10 explained that the gigafactory manager reported delays up to Mindnich and ultimately Marsh. ¶¶111, 271. Senior management also received daily supply chain reports and spreadsheets. ¶270. Further, Witness 12

---

[13] Witness 1's allegations, as detailed in the Complaint, also support a strong inference of scienter. *See infra* at 32-33. Witness 1's post-filing assertion that she resigned to pursue another opportunity, MTD at 31, raises a fact issue that cannot be resolved at this stage. Witnesses 2 and 3 each corroborated that Witness 1 left Plug because of her disagreement with Plug's public statements and because executives were "bullying" her to sign off on unrealistic completion dates. ¶¶91-92, 260. Regardless, Witness 1's post-filing statements have no bearing on the circumstances of Witness 2's departure, which likewise support a strong inference of scienter. ¶93.

[14] Defendants' argument that Mindnich's participation in supply chain meetings undermines scienter, MTD at 27, is a red herring. Being hired to address certain issues does not in any way negate the strong inference that Mindnich misled investors about those topics.

- 25 -

explained that supply chain delays "absolutely" impacted Plug's financial forecasts. ¶127; *contra* MTD at 27.[15] And regarding the material handling business, shortages and poor product reliability were discussed at internal "town hall" meetings that included senior management. ¶¶122, 273.

Defendants were also aware that Plug's 2022 revenue projection was misleading. ¶¶274-277. Witness 17 explained that, in late-August to late-September 2022, Marsh announced in an internal meeting that Plug was behind on its $900 million target, and *at that time*, Plug projected ending 2022 at roughly $700 million, ¶¶128, 276, well below both Plug's original and revised 2022 revenue projections of $900-925 million and $810-880 million, respectively.

Collectively, these facts demonstrate that Defendants were at least reckless in making the misstatements. *See Innocoll*, 2020 WL 1479128, at *12-*13 (recklessness well-pled when plaintiffs "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"). For the subset of forward-looking hydrogen and revenue projections, these allegations also show Defendants' actual knowledge that those projections were misleading. *See Advance*, 2020 WL 599543, at *8 (scienter well-pled based on "actual knowledge" that projections were incompatible with internal forecasts; "[c]ourts regularly draw an inference of scienter where [d]efendants had access to internal forecasts and the company's financial data indicating that the company could not meet the projected revenues"); *Swanson*, 2011 WL 2444675, at *12-*13 ("actual knowledge" that projections were misleading was well-pled for safe harbor purposes based on defendants' access to internal reports and communications with employees).[16]

Defendants do not dispute that the statements at issue concerned Plug's core operations

---

[15] That Plug purportedly exceeded its gross billing goals in 2020 and 2021, MTD at 27, has no bearing on Defendants' knowledge that their representations about 2022 were misleading.

[16] *See also Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *21 (N.D. Ill. Sept. 21, 2005) (same). Defendants' repeated misstatements in response to analyst questions, *see* ¶¶209-210, 218, 220, 266, 272, further strengthen the inference of scienter. *See Avaya*, 564 F.3d at 269.

(*i.e.*, hydrogen production, electrolyzer and fuel cell manufacturing, and corporate revenues), ¶278, which "give[s] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Urban Outfitters*, 103 F. Supp. 3d at 653-54. This supports the "logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems" plaguing Plug's operations. *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019).[17] Further, Defendants' misstatements "indicated personal knowledge of the subject." *Papa*, 2018 WL 3601229, at *21; *e.g.*, ¶¶135, 174 (manufacturing and supply chain); ¶¶152, 194 (hydrogen production and margins).

Moreover, Defendants do not and cannot specifically contend that they lacked scienter as to their non-forward-looking misstatements concerning the construction and operation of Plug's Georgia hydrogen plant and Rochester and Slingerlands factories. It is reasonable to infer that Plug's executives were aware of the basic status of Plug's most important facilities; Shrestha and Mindnich led Plug's hydrogen production and manufacturing operations, respectively, ¶¶23-24; and Marsh and Middleton touted their personal knowledge of Plug's operations. ¶¶266, 272, 277.

In response, Defendants wrongly claim that Plaintiffs rely on group pleading. MTD at 24-25. This argument was raised in *Horsehead*, 2018 WL 4838234, at *19-*20, where defendants cited purportedly "vague[]" and "formulaic" scienter allegations. *Id.* The court rejected that argument because the complaint had "dozens of specific references to allegedly false or misleading statements," and "la[id] out" the facts defendants knowingly disregarded. *Id.* The same is true here.

