**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re PLUG POWER INC. SECURITIES LITIGATION | Case No. 1:23-cv-00409 (JLH) |

**OPENING BRIEF IN SUPPORT OF ALL DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Of Counsel:

John J. Clarke, Jr.*
john.clarke@us.dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500


Yan Grinblat*
yan.grinblat@us.dlapiper.com
DLA PIPER LLP (US)
444 W. Lake Street
Chicago, Illinois 60606
(312) 368-4000


* Admitted *pro hac vice*


April 30, 2025

DLA PIPER LLP (US)
Ronald N. Brown, III (Bar No. 4831)
ronald.brown@us.dlapiper.com
Peter H. Kyle (Bar No. 5918)
peter.kyle@us.dlapiper.com
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
(302) 468-5700

*Counsel for
  Defendant Plug Power Inc.*

RICHARDS, LAYTON, & FINGER P.A
Rudolf Koch (Bar No. 4947)
koch@rlf.com
Jason J. Rawnsley (Bar No. 5379)
rawnsley@rlf.com
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Counsel for Individual Defendants
  Andrew Marsh, Paul B. Middleton,
  and Sanjay Shrestha*

Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

    A.    Summary of Allegations ................................................................................. 2

    B.    Procedural History ........................................................................................ 5

LEGAL STANDARD ................................................................................................................ 6

ARGUMENT ............................................................................................................................. 7

I.    Plaintiffs Have Not Alleged an Actionable Misstatement or Omission. .......................... 7

    A.    The PSLRA Safe Harbor Bars Most of Plaintiffs' Claims. ................................ 7

    B.    The Complaint Also Fails to Plausibly Allege Falsity for Other Reasons. ......... 12

II.    Plaintiffs Have Not Alleged Facts Supporting a Strong Inference of Scienter. .............. 19

    A.    Plaintiffs Continue to Rely on Impermissible Group Pleading. ......................... 19

    B.    The Complaint Still Lacks Any Motive Allegations. ........................................ 20

    C.    The Complaint Does Not Plead Circumstantial Evidence of Scienter. ............... 20

III.    The Complaint Does Not Plead a Scheme to Defraud. .................................................... 29

IV.    The "Controlling Person" Claim Also Should Be Dismissed. .......................................... 29

CONCLUSION .......................................................................................................................... 30

Table of Authorities

Page(s)

Cases

*In re Advance Auto Parts, Inc., Sec. Litig.*,
 2020 WL 599543 (D. Del. Feb. 7, 2020) ...............................................................................12

*Allegheny Cnty. Emps.'Ret. Sys. v. Energy Transfer LP*,
 532 F. Supp. 3d 189 (E.D. Pa. 2021) .............................................................................18, 26

*In re Amarin Corp. PLC., Sec. Litig.*,
 2015 WL 3954190 (D.N.J. June 29, 2015) ..........................................................................29

*Anderson v. Spirit Aerosystems Hldgs., Inc.*,
 827 F.3d 1229 (10th Cir. 2016) ....................................................................................25, 27

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................................6

*Bartesch v. Cook*,
 941 F. Supp. 2d 501 (D. Del. 2013)......................................................................................26

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
 896 F. Supp. 2d 1210 (N.D. Ga. 2012) ................................................................................21

*In re Biogen Idec, Inc. Sec. Litig.*,
 2007 WL 9602250 (D. Mass. Oct. 25, 2007)..........................................................................8

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997).................................................................................................23

*Campo v. Sears Holdings Corp.*,
 371 F. App'x 212 (2d Cir. 2010) ...........................................................................................21

*City of Edinburgh Council v. Pfizer, Inc.*,
 754 F.3d 159 (3d Cir. 2014)...................................................................................................17

*City of Roseville Emps.'Ret. Sys. v. Horizon Lines, Inc.*,
 442 F. App'x 672 (3d Cir. 2011) .....................................................................................14, 29

*Fowler v. UPMC Shadyside*,
 578 F.3d 203 (3d Cir. 2009).....................................................................................................1

*Gaines v. Guidant Corp.*,
 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) ........................................................................28

Page(s)

*GSC Partners CDO Fund v. Washington,*
    368 F.3d 228 (3d Cir. 2004) ........................................................................ 19, 20

*In re Hertz Glob. Holdings Inc.,*
    905 F.3d 106 (3d Cir. 2018) ............................................................................. 29

*In re Hertz Glob. Holdings, Inc. Sec. Litig.,*
    2017 WL 1536223 (D.N.J. Apr. 27, 2017) ....................................................... 28

*Higginbotham v. Baxter Int'l, Inc.,*
    495 F.3d 753 (7th Cir. 2007) ............................................................................ 24

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.,*
    2021 WL 4191467 (D.N.J. Sept. 15, 2021) ................................................. 21, 27

*Inst. Investors Group v. Avaya,*
    564 F.3d 242 (3d Cir. 2009) ...................................................................... *passim*

*In re Intelligroup Sec. Litig.,*
    527 F. Supp. 2d 262 (D.N.J. 2007) ............................................. 16, 19, 21, 25

*In re Level 3 Commc'na, Inc. Sec. Litig.,*
    667 F.3d 1331 (10th Cir. 2012) ........................................................................ 15

*Lewakowski v. Aquestive Therapeutics, Inc.,*
    2023 WL 2496504 (D.N.J. Mar. 14, 2023) .................................................. 19, 20

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ......................................................................... 25

*Martin v. GNC Holdings, Inc.,*
    757 F. App'x 151 (3d Cir. 2018) ...................................................................... 29

*In re Mylan N.V. Sec. Litig.,*
    2023 WL 3539371 (W.D. Pa. May 18, 2023) ................................................... 13

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.,*
    2009 WL 3112574 (C.D. Cal. Sep. 25, 2009) .................................................. 28

*Nat'l Jr. Baseball League v. Pharmanet Dev. Grp. Inc.,*
    720 F. Supp. 2d 517 (D.N.J. 2010) ........................................................ 9, 20, 29

*In re Newell Brands, Inc. Sec. Litig.,*
    837 F. App'x 869 (3d Cir. 2020) ........................................................................ 7

*In re NUI Sec. Litig.,*
    314 F. Supp. 2d 388 (D.N.J. 2004) .................................................................. 20

Page(s)

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016)..................................................................7, 8, 12, 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................13

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
   2023 WL 1800963 (D. Ariz. Feb. 7, 2023)..........................................28

*Ortiz v. Canopy Growth Corp.*,
   537 F. Supp. 3d 621 (D.N.J. 2021)........................................................9

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*,
   2013 WL 1192004 (E.D.N.C. Mar. 22, 2013)......................................27

*In re Plug Power Inc.*,
   2025 WL 388705 (D. Del. Feb. 4, 2025)...................................... *passim*

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021)...................................................................29

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Hldgs., Inc.*,
   673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012) ............25

*Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ...............................................................21

*Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)..................................................20, 21, 25

*Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009)......................................................14

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................27

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010)..................................................................20

*Stovall v. Grazioli*,
   2023 WL 3116439 (3d Cir. Apr. 27, 2023) .........................................30

*In re Synchronoss Sec. Litig.*,
   705 F. Supp. 2d 367 (D.N.J. 2010) ......................................................21

*Tanaskovic v. Realogy Holdings Corp.*,
   2021 WL 211049 (D.N.J. Jan. 21, 2021) ...............................................8

Page(s)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................19

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
    436 F. Supp. 2d 873 (N.D. Ohio 2006)..........................................................24

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017) ............................................................28

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)...................................................................... *passim*

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)...........................................................19, 20, 28

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ................................................................. *passim*

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020).......................................................14, 17, 21

### Statutes, Rules, and Regulations

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................2, 19

15 U.S.C. § 78u-5 ...............................................................................................7

15 U.S.C. § 78u-5(c)(1)(A)..................................................................................1

15 U.S.C. § 78u-5(c)(1)(A)(i)..............................................................................9

15 U.S.C. § 78u-5(c)(1)(B)(i) ...........................................................................12

15 U.S.C. § 78u-5(i)(1) ........................................................................................9

15 U.S.C. § 78u-5(i)(1)(B) ...................................................................................9

17 C.F.R. § 240.10b-5.............................................................................. 5, 7, 26, 29

Fed. R. Civ. P. 9(b) ...............................................................................................7