Further, Defendants mischaracterize the Complaint by arguing that it includes only general

---

[17] *See also Gorlamari*, 2024 WL 150341, at *9 ("reasonable inference" that CEO "would be aware of critical facts bearing on [company]'s core business"); *Energy Transfer*, 532 F. Supp. 3d at 232 (revenue projection was within core operations); *cf.* MTD at 34 (citing cases where core operations *alone* was insufficient).

claims of delay and mismanagement. MTD at 32. "A complaint is not subject to dismissal if [the] plaintiff[] plead[s] specific facts permitting the inference that defendants were intentionally concealing mismanagement." *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 950 (E.D. Pa. 1999) (misrepresentations and omissions actionable even if issues "stemmed from mismanagement").[18] Defendants' false and misleading statements are at issue here, not general mismanagement.

Defendants also argue that their later "updates" somehow undermine scienter. MTD at 28, 32-33. But incremental corrective disclosures do not provide a safe harbor for prior misstatements. *See Energy Transfer*, 532 F. Supp. 3d at 203-05, 227-31 (scienter well-pled when "the truth was revealed to investors only slowly and through numerous corrective disclosures"); *Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*, 2018 WL 6137169, at *15 (C.D. Cal. Aug. 29, 2018) (that the truth was "*eventually* revealed . . . does not undercut the inference [of] scienter") (emphasis in original).[19] That is especially so where, as here, the initial revisions are still misleading. *E.g.*, ¶¶72, 84 (no reasonable basis for revised hydrogen forecast); ¶¶128, 199, 234 (revised revenue guidance *after* lower internal projection). *See Aeropostale*, 2013 WL 1197755, at *19 (scienter well-pled; revision was untimely and "understated the severity of the problems").

### B.    The Complaint's Witness Allegations Are Reliable and Compelling

Defendants resort to meritless attacks on the Complaint's well-pled witness allegations,

---

[18] *See also Ravens v. Republic N.Y. Corp.*, 2002 WL 1969651, at *9 (E.D. Pa. Apr. 24, 2002) (misrepresentation actionable where "defendant was aware that mismanagement had occurred and made a material public statement . . . inconsistent with the existence of the mismanagement").

[19] *Cf. Winer Fam. Tr. v. Queen*, 503 F.3d 319, 328, 331 (3d Cir. 2007) (accurate update followed event that made defendants aware of truth for the first time); *Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *18-*19 (E.D.N.C. Mar. 22, 2013) (no allegation defendants knew non-public information); *N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *13 (C.D. Cal. Sept. 25, 2009) (no contradiction between public statements and internal reports); *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004) (defendants made "accurate" disclosure "once apprised of the situation") (MTD at 32-33).

but the detailed accounts of 17 former Plug employees show Defendants knew their statements lacked a reasonable basis. ¶¶64-128. The Complaint includes each witness' position, tenure, and basis of knowledge, ¶¶47-63, which "support the probability that a person in the position occupied by the [witness] would possess the information alleged." *Chubb*, 394 F.3d at 148; *see Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 492-93 (D. Del. 2019) (crediting witnesses). Moreover, the "consistent [witness] accounts reinforce one another." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002); *see Urban Outfitters*, 103 F. Supp. 3d at 648-49 (same).[20]

Defendants note some witnesses did not personally interact with individual Defendants, MTD at 26-27, but the Third Circuit has rejected a "direct link" requirement, and emphasized "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Avaya*, 564 F.3d at 268-69 (emphasis in original); *see also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023) ("A confidential witness does not need to be a fly on every relevant wall — or directly deliver every relevant presentation — to plead allegations supporting an inference of scienter."); *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019) (scienter well-pled even if "confidential witnesses did not have contact with [defendants]"); *see also In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018) ("It seems Defendants would only find these [witness] statements 'particular' if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, and product . . . That is not required.").