Fed. R. Civ. P. 12(b)(6)........................................................................................6

## PRELIMINARY STATEMENT

This case was filed soon after Plug Power Inc. ("Plug Power" or the "Company") reported "disappointing financial results" for the fourth-quarter and full-year 2022. Compl. ¶ 198. The Court dismissed the previous complaint because it failed to meet the heightened pleading standard imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re Plug Power Inc*, 2025 WL 388705, at *2 (D. Del. Feb. 4, 2025). The second amended complaint does not cure that fundamental pleading failure.[1]

Plaintiffs' theory of fraud is unchanged: they claim defendants lied to investors because the Company's goals for 2022 revenue and for the future production of hydrogen at brand-new facilities turned out to be too optimistic. *See* Compl. ¶ 5. Even though the Company generated $701.4 million in revenue for 2022 (a ***40% increase*** from 2021), it did not meet its more optimistic goal disclosed at the beginning of the year. *Id.* ¶ 198. Similarly, the Company was not producing 70 tons per day of hydrogen by the end of 2022, the goal it disclosed in January, due to setbacks that defendants told the market about as the year unfolded. *Id.* ¶¶ 167-68, 173, 179.

Lack of clairvoyance is not fraud. As the Court already has recognized, "many (if not most) of the challenged statements are forward-looking statements – and thus protected" by the PSLRA safe harbor. *Plug Power*, 2025 WL 388705, at *2. Those statements are not actionable because they were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially[.]" 15 U.S.C. § 78u-5(c)(1)(A). Even for statements that were not entirely forward-looking, plaintiffs' latest complaint still fails to

---

[1] Citations to "Compl. ¶ __" refer to paragraphs in the second amended complaint, D.I. 67. Citations to "Exh." refer to exhibits to the Request for Judicial Notice dated April 30, 2025, filed with this motion, which sets out the bases for taking judicial notice as to those exhibits. Well pleaded factual allegations are assumed to be true solely for purposes of this motion. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

provide any plausible allegations of scienter, much less the required "strong inference." 15 U.S.C. § 78u-4(b)(2)(A). There are no allegations of stock sales or any other motive.

Nor have plaintiffs offered any plausible contemporaneous facts in conflict with the challenged statements. Just as in their dismissed consolidated complaint, the second amended complaint relies on allegations purportedly gathered from 17 unnamed "witnesses" ("CWs"). But those allegations still "are largely undated, which leaves the Court without any way to assess whether it is plausible that [challenged] statements were false or misleading when they were made or whether there is a strong inference of scienter." *Plug Power*, 2025 WL 388705, at *2. CW1 – cited most often in the complaint – *disavowed all the allegations attributed to them* and said that "*the information attributed to [them] and to others in the [c]omplaint are 'lies.'*" D.I. 49 ("Disavowal Letter") at 2-3 (emphasis added). The CW allegations – which merely amount to griping or speculation unconnected to any specific statement or defendant – do not support any plausible inference of fraud.

At its essence, the second amended complaint still asserts that Plug Power and its officers disclosed aggressive but attainable goals for 2022 that ultimately were not met. Far from hiding that reality, the Company provided updates on its performance – including supply chain challenges it experienced in the wake of the COVID-19 pandemic – and revised its targets downward as the year progressed. Disclosed business challenges do not amount to violations of the federal securities laws. The complaint should be dismissed in its entirety and with prejudice.

## BACKGROUND

### A.    Summary of Allegations

Plug Power is a hydrogen energy company founded in 1997 and based in Latham, New York. Compl. ¶ 28. It manufactures hydrogen fuel cell systems that power equipment and

vehicles. *Id.* ¶¶ 30-31. Plaintiffs' claims of securities fraud primarily focus on the Company's stated goals for revenue and hydrogen production for 2022.

Coming into 2022, the Company had been increasing its capacity to manufacture electrolyzers, which convert water into hydrogen, and taking steps to build its own hydrogen production facilities to insulate its business from volatility in the market price of hydrogen. *Id.* ¶¶ 36-42. To that end, Plug Power made several strategic acquisitions, including of an electrolyzer manufacturing company, a hydrogen production facility, a company that builds trucks to transport liquid hydrogen, and a company that designs and builds energy plants. *Id.* ¶¶ 37, 42. To expand its fuel cell manufacturing capacity, Plug Power broke ground on a second fuel cell facility in Slingerlands, New York in March 2022. *Id.* ¶¶ 34, 143(d). It also opened its Rochester, New York gigafactory to manufacture electrolyzers and announced plans to build liquid hydrogen production facilities in Kingsland, Georgia and Alabama, New York. *Id.* ¶¶ 38-39.

### 1.    Plug Power Discusses Goals for 2022 (January 2022)

In an annual business update on January 19, 2022, the Company discussed its goals for the year ahead, including to generate annual revenue of $900-925 million (compared with $502 million in 2021), *id.* ¶ 157(b); construct a 15 tons per day ("TPD") liquid hydrogen plant in Georgia by the end of 2022, *id.* ¶ 131; and develop liquid hydrogen production capacity of 70 TPD by year-end, *id.* ¶ 143(a).

### 2.    Plug Power Updates Investors (March and May 2022)

On March 1, 2022, Plug Power announced its results for fourth quarter and full-year 2021. The Company reiterated its 2022 revenue goal of $900-925 million and reaffirmed its target of 70 TPD of liquid hydrogen production capacity by year-end. *Id.* ¶¶ 143(c)-(d), 157(d). The same day, it filed its Form 10-K for 2021, which included extensive disclosures of risk factors that could affect its ability to reach its goals. *Id.* ¶¶ 146-47; *see* Exh. 6 at 3-6, 15-34.

On May 9, 2022, Plug Power reported $140.8 million in revenue for Q1 2022 – nearly double its revenue in Q1 2021. Exh. 7 at 1. It reaffirmed its goals of $925 million in 2022 revenue and 70 TPD in liquid hydrogen production capacity by year-end. Compl. ¶¶ 156(f), 143(e)-(f).

### 3.    Plug Power Reduces Expectations (August to November 2022)

On August 9, 2022, the Company reported revenue for Q2 2022 of $151.3 million, bringing its revenue for the year to $292 million. Exh. 9 at 1, 12. Historically, Plug Power earned significantly more revenue in the second half of any given year than it did in the first half. *See* Exh. 9 at 12. Its revenue through the second quarter therefore suggested the Company was on track to meet its goal for the year. The Company reaffirmed its $900-925 million revenue guidance. Compl. ¶ 150(d). The Company also said its Rochester gigafactory was on track to produce 100 megawatts of electrolyzer stacks per month by the fall. *See* Exh. 9 at 9.

At the same time, Plug Power reported it no longer expected it could achieve 70 TPD of liquid hydrogen production capacity by year-end. In its quarterly letter to shareholders, the Company provided an update on the status of construction of facilities in Georgia (in site preparation) and western New York (delayed by "permitting dynamics") and discussed an alternative approach to reaching its year-end goal of 70 TPD production capacity using a different mix of liquid and gaseous hydrogen production. Exh. 9 at 5, 7; *see* Compl. ¶ 150(a)-(c).

On October 14, 2022 – soon after the end of Q3 2022 but still weeks before its results would be reported – Plug Power issued a press release lowering by 5-10% its revenue guidance for the full year 2022. Compl. ¶ 163(a). The press release explained that the Company was being impacted by "broader supply chain issues" and that some customer projects that it had expected to deliver in 2022 now would be delayed until 2023. Exh. 11 at 1; *see* Compl. ¶¶ 163(a); 168.

On October 19, 2022, Plug Power hosted a symposium for securities analysts at its new Rochester, New York gigafactory. Compl. ¶¶ 202, 206, 208. During the symposium, the

Company provided an additional update on its expectations for hydrogen production capacity, including a new and reduced goal of 50 TPD of liquid and gaseous hydrogen production capacity by the end of 2022. *Id.* ¶¶ 151, 172-73.