Defendants posit that they may have disagreed with employees who warned that Plug's hydrogen projections were fanciful. MTD at 30. But Defendants' knowledge is a fact issue, and a

---

[20] Cases where witnesses were not in a position to know the information alleged, MTD at 26-27, are not probative here, where the basis of witness' knowledge is alleged in detail. Defendants' arguments concerning dates of witness' knowledge and hearsay are addressed *supra* at 10, 14.

jury could well determine—any wishful thinking aside—that Defendants knew the facts their employees told them. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *19 (W.D. Pa. May 18, 2023) (management's belief that company could "remedy" concerns did not salvage statement that "flies in the face of the reality facing the company at the time"); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 483 (S.D. Tex. 2016) ("disregarding information" from employees in position to understand plant operations supports scienter); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 907 (D. Minn. 2011) (scienter adequately pleaded when management's "hope" that conditions would improve grew "untenable"). Trying "to push employees to meet difficult objectives," MTD at 31, does not require (or permit) misleading investors about existing conditions or projecting unrealistic near-term results.[21] In short, "the totality of the direct contradictions of the truth, statements about core operations, [and] information provided by Plaintiff's confidential witness[es] . . . support a strong inference of scienter." *Dr. Reddy's*, 2019 WL 1299673, at *17.

**C.   The Complaint Establishes a Strong Inference of Plug's Scienter**

Scienter is properly imputed to Plug due to the scienter of all (or any) of the individual Defendants, and/or other high-ranking Plug personnel, *e.g.*, ¶¶262, 264, 268-271. *See, e.g.*, *Li v. Aeterna Zentaris, Inc.*, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016) (scienter of defendant CEO established company's scienter). Corporate scienter is also well-pled because Plug's "high managerial agents," whether or not specifically named, necessarily "tolerated the misrepresentation" to be made on Plug's behalf. *Energy Transfer*, 532 F. Supp. 3d at 237.[22]

---

[21] *Tesla*, by contrast, "d[id] not reach the issue[] of scienter." 985 F.3d at 1188 (MTD at 31). *Cf. Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *14 (D. Ariz. Feb. 7, 2023) (no connection pled between certain "business practices" and securities fraud); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 686 (N.D. Tex. 2017) (no explanation of duty to disclose the omitted items); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017) (no "red flags" were present) (MTD at 31-32).

[22] *See also Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (corporate scienter well-

## IV.   Scheme Liability Is Properly Pleaded

The Complaint also pleads a scheme to defraud under Rules 10b-5(a) and (c), which requires a deceptive or manipulative act in furtherance of the alleged scheme to defraud, along with scienter and reliance. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020). Defendants' claim that the Complaint alleges only misstatements and omissions, MTD at 34, is incorrect. As alleged, Plug constructed empty frames, with no electrolyzers, at its hydrogen plants to conceal delays and "show progress," ¶88; deemed the gaseous hydrogen portion of its Georgia plant "in service" based merely on a display panel changing numbers, ¶89; and delivered hydrogen *to* that plant by truck "as a display of showmanship to get good headlines because Pathfinder was supposed to be completed by then." *Id.* This conduct furthered the fraudulent scheme by perpetuating the myth that Plug's hydrogen production build-out was proceeding consistent with Defendants' public statements.[23]

## V.   Control Person Liability Is Properly Pleaded

Defendants' only challenge to control person liability under Section 20(a) of the Exchange Act is that there is no primary violation, MTD at 35, which is incorrect as set out herein.

## VI.   Defendants' "Puzzle Pleading" Suggestion Is Inapplicable

As described herein, the Complaint sets out cogent and particularized allegations, not an indecipherable "puzzle" (*contra* MTD at 9-10). The Complaint specifies why each misstatement

---

pled; statements "presumably" approved by unnamed senior auditor created "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter"); *cf. City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) and *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) (MTD at 34) (declining to address whether a plaintiff can establish corporate scienter other than via an individual defendant).

[23] *See, e.g.*, *Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023) (scheme liability well-pled based on "falsification of internal documents to make the company's financial state appear rosier than it was in reality").

- 31 -

was false or misleading, with appropriate cross-referencing to limit repetition.[24]

### VII.    Allegations Attributed to Witness 1 Are Properly Considered on this Motion

While not needed to overcome this motion given the strength of the Complaint's other allegations, Plaintiffs stand behind all allegations attributed to Witness 1, including that she told senior management that Plug's hydrogen projections were "hilariously off," told Marsh and other executives that Plug's hydrogen plants were "three years out in service," and resigned because she "refused to let this all fall on [her.]" ¶¶84, 92, 258. Defendants have not come close to showing that these allegations are "immaterial, impertinent, or scandalous" under F.R.C.P. 12(f).