On November 8, 2022, the Company reported its results for Q3 2022 and reaffirmed its lowered revenue goal of $810-880 million for the year. *Id.* ¶ 163(b). Plug Power reported that its gross margins had decreased due to a rise in the market price of hydrogen. *Id.* ¶ 179. The Company also disclosed that it expected to produce only 60-100 megawatts of electrolyzer stacks during the fourth quarter and did not expect to reach a monthly production rate of 100 megawatts until 2023. *See* Exh. 14 at 7. In addition, the Company reduced its goal for hydrogen production capacity by the end of 2022 to 45-50 TPD of liquid and gaseous hydrogen. Compl. ¶ 184.

### 4. Plug Power Reports Annual Revenue Growth But Short of Goal

In a business update call on January 25, 2023, Plug Power disclosed that it expected to report year-over-year revenue growth of roughly 45-50%, which was lower than its revised 2022 goal. *Id.* ¶ 191. The Company explained that during Q4, it encountered manufacturing and supply chain issues for new products and some customers had delayed projects into 2023. *Id.* ¶ 192. In its annual report filed on March 1, 2023, Plug Power reported full-year revenue of $701.4 million, *id.* ¶ 198, an increase of $200 million compared with 2021 but less than its revised goal for 2022.

### B. Procedural History

Plaintiffs' previous, consolidated complaint asserted claims for alleged violations of sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5, on behalf of an alleged class of purchasers of Plug Power's common stock between January 19, 2022 and March 1, 2023 against the Company and four of its officers: chief executive officer Andrew Marsh, chief financial officer Paul B. Middleton, chief strategy officer Sanjay Shrestha, and executive vice president of global manufacturing David Mindnich.

On February 4, 2025, the Court granted the defendants' motion to dismiss that complaint, holding that it did not "comply with the PSLRA" because plaintiffs had failed to identify "what [allegations] might plausibly support falsity and scienter" for each of the challenged statements. *Plug Power*, 2025 WL 388705, at *2. The Court also observed that "many (if not most) of the challenged statements are forward-looking statements – and thus protected by the PSLRA Safe Harbor[.]" *Id.* (citing 15 U.S.C. § 78u-5(c)). Separately, the "largely undated" "allegations gathered from 17 unnamed witnesses" were too vague for the Court to assess whether any "statements were false or misleading when they were made or whether there is a strong inference of scienter." *Id.* The Court instructed that if plaintiffs elected to amend their complaint, "the parties shall . . . meet and confer regarding which statements Plaintiff wishes the Court to assess on [a] motion to dismiss" before any such motion was filed. *Id.* at *2-3.

On February 25, 2025, plaintiffs filed their second amended complaint, which attempted to cure their prior impermissible "puzzle pleading" but did not change their theory of liability or the underlying factual allegations. As a result of discussions, the parties submitted a stipulation identifying nine statements, covering three topics, to be discussed in this motion to dismiss:

- Three statements regarding the status of construction and projected future hydrogen production of the Company's Georgia liquid hydrogen plant (Compl. ¶¶ 131, 132, 139);

- Three statements regarding its year-end hydrogen production target (*Id.* ¶¶ 150(a), 150(c), 152); and

- Three statements regarding its year-end revenue goal (*Id.* ¶¶ 157(b), 157(f), 163(b)).

*See* D.I. 70 (parties' proposal); D.I. 71 (order approving same). In the same stipulation and order, plaintiffs also dismissed their claims against Mr. Mindnich without prejudice. *See id.*

## LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (cleaned up).  "A possibility of relief is not enough."  *Plug Power*, 2025 WL 388705, at *1 (citing *Iqbal*, 556 U.S. at 678).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Securities fraud claims also must satisfy the heightened pleading requirements of the PSLRA.  *Id.* at *2 (citing *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018)).  Plaintiffs must "state with particularity facts giving rise to a ***strong inference***" that each defendant "acted with the requisite state of mind."  *Id.* (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)(A) and *Hertz*, 905 F.3d at 114).  That requires the inference of fraud to be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (quoting *Hertz*, 905 F.3d at 114); *see also* Fed. R. Civ. P. 9(b) (fraud must be pleaded with particularity).

## ARGUMENT

### THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

"To state a claim under Rule 10b-5, a plaintiff must demonstrate: (1) [a] material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation."  *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020).  The second amended complaint fails to plausibly allege at least two of these elements – falsity and scienter.

## I.   Plaintiffs Have Not Alleged an Actionable Misstatement or Omission.

### A.   The PSLRA Safe Harbor Bars Most of Plaintiffs' Claims.

Most of the statements challenged in the second amended complaint are "forward-looking statements" subject to the statutory "safe harbor" that "immunizes" them from liability.  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016); *see* 15 U.S.C. § 78u-5.  Under

the safe harbor, a forward-looking statement cannot give rise to liability if – as in this case – it was "identified as [forward-looking], and [was] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those in the statement. *Cooper Tire*, 834 F.3d at 490.[2]

### 1.   The Statements Were Forward-Looking.

Eight of the nine statements selected by plaintiffs to be the focus of this motion are forward-looking in whole or in significant part. *See* Compl. ¶¶ 131, 132, 150(a), 150(c), 152, 157(b), 157(f), 163(b)).  The statute defines the term "forward-looking statement" "broadly" to include statements regarding "***projection[s] of revenues***," "***plans and objectives of management for future operations***, including plans or objectives relating to the products or services of the issuer," or "***future economic performance***," as well as "any statement of the assumptions underlying or relating to" the foregoing.  *Inst. Investors Group v. Avaya*, 564 F.3d 242, 255 (3d Cir. 2009) (quoting 15 U.S.C. § 78u–5(i)(1)) (cleaned up; emphasis added).

Three of the nine statements here concerned Plug Power's revenue guidance for 2022.  *See* Compl. ¶¶ 157(b), 157(f), 163(b).  Three others concerned the Company's year-end hydrogen production goal.  *See id.* ¶¶ 150(a), 150(c), 152.  Finally, two of three statements regarding the Georgia liquid hydrogen plant being developed by Plug Power included estimates for the future completion date and future hydrogen production.  *See id.* ¶ 131 (estimating plant will "be producing some green hydrogen [] this February" and "will be 15 tons" by year end); *id.* ¶ 132 (the "15 TPD liquid plant" is "on schedule to be commissioned by the end of 2022").  The

---

[2] Congress enacted the safe harbor to "encourage[] companies to disclose forward-looking information," *Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *15 (D.N.J. Jan. 21, 2021) (quoting S. Rep. No. 104-98 (1995)), and not "fear" an "action for fraud" if those projections "did not materialize," *In re Biogen Idec, Inc. Sec. Litig.*, 2007 WL 9602250, at *10 (D. Mass. Oct. 25, 2007) (citing H.R. Conf. Rep. No. 104-369 (1995)), *aff'd*, 537 F.3d 35 (1st Cir. 2008).

Company identified each of these statements as forward-looking.  *See* Exh. 2 at 4; Exh. 4 at 15; Exh. 8 at 4; Exh. 9 at 14-15; Exh. 14 at 16; Exh. 15 at 4.[3]

Statements concerning future revenue goals are by definition forward looking.  15 U.S.C. § 78u-5(i)(1) ("projection of revenues" and "future economic performance"); *see Avaya*, 564 F.3d at 246-47, 255-57 (statements concerning projected revenue growth protected by safe harbor).  So too are statements concerning future hydrogen production and plant construction.  15 U.S.C. § 78u-5(i)(1)(B) ("plans and objectives of management for future operation"); *Avaya*, 564 F.3d at 255 (statements that company was "on track" could not "meaningfully be distinguished from the future projection of which they are a part"); *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (goal to "produce 5,000 vehicles per week" was forward-looking, even when accompanied by statements that company was "on track" and "there are no issues" that "would prevent" achieving that goal).

## 2.    <u>The Statements Were Qualified by Cautionary Language.</u>

These eight statements are immunized from liability under the federal securities laws because Plug Power provided investors with meaningful cautionary language that identified "important factors that could cause actual results to differ materially[.]"  15 U.S.C. § 78u-5(c)(1)(A)(i).  Under the safe harbor, "cautionary language" need not list "every factor" or "even the particular factor that ultimately causes the forward-looking statement not to come true."  *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 645 (D.N.J. 2021).  Disclosures are sufficiently cautionary if they are "substantive and tailored" to the subject.  *Nat'l Jr. Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 533 (D.N.J. 2010).  That standard is easily met.