As set out in Lead Counsel's November 3, 2023 letter, D.I. 49, every allegation attributed to Witness 1 matches the contemporaneous interview notes. Critically, facts revealed by Witness 1—including that Plug's hydrogen projections were unrealistic, Plug's senior executives were informed of this fact, and Witness 1 quit in protest—were corroborated by Witnesses 2 and 3, who worked in Plug's Project Management group with Witness 1. ¶¶47-49, 72-93. When Witness 1 contacted Plaintiffs' counsel months later, she could no longer recall key facts, such as the context of her meeting with Marsh. She also acknowledged she provided production schedules to certain Plug executives showing that the hydrogen plants were "three years out in service," and that she had considered Plug's hydrogen production schedule "hilariously off." Yet Witness 1 emphasized that she is under severe personal stress and does not want to be involved in this case. D.I. 49.

These facts, which Defendants ignore, MTD at 10-11, strongly suggest that Witness 1 told

---

[24] *See City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 2011 WL 2650717, at *7 (W.D. Mich. July 6, 2011) (the "use of a single set of reasons to explain why various statements [a]re false . . . is an acceptable means of identifying the reasons for falsity" and "a permissible way to establish falsity"); *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) (same). Even if any part of the Complaint were unclear, dismissal is not appropriate, and Plaintiffs would respectfully request leave to amend. *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *3 (D. Del. Sept. 6, 2017) (allowing amendment to cure puzzle pleading).

the truth when first contacted, but now for her own reasons does not wish to be involved and believes disavowing her prior statements will achieve that goal. In any event, that is a reasonable inference. Numerous courts have made clear that a witness's attempt to recant raises fact questions that can only be assessed after discovery, and that allegations attributed to such witnesses should be credited at the pleading stage, not stricken. *See, e.g.*, *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *12 (D.N.J. Aug. 8, 2018) (denying motion to strike recanting witness allegations); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *12 (D.N.J. Sept. 30, 2009) (declining to "reconcile competing facts" or strike recanting witness allegations).[25]

Defendants also cast vague aspersions on Plaintiffs' counsel's interview process, MTD at 2, 11 n.5, which are unwarranted. The investigation involved extensive witness interviews, including numerous follow-ups with counsel. As to Witness 1, whose principal allegations are corroborated by other witnesses, counsel acted "reasonabl[y]" by "*attempt[ing]* to confirm with the witness" the allegations in question. *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015) (emphasis added); *see also Moshell*, 2021 WL 3174414, at *17 (counsel not required to secure witness' consent before making allegations based on their statements); D.I. 49. Defendants' baseless insinuations are misplaced.

## VIII.  The PSLRA Does Not Require Republication of Notice

Defendants' contention that the notice in this action was inadequate, MTD at 8-9, is wrong.

---

[25] *See also Moshell v. Sasol Ltd.*, 2021 WL 3174414, at *18 (S.D.N.Y. Jul. 24, 2021) ("it remains unclear whether it is [the investigator] or the repudiating [witnesses] whose credibility is compromised or whose recollection is faulty"); *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1099-1100 (N.D. Cal. 2017) (striking post-filing recanting declaration that raised fact questions); *Dep't of Treasury of the State of N.J. v. Cliffs Nat'l Res., Inc.*, 2015 WL 6870110, at *4 (N.D. Ohio Nov. 6, 2015) (denying motion to strike allegations; "issues of fact and credibility raised by [d]efendants' [recanting] witness declarations cannot be determined at the pleading stage"; nor were the allegations "impertinent or scandalous"); *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *4 (S.D. Ohio Mar. 29, 2010) (striking post-filing recanting declaration).

No provision of the PSLRA requires republication of notice upon the filing of an amended complaint. Rather, the PSLRA provides only for notice of the *initial complaint*, even if additional complaints are filed before the lead plaintiff is appointed. 15 U.S.C. §78u-4(a)(3)(A). "Given that the PSLRA is intended to provide a comprehensive statutory scheme" and is "focused on the expeditious selection of lead plaintiff," courts "generally disfavor [republication] when a complaint is amended," and "[t]he language of the statute cautions against imposing additional notices in all but unusual situations." *Ito-Stone v. DBV Techs. S.A.*, 2020 WL 6580776, at *3 (D.N.J. Nov. 9, 2020); *see also Greenberg v. Bear Stearns & Co., Inc.*, 80 F. Supp. 2d 65, 69 (E.D.N.Y. 2000) (PSLRA "does not mandate, nor does it suggest, that a Court approved lead plaintiff must re-publish a notice . . . after an amended complaint is filed").