---

[3] The complaint challenges 30 statements; 21 of the statements that are not the focus of this motion all concern goals for 2022 revenue or year-end hydrogen production capacity.  *See* Compl. ¶¶ 157, 163, 167-68, 183, 191 (revenue); 131-32, 139, 143, 146-47, 150-52, 173 (hydrogen).

The complaint alleges that Plug Power did not meet its revenue goal for 2022 because of "manufacturing and supply chain problems," Compl. ¶ 158; *see id.* ¶¶ 158(c)-(d), (f), 159(a)-(b), 164; hydrogen plant construction delays, *id.* ¶ 158(a); parts shortages, *id.* ¶ 158(b), (e), (g)-(h); and customer postponement of projects into 2023, *id.* ¶¶ 158(c)-(d); *id.* 159(a)-(b). Plaintiffs similarly assert that the Company fell short of its hydrogen production goal because defendants purportedly "concealed . . . then-existing problems," *id.* ¶ 158, including electrolyzer shortages, as well as delays in hydrogen plant construction and hydrogen production, *id.* ¶¶ 154, 158(a), (b), (c). The complaint further alleges, in fraud-by-hindsight style, that the 2022 revenue goal was misleading because the Company did not meet its 2022 hydrogen production goal. *Id.* ¶ 160.

All of these risks were covered in the Company's risk factor disclosures, including that:

- "We may not be able to achieve our growth strategy and increase production capacity as planned during the foreseeable future."

- "Delays in or not completing our product development goals may adversely affect our revenue and profitability."

- "Some of the orders we accept from customers . . . may be cancelled" and "[a] slowdown, delay, or reduction in a customer's orders could result in . . . unexpected quarterly fluctuations in our operating results."

- "[T]ime periods from receipt of an order to shipment date and installation vary widely and are determined by a number of factors, including . . . the customer's deployment plan."

- "We may be unable to successfully execute and operate our green hydrogen production projects and such projects may cost more and take longer to complete than we expect."

- "Our hydrogen production projects are dependent, in part, upon the Company's ability to meet our internal demand for electrolyzers required for such projects."

- "The timing and cost to complete the construction of our hydrogen production projects are subject to a number of factors outside of our control and such projects may take longer and cost more to complete and become operational than we expect."

- "The failure of a supplier to develop and supply components in a timely manner or at all, or to develop or supply components that meet our . . . requirements . . . could

10

impair our ability to manufacture our products or could increase our costs of production."

- "Our ability to source parts . . . from our suppliers could be disrupted or delayed in our supply chain which could adversely affect our results of operations."

- "We expect that these challenges [posed by global supply chains] will continue to have an impact on our business for the foreseeable future."

- "The failure of a supplier to develop and supply components in a timely manner or at all . . . could impair our ability to manufacture our products."

- "We anticipate that we will continue to incur losses until we can produce and sell our products and services on a large-scale and cost-effective basis. We cannot guarantee when we will operate profitably, if ever."

Exh. 6 at 3-6, 15-34. Each challenged statement referenced and incorporated these disclosures. *See* Exh. 2 at 4 (Jan. 19 call); Exh. 4 at 15 (Mar. 1 letter); Exh. 8 at 4 (May 9 call); Exh. 9 at 14-15 (Aug. 9 letter); Exh. 14 at 16 (Nov. 8 letter); Exh. 15 at 4 (Nov. 8 call).[4]

Appellate courts have relied on similar cautionary language in affirming dismissal of securities fraud complaints. *Avaya*, 564 F.3d at 257 (affirming dismissal where defendants "explicitly warned that Avaya's forward-looking statements 'may turn out to be wrong'" including because of "price and product competition" that plaintiffs alleged to be the reason for falsity); *see also Tesla, Inc.*, 985 F.3d at 1193 n.3 (citing "detailed and specific" language cautioning that results could "differ materially from those projected" in action challenging statements concerning production capacity for mass-market electric car).

Plaintiffs' contention that the challenged forward-looking statements "lack[ed] any reasonable basis," Compl. ¶ 158, is just a variation on the argument that defendants did not believe

---

[4] The Company's January 2022 discussion of its goals for the year incorporated equally robust risk factor disclosures that had been set forth in Plug Power's annual report on Form 10-K for 2021. *See* Exh. 3 at 2; Exh. 1 at 4-8, 14-31 (risks include "ability to source parts and raw materials," "supply chain" disruptions, "[d]elays in or not completing our product development goals," and hurdles with "development of hydrogen production plants across the United States").

the goals when they were announced. But for the safe harbor to apply, whether defendants "believed th[e] statement[s] to be true at the time is irrelevant, as long as there was sufficient 'meaningful cautionary language.'" *Cooper Tire*, 834 F.3d at 503 (citation omitted).

### 3.    The "Actual Knowledge" Prong of the Safe Harbor Also Applies.

"[E]ven in the absence of . . . meaningful cautionary language, the second entrance to the safe harbor is available to 'immunize[] from liability any forward looking statement" if a plaintiff "fails to show the statement was made with actual knowledge of its falsehood.'" *Cooper Tire*, 834 F.3d at 491 (quoting *Avaya*, 564 F.3d at 254); *see* 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiffs have failed to plausibly allege that any defendants had "actual knowledge" that the challenged forward-looking statements were false or misleading here – a more demanding pleading standard than even the "strong inference" standard for allegations of scienter. *See infra* at 20-29.

### B.    The Complaint Also Fails to Plausibly Allege Falsity for Other Reasons.

Even if the PSLRA safe harbor did not immunize them, the complaint does not plausibly allege that six opinion statements concerning the Company's revenue and hydrogen production goals for 2022, or three statements concerning the status of construction of the Company's Georgia project, were actionably false or misleading.

The six statements about Plug Power's revenue and hydrogen production goals were statements of opinion because they "express[ed] expectations about the future[.]" *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *4 (D. Del. Feb. 7, 2020) (collecting cases). That type of statement is not actionable unless "(1) the speaker did not actually hold the stated belief at the time made; (2) the opinion contains 'embedded statements of fact' that were untrue; or (3) the speaker omitted known material facts that 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015)). Plaintiffs argue that the statements omitted material

facts, but prevailing on this theory is "no small task for an investor." *Omnicare*, 575 U.S. at 194. It requires showing that an "undisclosed fact made it impossible for the speaker's opinion to be correct." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *13 (W.D. Pa. May 18, 2023).

### 1.    Statements Concerning Revenue Goals for 2022.

During an annual update call on January 19, 2022, Mr. Marsh announced the Company's revenue goal of $900-925 million for 2022.  Compl. ¶ 157(b).  On May 9, 2022, the Company reiterated that guidance.  *Id.* ¶ 157(f).  Then, in a press release dated October 14, 2022, Plug Power reduced its revenue goal by 5-10% due to "recent[]" "supply chain issues" and the deferral of some customer orders into 2023.  Exh. 11 at 1.  It "[r]eaffirm[ed]" that reduced guidance when it announced results for Q3 2022 on November 8, 2022, citing the same recent "delays due to supply chain and timing of some large projects."  Exh. 14 at 1, 12; *see* Compl. ¶ 163(b).

Nothing suggests that any defendant disbelieved the guidance when it was issued.  In each of the previous two years, the Company exceeded its revenue/gross billing goals.  *See* Exh. 20 at 14; Exh. 22 at 1; Exh. 21 at 8; Exh. 4 at 1 ($337 million actual vs. $300 million projected in 2020; $502 million actual vs. $475 million projected in 2021).  Because Plug Power historically generated more revenue in the second half of each year, its revenue through Q2 2022 – reported in August – also provided assurance about the original revenue goal for the full year.  Exh. 9 at 12.