This is not an "unusual situation" justifying republication. In every case cited by Defendants—all of which are out-of-circuit—the amended complaints involved entirely new claims, offerings, and/or securities. For example, in *In re Select Comfort Corp. Sec. Litig.*, 2000 WL 36097395, at *2 (D. Minn. May 12, 2000), the court recognized the "sound authority that lead plaintiffs are not automatically required under the PSLRA to republish notice where a consolidated complaint is amended to allege new, closely related claims or a different class period," but held "in the circumstances of [that] particular case" that republication was warranted because lead plaintiffs added new Securities Act claims for which they may have lacked standing.[26] By contrast, many courts have held that expanding the class period and adding fact allegations addressing the same security at issue in the initial complaint do not compel republication. *See, e.g.*, *Ito-Stone*,

---

[26] *Cf. Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *5 (C.D. Cal. May 9, 2013) (new claims concerning separate, private offering); *In re Sandridge Energy, Inc. Sec. Litig.*, 2015 WL 3652526 (W.D. Okla. May 11, 2015) (new claims concerning new securities in which lead plaintiffs had minimal transactions) (MTD at 9). Further, Defendants cite the R&R in *Select Comfort*, 2000 WL 35529101 (D. Minn. Jan. 27, 2000), not the district court ruling quoted above.

2020 WL 6580776, at \*4-\*5 (republication not required when class period expanded from 10 to 25 months, plus three new offerings, nine new false statements, and a new stock price decline).[27]

Here, "the thrust of the misconduct is the same, there are no new claims, there are no new categories of shareholders and . . . there is no member of the purported class seeking to reopen the lead plaintiff process." *Id.* at \*5. Both the initial and amended complaints allege Plug misled investors about its production capabilities, revenues, and margins, which are closely linked to hydrogen production. And in both complaints, the stock price declines giving rise to damages cover the same period. Thus, "[i]t is difficult to believe that, as a practical matter, anyone interested in pursuing securities litigation involving [Plug] is not well aware of this action," *Thornburg Mortg.*, 629 F. Supp. 2d at 1242, particularly if they suffered losses in that period. Yet no prospective lead plaintiff has intervened, and it is Defendants, "which generally lack standing to challenge the appointment of initial lead plaintiff and are adverse to the class," who challenge the notice, which "diminishes the weight of their argument." *Ito-Stone*, 2020 WL 6580776, at \*4.[28]

## CONCLUSION

Respectfully, Defendants' motion should be denied in its entirety.

---

[27] *See also In re Thornburg Mortg., Inc. Sec. Litig.*, 629 F. Supp. 2d 1233, 1240-42 (D.N.M. 2009) (republication not required when class period expanded by seven months and allegations added on the same "general outline" and "theme"); *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at \*23 (C.D. Cal. May 23, 2008) (republication not required when 17-month class period extended by 32 months); *In re Rite Aid Corp. Sec. Litig.*, 1999 WL 34807713, at \*1 (E.D. Pa. Dec. 21, 1999) ("new allegations and extending the class period" did not require republication). Also, a new lead plaintiff would likely file a new complaint, requiring yet another notice per Defendants' theory.

[28] In any case, dismissal would harm the class that notice is intended to protect. *Cf. Sandridge Energy*, 2015 WL 3652526, at \*11 (MTD at 9) (dismissing new claims only because republication was not requested). If required, Lead Plaintiffs respectfully request leave to publish a new notice.

DATED: February 12, 2024

Respectfully submitted,

**FRIEDLANDER & GORRIS, P.A.**

*/s/ Jeffrey M. Gorris*
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

*Liaison Counsel for the Class*

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted pro hac vice)
Desiree Cummings (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY 10170
(212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com

*Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER
  & CHECK, LLP**
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Nathan A. Hasiuk (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
jwhitman@ktmc.com
nhasiuk@ktmc.com
ehoey@ktmc.com

*Additional Counsel for the Class*

- 36 -