Likewise, no facts support plaintiffs' contention that ***undisclosed*** "manufacturing and supply chain problems" made Plug Power's revenue goal unachievable.  Compl. ¶ 158; *see id.* ¶ 164 (similar regarding revised target).  Defendants discussed supply chain challenges throughout the alleged class period.  *See id.* ¶ 237 ("one of the reasons I have Dave [Mindnich] and supply chain people who worked at Tesla is they were really good at working through getting components during the crisis.  And we work [at] it every day."); Exh. 2 at 20 ("I don't want to downplay the supply chain issues."); Exh. 5 at 7 (discussing the "very difficult supply chain" that "we exist in

today"); Exh. 10 at 7 ("I'm not trying on this call, [to] downplay that we don't fight supply chain issues every day.  We do.").  And the complaint describes steps defendants took to address the issues.  *See* Compl. ¶¶ 97-98 (alleging "daily calls" and "daily meetings" "in which supply chain issues were discussed"); *id.* ¶ 104 (alleging employees would "alter older versions of components" to work around parts shortages); *id.* ¶ 106 (alleging the Company "went to great lengths and expended significant resources to retrieve components from suppliers to mitigate . . . supply chain problems"); *id.* ¶ 108 (alleging Company would purchase excess parts when available); *id.* ¶ 122 (alleging "bi-weekly team meetings" to discuss supply chain).

Allegations from purported confidential "witnesses" – still "largely undated" – also do not support any plausible inference that "statements were false or misleading when they were made[.]" *Plug Power*, 2025 WL 388705, at *2.  Despite the Court's instruction that they be specific, plaintiffs have only added date *ranges* spanning several months to some CW allegations.  That still is not enough to support a plausible inference that any statement was false when made.  *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (allegations "must be sufficient to show that the challenged statements were actionably unsound when made"); *see also Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020) (undated allegations cannot show "contemporaneous falsity").  As a general matter, most of the CW allegations concern supply chain difficulties and customer order delays, which defendants repeatedly discussed during the period in question.  *See supra* at 13-14; *see also infra* at 20-29.

Plaintiffs place great weight on a CW allegation attributed to a short-term former employee that, during a "company-wide Zoom call[]" sometime "between late-August and late-September 2022," Mr. Marsh supposedly said that Plug Power "was behind on either its sales or revenue targets."  *Id.* ¶¶ 128, 165.  That vague recollection, uncorroborated by any other source, is entitled to no deference.  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404,

422 (D. Del. 2009) (CW statement unreliable where "there are no facts pleaded to corroborate this source's statements"). Even if considered, that supposed remark does not support plaintiffs' fraud claims because it allegedly occurred *after* statements in January and May discussing the Company's revenue goal of $900-925 million, Compl. ¶¶ 157(b), (f), and soon before Plug Power publicly lowered its revenue outlook by 5-10% in October, *see* Exh. 11 at 1; Compl. ¶ 163(b).

Similarly, an allegation concerning construction delays at the Slingerlands fuel cell plant beginning in "January 2021," Compl. ¶ 158(a), does not conflict with any challenged statement. Plaintiffs acknowledge Plug Power broke ground for the Slingerlands plant in March 2022, and GenDrive fuel cells were being made there at scale by November 2022, *id.* ¶ 109; *see id.* ¶ 143(d).

None of these allegations shows a mismatch between the Company's stated revenue goal for 2022 and **undisclosed** facts in existence at the time. *See Tesla, Inc.*, 985 F.3d at 1194 (opinions not actionable where plaintiffs had not alleged that defendants "knew their year's end goal was impossible to achieve"); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340, 1341 n.9 (10th Cir. 2012) (statement that project was "tracking within expectations" not actionable even though project "was behind schedule and over budget" because defendants can express optimism in their ability to successfully fix those problems).

### 2. Statements Concerning Hydrogen Production Capacity.

Plaintiffs also do not plead any facts conflicting with challenged opinion statements concerning the Company's future hydrogen production capacity. These include statements in August 2022 that Plug Power was "on track" to meet its initial goal of 70 TPD of capacity by year-end, Compl. ¶¶ 150(a), (c), and a statement in November 2022 affirming the Company's October 2022 revised guidance of 45-50 TPD in anticipated production by year-end, *id.* ¶ 152.

Plaintiffs largely ignore that the Company revised its outlook for future hydrogen production over the course of 2022. In January, Plug Power's stated goal was to have 70 TPD of

liquid hydrogen capacity by year-end. *Id.* ¶ 143(a)-(c). As the year progressed, however, that goal was revised, first by acknowledging delays in bringing *liquid* hydrogen capacity online and substituting *gaseous* capacity, Exh. 9 at 5-8; Compl. ¶ 150(a)-(c), and then by reducing the expectation to 45-50 TPD by year-end, Exh. 11 at 1; Compl. ¶¶ 151-52. Plug Power also explained that these complex projects take time to ramp up. For example, its Tennessee plant reached 93% of its expanded capacity six months after commissioning. *See* Exh. 4 at 2; Exh. 8 at 6. Plaintiffs cannot avoid dismissal by ignoring the context provided by defendants' statements as a whole. *See Cooper Tire*, 834 F.3d at 489 ("[o]ne purpose of the [PSLRA] is to prevent disappointed investors from treating every imprecise statement . . . as an invitation to file a lawsuit").

In response, plaintiffs again fall back on discredited and inconsistent allegations from confidential "witnesses." Based on statements attributed to CW1, plaintiffs contend that the Company's hydrogen production targets were "way off" and certain facilities were "three years out in service." Compl. ¶ 153(b). But CW1 disavowed those allegations and denied discussing such opinions with any defendant. *See* Disavowal Letter at 2-3. Plaintiffs also allege, based on statements attributed to CW2, that a certain plant "was still not operational as of June 2023," but CW2 is alleged to have left Plug Power months earlier, in November 2022. Compl. ¶ 153(a). Plaintiffs then assert that unidentified "senior management knew by June or July 2022" that the "hydrogen production targets were impossible to meet." *Id.* But plaintiffs do not allege how CW2 obtained this information, and the allegation is entitled to no weight. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007) (discounting CW allegations based on "hearsay rather than personal knowledge"). In any event, plaintiffs acknowledge that the Company lowered its estimate of its future hydrogen production capacity soon after July. *See* Compl. ¶¶ 151-52.

Plaintiffs also cite the subjective opinions of CWs that project schedules were "unrealistic," *id.* ¶ 153(c); *see id.* ¶¶ 153(a), (b), but they do not allege that information was communicated to

16

any defendant, much less explain why opinions held by unnamed employees rendered goals unachievable. Internal "differences of opinion" or "disagreements" such as these are not a basis to infer securities fraud. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) (internal "difference of opinion" does not show a lack of reasonable basis); *see also Tesla, Inc.*, 985 F.3d at 1194 (plaintiffs failed to allege that defendants ever accepted former employees' subjective views that goals were "impossible" to achieve).[5]

### 3. Statements Concerning Hydrogen Production Facilities.

Plaintiffs similarly do not plausibly allege falsity for the three challenged statements about construction of Plug Power's Georgia hydrogen production facilities. During an investor call on January 19, 2022, Mr. Marsh discussed a green hydrogen plant "that's being constructed in Georgia." Compl. ¶ 131; Exh. 2 at 10. Later, the Company's March 1, 2022 investor letter stated that the Georgia site is "under construction for a 15 TPD liquid plant." Compl. ¶ 132; Exh. 4 at 5.

Plaintiffs challenge these statements based on a promotional video from May 2023 stating the Georgia facility "is being completed in eleven months," which they contend shows that construction "did not begin until eleven months earlier, in June 2022." Compl. ¶ 134. Plaintiffs also cite an August 9, 2023 earnings call in which Mr. Shrestha stated that the facility was "still coming online in 12 months since we actually issued the EPC [engineering, procurement, and construction] contract," which plaintiffs believe shows that construction only began in "August 2022." *Id.* ¶ 135. Finally, plaintiffs point to a January 23, 2024 statement in which "Plug [Power] indicated that the plant had been finished in '18 months,' placing the start of construction in summer 2022." *Id.* ¶ 136.

---

[5] Because most of these CW allegations also are undated, they cannot support any plausible inference of falsity, especially given the admitted updates to Plug Power's hydrogen production target throughout 2022. *Globus Med.*, 869 F.3d at 244; *see Woolgar*, 477 F. Supp. 3d at 221.

None of these hindsight arguments suggest that defendants' statements were knowingly false when made. As an initial matter, Plug Power announced in August 2021 that it had broken ground on the Georgia facility, Exh. 23 at 1, and its March 1, 2022 investor letter included photos of the site under construction, Exh. 4 at 5. Plaintiffs do not dispute either. To the contrary, the complaint admits that "pipes had been installed" at the site by "May 2022." Compl. ¶ 86.

The later comment that the Georgia plant was "still coming online in 12 months since we actually issued the EPC contract," *id.* ¶ 135, also does not support an inference that earlier challenged statements were false. Plaintiffs improperly conflate the start of construction with entry into the EPC contract, but the only "fact" they offer for equating the two is a footnote that describes EPC contracts generally. *See id.* ¶ 135 n.5. That does not conflict with Mr. Shreshtha's statement. Plaintiffs also falsely equate the plant "coming online" with the end of construction, but that ignores the Company's explanation that plants can take months after commissioning to reach their production capacity. *See supra* at 16. The January 23, 2024 statement that "the plant had been finished in '18 months,'" *id.* ¶ 136, similarly does not say *when* construction began or concluded; it only states how long construction took. None of this semantic gamesmanship supports an inference of falsity. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 210 (E.D. Pa. 2021) (granting motion to dismiss because plaintiffs failed to allege statements regarding the timeline of construction were knowingly false when made).[6]

Finally, plaintiffs challenge a statement in August 2022 that "2.5 TPD Green gaseous production" was "online at [the] Georgia facility." Compl. ¶ 139. The complaint asserts this was

---

[6] Plaintiffs contradict themselves on this point, alleging at different times that construction took 11, 12, or 18 months, and that construction began in either June or August 2022. *See* Compl. ¶¶ 134-36. And CW accounts that Plug Power faced "major difficulties" with new projects generally, *see id.* ¶ 137, have no bearing on when construction began for the Georgia plant.

false because one CW relayed an unsupported comment about purportedly symbolic testing made by an unidentified "mechanical inspector." *Id.* ¶ 89. But the complaint alleges the CW "did not know whether the information relayed" to that CW about the alleged testing "served as the basis for the Company's public announcement" concerning the facility. *Id.* That kind of hearsay and conjecture is not entitled to the presumption of truth. *See Intelligroup*, 527 F. Supp. 2d at 360-61.

## II.    Plaintiffs Have Not Alleged Facts Supporting a Strong Inference of Scienter.

The complaint also should be dismissed because it does not allege facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). A court evaluating scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). To be "strong," an inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. This requires factual allegations of both "motive and opportunity" to commit fraud and "conscious misbehavior or recklessness," *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *11-12 (D.N.J. Mar. 14, 2023), or in the case of forward-looking statements, actual knowledge of falsity, *Globus Med.*, 869 F.3d at 244. "Where motive is not apparent, . . . the strength of the circumstantial allegations must be correspondingly greater." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004) (collecting cases).

### A.    Plaintiffs Continue to Rely on Impermissible Group Pleading.

A "strong inference" of fraudulent intent must be alleged for ***each*** defendant. *Winer Family Tr. v. Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007). The second amended complaint disregards this bedrock requirement, repeatedly making allegations about all "Defendants" – a term that appears more than 150 times in the complaint – as an undifferentiated group. *See, e.g.*, Compl. ¶¶ 222-43 (numerous allegations about what unspecified "Defendants" or unidentified

"senior management" purportedly "knew" or "were aware" of). That kind of "group pleading" is "no longer viable[.]" *Winer Family Tr.*, 503 F.3d at 337.

## B. The Complaint Still Lacks Any Motive Allegations.

Plaintiffs still fail to allege that any of the defendants had any personal motive to commit fraud. They do not identify any stock transactions or otherwise allege that any "defendants stood to gain in a concrete and personal way from one or more of the allegedly false and misleading statements[.]" *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 414 (D.N.J. 2004). Courts "have consistently weighed" the lack of such allegations "against an inference of scienter." *Lewakowski*, 2023 WL 2496504, at *12 (collecting cases); *see Nat'l Jr. Baseball League*, 720 F. Supp. 2d at 550 ("no strong inference of scienter" given absence of stock sale allegations); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) (no scienter where "plaintiffs have not alleged any theory as to why the defendants would knowingly mislead investors").

## C. The Complaint Does Not Plead Circumstantial Evidence of Scienter.

Given the absence of motive allegations, plaintiffs were required to plead "correspondingly greater" circumstantial evidence of each defendant's scienter. *GSC Partners*, 368 F.3d at 238. Since most challenged statements are forward-looking, recklessness is not enough. Plaintiffs must set forth allegations supporting a strong inference that each statement was knowingly false when made. *Globus Med.*, 869 F.3d at 244; *Avaya*, 564 F.3d at 274. The complaint still does not do so.

### 1. <u>The Confidential Witnesses Allegations Should be Steeply Discounted.</u>

The numerous allegations that plaintiffs attribute to 17 anonymous "witnesses" must be evaluated considering their claimed "basis of knowledge," "reliability," and "coherence and plausibility[.]" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). "If anonymous source allegations are found wanting with respect to these criteria, then [courts] must discount them steeply[.]" *Avaya*, 564 F.3d at 263 (citing *Tellabs*, 551 U.S. at 310).

Almost none of the CWs here had any alleged contact with the individual defendants, and none had any alleged role in preparing the Company's 2022 revenue or hydrogen production guidance. CWs "who are not alleged to have had any communication with" individual defendants "fail to demonstrate" any individual's scienter. *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *18 (D.N.J. Sept. 15, 2021); *see Woolgar*, 477 F. Supp. 3d at 220 (allegations insufficient where most CWs had no direct contact with individual defendants and did not "know what information they possessed"). Nor is it permissible to paper over such defects by alleging that issues were "common knowledge" or were reported up the "chain of command," as plaintiffs attempt to do here. Compl. ¶¶ 99, 121; *see Chubb Corp.*, 394 F.3d at 155 (assertions of supposed common knowledge are impermissible "speculation"); *Intelligroup*, 527 F. Supp. 2d at 360-61 (similar). Most of the CW allegations also still fail to state "the particular dates on which the relevant information was [allegedly] acquired." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 401 (D.N.J. 2010); *see Woolgar*, 477 F. Supp. 3d at 220-21 (discounting similar vague, undated allegations).

Allegations attributed to "Witness 1" should be discounted even more because "Witness 1" has "***disavow[ed]***" every statement attributed to them and stated "that the information attributed to [them] ***and to others*** in the [c]omplaint ***are* '*lies*.'"" Disavowal Letter at 2 (emphasis added). Recanted allegations are not entitled to the presumption of truth. *See City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 760 (7th Cir. 2013) (allegations not entitled to deference where CW "denied . . . everything that the investigator had reported"); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (same, where CW "expressly disclaimed the allegations attributed to him in the complaint"); *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1228 (N.D. Ga. 2012) (upon reconsideration, granting motion to dismiss based on CW's recantation).

### 2.    No Scienter for Statements Concerning 2022 Revenue Goal.

The complaint does not plausibly allege that any challenged statement about the Company's 2022 revenue goal was false when made, much less supply factual allegations supporting a "strong" inference that any defendant intended to commit fraud in making it.

*First*, most of the scienter allegations concerning the three revenue-related statements at issue in this motion raise generalized allegations about supply chain difficulties or parts shortages. *See* Compl. ¶¶ 158(b) (Latham plant "struggled daily with missing parts"); 158(c) ("inability to source components from suppliers"); 158(d) ("constant supply chain issues"); 158(e) (Company "never had any replacement parts" for a client); 158(f) ("'huge' supply chain issues at the [Latham] plant"); 158(g) ("electrolyzers and related equipment . . . were always scarce"); 158(g) ("supply sources could not meet the Company's demand"); 159(a) ("constant supply chain issues" at Latham); 159(b) ("the supply chain was always a problem" for products for certain customers). But as already discussed, defendants were candid in discussing supply chain problems and their impact on the Company both before and during the putative class period.  *See supra* at 13-14. Nothing suggests there were undisclosed problems with the supply chain.  To the contrary, when issues became worse in Q3 2022, Plug Power lowered its revenue target while pointing to supply chain challenges as one of the reasons.  *See supra* at 4-5.

Given the Company's regular updates to investors and its revision of goals based on supply chain difficulties and parts shortages, the complaint does not plausibly allege that these disclosed business challenges rendered Plug Power's revenue goals knowingly false or "impossible to achieve." *Tesla, Inc.*, 985 F.3d at 1194.  Nor do plaintiffs plausibly allege that the challenges were any worse during the putative class period than they had been since the COVID-19 pandemic began – when the Company regularly exceeded its annual goals.  *See Avaya*, 564 F.3d at 275 (meeting or exceeding expectations in prior periods undermine inference of scienter for revenue

targets); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997) (same).

The Company's strong reported revenue for the first two quarters of 2022 also "fatally weaken[s]

any inference of scienter" for challenged statements through August 9, 2022. *Avaya*, 564 F.3d at

272 (no liability for future revenue targets made prior to and "on the same day as the release of

[quarterly] results, which . . . were 'in line with, or better than, analysts' expectations'").

    *Second*, no inference of scienter can be drawn from an allegation from a CW that sometime

in "Q2 2022, Plug [Power] lowered its internal 2022 production goal of 15,000 to 16,000 GenDrive

units to just over 10,000 units due primarily to supply chain issues and customer pushouts."

Compl. ¶ 159(a). The complaint acknowledges that Plug Power updated its 2022 revenue goal on

October 14, 2022 and "attributed this revised guidance to 'some larger projects potentially being

completed in 2023 instead of 2022 due to timing and broader supply chain issues,'" *id.* ¶¶ 163(a);

168, the same factors allegedly mentioned by the confidential witness for the change in the

production goals. This allegation does not show "actual knowledge" by any defendant that any

challenged statements were false. *See Tesla, Inc.*, 985 F.3d at 1185-90; *Globus Med.*, 869 F.3d at

246; *Avaya*, 564 F.3d at 274.

    Conclusory assertions that some customer projects "were pushed out into 2023" fall short

for the same reason. Compl. ¶ 159(b); *see id.* ¶ 159(a) (customer "push outs"); *id.* ¶¶ 158(c)-(d)

(customer "dissatisfaction" and delays in meeting orders). Putting aside the absence of any

specific timing for those allegations, no facts have been alleged suggesting these issues were

different than the customer postponements that led Plug Power to reduce its 2022 revenue goal in

October. *See Globus Med.*, 869 F.3d at 246 ("knowledge that sales from one source might decrease

is not the same as actual knowledge that the company's overall sales projections are false" and

"does not mean that [the company] failed to account for this drop in its projections"). Similarly,

the allegation that the Company was "behind on either its sales or revenue targets" in "late-August"

or "late-September 2022," Compl. ¶ 165, does not support scienter since this was after earlier statements about year-end revenue and shortly before Plug Power's October press release lowering that guidance by 5-10%. Exh. 11 at 1; Compl. ¶ 163(b).

*Third*, plaintiffs' allegation that Mr. Mindnich and his team were "hired by Plug [Power] from Tesla" to address supply chain issues is self-defeating. Compl. ¶ 158(c). The Company told investors the team was hired expressly for that purpose, *id.* ¶ 237, and the complaint acknowledges the team held "daily" meetings to address supply chain challenges, *id.* ¶¶ 97, 233-34. This shows "a pursuit of truth rather than reckless indifference to the truth," which is "a very great distance from . . . intent to deceive." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007); *see In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 904 (N.D. Ohio 2006) (no scienter where defendants "acted diligently in remedying problems").[7]

### 3. No Scienter for Statements Concerning Future Hydrogen Production.

In an attempt to allege scienter for statements concerning the Company's future hydrogen production capacity, plaintiffs again rely heavily on disavowed allegations attributed to CW1. The complaint alleges that CW1 purportedly "told" "senior management" that goals for the Company's future hydrogen production were "hilariously off" and told Mr. Marsh that "the facilities they were constructing were 'three years out in service.'" Compl. ¶ 153(b). But plaintiffs later admitted that CW1 told them those were just CW1's "own opinion" and "not said to anyone in particular." Disavowal Letter at 2. CW1 also told plaintiffs' counsel that CW1 does not know whether Mr. Marsh ever "received this information." *Id.* Even if these disavowals alone were not sufficient to eliminate the allegations, no allegations suggest Mr. Marsh "shared" such "gloomy view[s]," so

---

[7] For the same reasons, plaintiffs fail to allege scienter for the remaining challenged statements concerning Plug Power's 2022 revenue goals, which are not the subject of defendants' motion to dismiss. *See* Compl. ¶¶ 157(a), 157(c)-(d), 157(g), 163(a), 163(c), 167, 183, 191.

there can be no inference of scienter based on CW1's opinions. *Tesla, Inc.*, 985 F.3d at 1194; *see Chubb Corp.*, 394 F.3d at 147 (refusing to credit conclusory opinion something was a "failure"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations" without facts substantiating them are "insufficient").[8]

The complaint further alleges that CW2 "said that the fact that the hydrogen production targets were not realistic was communicated to Plug [Power] senior management, including [Mr.] Shrestha, and that senior management knew in June or July of 2022 that the targets were impossible to meet." Compl. ¶ 153(a). The complaint also alleges that, according to CW3, "there was a 'strong awareness' by all employees that [a certain] schedule was unachievable." *Id.* Yet the complaint does not explain how those CWs knew this information, who allegedly communicated the supposed "facts" to "senior management," or why the Company's publicly stated goals were "not realistic" or "unachievable." Such generalized allegations are not enough to support a "strong" inference of scienter. *Chubb Corp.*, 394 F.3d at 155; *see Intelligroup*, 527 F. Supp. 2d at 360–61 (refusing to credit conclusory allegations of supposed common knowledge). Nor is there any allegation that any defendant agreed with such negative sentiments, *Tesla, Inc.*, 985 F.3d at 1194, or that these issues rendered the Company's goals for future hydrogen production knowingly false, *Globus Med.*, 869 F.3d at 246; *Avaya*, 564 F.3d at 274; *see Anderson v. Spirit Aerosystems Hldgs., Inc.*, 827 F.3d 1229, 1240 (10th Cir. 2016).[9]

---

[8] For the same reasons, plaintiffs fail to allege scienter for the remaining challenged statements concerning Plug Power's 2022 hydrogen production capacity, which are not the subject of defendants' motion to dismiss. *See* Compl. ¶¶ 143, 146, 147, 150(b), 150(d), 151, 173.

[9] Allegations attributed to CW2 are also inconsistent, undermining their credibility. CW2 claims both that the Georgia facility had "not received its first electrolyzer by February 2022" and that "five stacks" of electrolyzers "arrived[d] at the site [in] April 2021." *Compare* Compl. ¶ 78, *with id.* ¶ 90; *see Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Hldgs., Inc.*, 673 F. Supp. 2d 718, 737 (S.D. Ind. 2009) (declining to credit "inconsistent" CW allegation), *aff'd*, 679 F.3d 952 (7th Cir. 2012).

### 4.    Plaintiff Does Not Allege Conscious Misbehavior or Recklessness.

For the non-forward-looking portions of the three statements regarding construction of the Georgia hydrogen plant, the complaint does not plead circumstantial evidence of conscious misbehavior or recklessness. *See* Compl. ¶¶ 131, 132 (January and March 2022 statements that the Georgia plant was under construction), 139 (August 2022 statement that 2.5 TPD gaseous production is "online at [the] Georgia facility"). Recklessness for this purpose requires more than "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care" "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42. Allegations of "corporate mismanagement" are not enough. *Id.*

Plaintiffs do not challenge Plug Power's August 2021 disclosure that it had broken ground on the Georgia facility, Exh. 23 at 1, or its March 2022 investor letter showing images of the facility under construction, Exh. 4 at 5. Indeed, the complaint alleges "pipes had been installed" at the Georgia site by "May 2022." Compl. ¶ 86. The complaint also is confused about whether the facility was constructed in 11, 12, or 18 months, while at the same time failing to allege facts to support conjecture about when construction started. *Id.* ¶¶ 134-36; *see Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) ("there can be no Section 10(b) claim" where "the alleged omissions are contradicted by the company's public disclosures"); *see also Energy Transfer*, 532 F. Supp. 3d at 210 (no scienter where plaintiffs failed to allege facts showing that statements regarding timeline of construction were knowingly false when made).[10]

---

[10] In any event, the primary import of the challenged statements about the status of the Georgia plant was whether Plug Power could rely on its anticipated 15 TPD of hydrogen production capacity by the end of 2022. When subsequent developments showed the plant would not produce 15 TPD until after 2022, Plug Power revised its year-end goal to reflect this. *See* Compl. ¶¶ 150-52.

Nor can plaintiffs establish scienter for a statement in August 2022 that "2.5 TPD Green gaseous production" was "online" at the Georgia facility.  Compl. ¶ 139.  Plaintiffs' challenge to that statement is based on a CW relating hearsay from an unidentified "mechanical inspector" about allegedly symbolic "testing" conducted before production began.  *Id.* ¶ 89.  But the CW admitted they "did not know whether" that alleged test "served as the basis for the Company's public announcement."  *Id.*  The complaint also does not allege facts suggesting that any defendant knew about this alleged test or had any other contemporaneous knowledge conflicting with the challenged statement.  *Avaya*, 564 F.3d at 263; *Becton, Dickinson*, 2021 WL 4191467, at *18.

To the extent any challenged statements about the Company's revenue and hydrogen production goals are found not to be subject to the PSLRA safe harbor (they are), plaintiffs still cannot plead scienter for them.  Plaintiffs' challenge to statements about Plug Power's revenue goals depends almost entirely on "general reports of delay and mismanagement." *Spirit Aerosys.*, 827 F.3d at 1243.  Without any facts connecting these issues to any challenged statements or any individual defendant, such allegations cannot support the inference that "executives ***must have long known***" about undisclosed issues with supply chain, operations, or similar problems.  *Id.* (emphasis added).

The Company's admittedly frequent updates also factor strongly against any inference of scienter.  For example, weeks before its Q3 2022 financials were due, Plug Power publicly lowered its revenue target by 5-10% based on recent developments.  Compl. ¶ 163(a)-(b).  It did the same soon after the end of Q4 2022, when it reported its 2022 revenue target would be only 45-50% more than in 2021.  *Id.* ¶ 163(c).  Such proactive updates strongly contradict any inference that defendants "behaved recklessly."  *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004); *see Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at *19 (E.D.N.C. Mar. 22, 2013) (updates about effect of "delays . . . militate against an inference of scienter");

*Gaines v. Guidant Corp.*, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004) (disclosure of negative information "substantially undercut an inference that Defendants were . . . attempting to mislead the investing public"). The "most plausible inference" is that defendants responded to new information as it developed and provided updates when they were required. *See Winer Family Tr.*, 503 F.3d at 332.

Similarly, plaintiffs' challenges to statements about Plug Power's hydrogen production goals amount to alleged differences of opinion based on the alleged subjective beliefs held by unidentified former employees. Companies are permitted to push employees to meet difficult objectives, and it does not amount to fraud that some employees think those objectives cannot be met. *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017) ("creat[ing] a pressurized environment to meet sales goals" is not securities fraud); *see Tesla, Inc.*, 985 F.3d at 1186 (affirming dismissal despite allegation that employee was pushed out after claiming production goals were "unattainable"); *see also Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *14 (D. Ariz. Feb. 7, 2023) (similar); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 685 n.31 (N.D. Tex. 2017) (dismissing claims where "[e]xecutive defendants set 'unrealistic' and 'totally unattainable' sales goals . . . [d]espite repeated push-back" from employees).

As with its revenue guidance, Plug Power provided regular updates about the development of its hydrogen production capacity, including lowering its 2022 year-end goal from 70 TPD of liquid hydrogen, Compl. ¶ 143(a), to 70 TPD of liquid and gaseous hydrogen, *id.* ¶ 150(a)-(c), to 45-50 TPD of liquid and gaseous hydrogen, Exh. 11 at 1; *see* Compl. ¶¶ 151-52. These updates strongly contradict any inference that defendants were acting with an intent to defraud. *N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *14 (C.D. Cal. Sep. 25, 2009) ("[t]he public disclosure of the company's problems and its efforts to address those problems (no

matter how inadequate the efforts ultimately proved to be) weighs against a conclusion that [defendants] knowingly or recklessly made misleading public statements").

### 5.    No Scienter Based on "Core Operations" or "Corporate Scienter."

Plaintiffs' conclusory assertion that the challenged statements "concerned Plug [Power]'s core operations," Compl. ¶ 243, does not support scienter because there are no allegations "of specific information conveyed to management and related to the fraud." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018); *In re Amarin Corp. PLC., Sec. Litig.*, 2015 WL 3954190, at *12 (D.N.J. June 29, 2015) (same); *see Nat'l Jr. Baseball League*, 720 F. Supp. 2d at 556 (rejecting core operations doctrine given lack of "other individualized allegations").

Because plaintiffs do not "raise a strong inference of scienter" as to any of the individual defendants, the complaint also fails to allege scienter as to the Company. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011). Nor does the complaint set forth plausible allegations of fraud sufficient to invoke the doctrine of corporate scienter. *Hertz*, 905 F.3d at 121 (rejecting corporate scienter where alleged "errors were [not] so obvious that only an attitude of reckless disregard" could have explained them).

## III.    The Complaint Does Not Plead a Scheme to Defraud.

To the extent plaintiffs purport to assert a "scheme" claim under Rule 10b-5(a) and (c), *see* Compl. ¶¶ 245-46, it should be dismissed because it is not supported by any fact allegations. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). In addition, scheme claims require "something beyond misstatements and omissions," and there are no such allegations here. *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).

## IV.    The "Controlling Person" Claim Also Should Be Dismissed.

Because plaintiffs have not alleged a primary violation under section 10(b) of the Exchange Act, the "controlling person" claims also should be dismissed. *Globus Med.*, 869 F.3d at 246.

## CONCLUSION

The second amended complaint fails to state a claim for violations of the federal securities laws and should be dismissed.  Given plaintiffs' "repeated failures" to state a claim after being given leave to replead, the Court should dismiss all claims asserted in the second amended complaint with prejudice.  *Stovall v. Grazioli*, 2023 WL 3116439, at *3 (3d Cir. Apr. 27, 2023).

Dated: April 30, 2025                    Respectfully submitted,

Of Counsel:                              DLA PIPER LLP (US)

John J. Clarke, Jr.*                     By:  */s/ Ronald N. Brown, III*
john.clarke@us.dlapiper.com                   Ronald N. Brown, III (Bar No. 4831)
DLA PIPER LLP (US)                            ronald.brown@us.dlapiper.com
1251 Avenue of the Americas, 27th Floor       Peter H. Kyle (Bar No. 5918)
New York, New York 10020-1104                 peter.kyle@us.dlapiper.com
(212) 335-4500                           1201 North Market Street, Suite 2100
                                         Wilmington, Delaware 19801
                                         (302) 468-5700

Yan Grinblat*                            *Counsel for Defendant Plug Power Inc.*
yan.grinblat@us.dlapiper.com
DLA PIPER LLP (US)                       RICHARDS, LAYTON, & FINGER P.A
444 W. Lake Street, Suite 900
Chicago, Illinois 60606                  By:  */s/Rudolf Koch*
(312) 368-4000                                Rudolf Koch (Bar No. 4947)
* Admitted *pro hac vice*                     koch@rlf.com
                                              Jason J. Rawnsley (Bar No. 5379)
                                              rawnsley@rlf.com
                                         920 North King Street
                                         Wilmington, Delaware 19801
                                         (302) 651-7700

                                         *Counsel for Defendants*
                                         *Andrew Marsh, Paul B. Middleton,*
                                         *and Sanjay Shrestha*