# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE PLUG POWER INC. SECURITIES LITIGATION | C.A. No. 23-409 (JLH) CONSOLIDATED |

## LEAD PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**ROBBINS GELLER RUDMAN**
**& DOWD LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted *pro hac vice*)
Desiree Cummings (admitted *pro hac vice*)
Jai Chandrasekhar (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
(212) 432-5100

*Lead Counsel for the Class*

**FRIEDLANDER & GORRIS, P.A.**
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE  19801
(302) 573-3500

*Liaison Counsel for the Class*

Dated:  June 18, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

PROCEDURAL HISTORY ................................................................................................ 3

SUMMARY OF FACT ALLEGATIONS .......................................................................... 3

I.     Plug Launched a Vertical Integration Plan in an Effort to Become Profitable ................ 3

II.    Defendants Dramatically Overstated Plug's Existing Progress and Issued
Unrealistic Projections ................................................................................................ 4

      A.    Defendants' Statements About the Existing State of Construction of
Plug's Georgia Liquid Hydrogen Plant Were Knowingly or Recklessly
False and Misleading ........................................................................................ 4

      B.    Defendants' Statement About the Existing Status of Gaseous
Hydrogen Production at Plug's Georgia Plant Was Knowingly or
Recklessly False and Misleading ...................................................................... 5

      C.    Defendants' Hydrogen Production Projections Were Knowingly False
and Misleading ................................................................................................. 5

      D.    Defendants' Revenue Projections Were Knowingly False and
Misleading ....................................................................................................... 7

III.    Investors Suffered Massive Losses When the Truth Was Revealed ................................ 8

ARGUMENT ...................................................................................................................... 8

I.     Defendants' False and Misleading Statements of Purportedly Existing Fact ................. 8

      A.    False and Misleading Statements About the Existing State of
Construction of the Georgia Liquid Hydrogen Production Facility ...................... 8

      B.    False and Misleading Statements About the Existing State of Gaseous
Hydrogen Production at the Georgia Plant ......................................................... 10

II.    Defendants' Projections Were Materially False and Misleading .................................. 11

      A.    Defendants' False and Misleading Hydrogen Production Projections ................ 11

      B.    Defendants' False and Misleading Revenue Projections ...................................... 13

**Page**

C.    The Safe Harbor Does Not Shelter the False and Misleading
Projections............................................................................................15

D.    Even If Viewed as Opinions, Defendants' Projections Are Actionable
Under *Omnicare*..................................................................................19

III.    The SAC Alleges a Strong Inference of Each Defendant's Scienter............................21

A.    Defendants Knew or Had Access to Information Contradicting Their
Public Statements About the Existing State of Plug's Georgia Plant...................21

B.    Defendants Knew Information Contradicting Their Public Hydrogen
Production and Revenue Statements........................................................22

C.    The SAC's Witness Allegations Are Reliable and Compelling ...........................26

D.    The SAC Establishes a Strong Inference of Plug's Scienter ...............................29

IV.    Scheme Liability Is Properly Pleaded........................................................30

V.    Control Person Liability Is Properly Pleaded ...............................................30

CONCLUSION..............................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ....................................................................20, 25, 26, 30

*Baker v. MBNA Corp.*,
    2007 WL 2009673
    (D. Del. July 6, 2007)............................................................................................................21

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
    896 F. Supp. 2d 1210 (N.D. Ga. 2012) .................................................................................29

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)............................................................................................11, 26

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ..........................................................................................29

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) ..................................................................................28

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
    2019 WL 3451523
    (D.N.J. July 31, 2019) ...........................................................................................................28

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)...................................................................................................20

*City of Hialeah Emps.' Ret. Sys. v. Toll Brothers, Inc.*,
    2008 WL 4058690
    (E.D. Pa. Aug. 29, 2008)........................................................................................................17

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) .................................................................................................29

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755
    (S.D.N.Y. Mar. 25, 2013) ......................................................................................................25

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    442 F. App'x 672 (3d Cir. 2011) ...........................................................................................30

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
    70 F.4th 668 (3d Cir. 2023) ..............................................................................................19, 20

Page

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ........................................................................11

*Curran v. Freshpet, Inc.*,
   2018 WL 394878
   (D.N.J. Jan. 9, 2018) ...............................................................................................17

*Gaines v. Guidant Corp.*,
   2004 WL 2538374
   (S.D. Ind. Nov. 8, 2004) ..........................................................................................26

*Gorlamari v. Verrica Pharms., Inc.*,
   2024 WL 150341
   (E.D. Pa. Jan. 11, 2024) ...........................................................................................26

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543
   (D. Del. Feb. 7, 2020) .............................................................................11, 20, 24, 27

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) .........................................................................23

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ......................................................................................18

*In re AT&T Corp. Sec. Litig.*,
   2002 WL 31190863
   (D.N.J. Jan. 30, 2002) ..............................................................................................14

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ..............................................................................12, 21

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ......................................................................................26

*In re Cell Pathways, Inc.*,
   2000 WL 805221
   (E.D. Pa. June 20, 2000) ..........................................................................................10

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675
   (D.N.J. Aug. 8, 2018) ...............................................................................................29

Page

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564
(D.N.J. June 5, 2020) ..............................................................................30

*In re Coinbase Glob., Inc. Sec. Litig.*,
2024 WL 4053009
(D.N.J. Sept. 5, 2024) .............................................................................10

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
2019 WL 1299673
(D.N.J. Mar. 21, 2019)........................................................................26, 29

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065
(D.N.J. Dec. 15, 2015) .............................................................................16

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020)......................................17, 22, 24

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)....................................................................30

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
2017 WL 1536223
(D.N.J. Apr. 27, 2017) .............................................................................28

*In re Horsehead Holding Corp. Sec. Litig.*,
2018 WL 4838234
(D. Del. Oct. 4, 2018) ..............................................................................17

*In re Horsehead Holding Corp. Sec. Litig.*,
2019 WL 1409454
(D. Del. Mar. 28, 2019)............................................................................17

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128
(E.D. Pa. Mar. 25, 2020)....................................................................15, 21

*In re Intelligroup Securities Litigation*,
527 F. Supp. 2d 262 (D.N.J. 2007) .........................................................11

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ..............................................................15

**Page**

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371
(W.D. Pa. May 18, 2023)..................................................................................20, 28

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273
(D.N.J. Sept. 30, 2009) .............................................................................................29

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801
(D.N.J. Aug. 28, 2017)..............................................................................................22

*In re Salix Pharms., Ltd.*,
2016 WL 1629341
(S.D.N.Y. Apr. 22, 2016)..........................................................................................17

*In re SolarWinds Corp. Sec. Litig.*,
595 F. Supp. 3d 573 (W.D. Tex. 2022)....................................................................25

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ......................................................................28

*In re Synchronoss Sec. Litig.*,
705 F. Supp. 2d 367 (D.N.J. 2010) ..........................................................................27

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882
(D.N.J. Dec. 6, 2018) ..........................................................................................25, 28

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ..................................................................26, 27

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022) ..............................................................11, 17, 24, 27

*Inst. Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..........................................................8, 9, 14, 15, 18, 21, 26, 28

*Lewakowski v. Aquestive Therapeutics, Inc.*,
2023 WL 2496504
(D.N.J. Mar. 14, 2023) ..............................................................................................21

**Page**

*Li v. Aeterna Zentaris, Inc.*,
    2016 WL 3583821
    (D.N.J. June 30, 2016) ....................................................................................29, 30

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
    2011 WL 2444675
    (D. Del. June 14, 2011) .....................................................................................17, 24

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    363 F. Supp. 3d 476 (D. Del. 2019) ..........................................................................26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ....................................................................................16

*Marsden v. Select Med. Corp.*,
    2006 WL 891445
    (E.D. Pa. Apr. 6, 2006) ..........................................................................................11

*Marsden v. Select Med. Corp.*,
    2007 WL 518556
    (E.D. Pa. Feb. 12, 2007) .........................................................................................11

*Menkes v. Stolt-Nielsen S.A.*,
    2006 WL 1699603
    (D. Conn. June 19, 2006) .........................................................................................25

*N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*,
    2009 WL 3112574
    (C.D. Cal. Sept. 25, 2009) ...................................................................................25, 26

*Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*,
    2018 WL 6137169
    (C.D. Cal. Aug. 29, 2018) ........................................................................................25

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) .....................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...........................................................................................19, 20

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
    2023 WL 1800963
    (D. Ariz. Feb. 7, 2023) ............................................................................................28

**Page**

*Ortiz v. Canopy Growth Corp.*,
537 F. Supp. 3d 621 (D.N.J. 2021) ...............................................................20, 27

*Pino v. Cardone Cap., LLC*,
2025 WL 1642422
(9th Cir. June 10, 2025) ...............................................................................20

*Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*,
2013 WL 1192004
(E.D.N.C. Mar. 22, 2013) ............................................................................25

*Ravens v. Republic N.Y. Corp.*,
2002 WL 1969651
(E.D. Pa. Apr. 24, 2002) ..............................................................................23

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229
(D.N.J. July 27, 2018) ..................................................................................21

*S.E.C. v. Desai*,
145 F. Supp. 3d 329 (D.N.J. 2015) ..............................................................25

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ..........................................................17

*Selbst v. McDonald's Corp.*,
2005 WL 2319936
(N.D. Ill. Sept. 21, 2005) .............................................................................24

*Steamship Trade Ass'n of Balt. v. Olo Inc.*,
2023 WL 8287681
(S.D.N.Y. Nov. 30, 2023) ............................................................................11

*Sun v. Han*,
2015 WL 9304542
(D.N.J. Dec. 21, 2015) .................................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .....................................................................................21

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
273 F. Supp. 3d 650 (N.D. Tex. 2017) ........................................................28

**Page**

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)........................................................................16, 27

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007)................................................................................25

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ......................................................................18, 28

*Woolgar v. Kingstone Cos., Inc.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)................................................................27

*Yoshikawa v. Exxon Mobil Corp.*,
2023 WL 5489054
(N.D. Tex. Aug. 24, 2023) .................................................................................30

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)................................................................................................................20
§78t(a)................................................................................................................30
§78u-5................................................................................................................15
§78u-5(c)(1) .......................................................................................................15

Private Securities Litigation Reform Act of 1995
Pub. L. No. 104-67, 109 Stat. 737 (1995).................................................1, 2, 22

Federal Rules of Civil Procedure
Rule 10b-5(a) .....................................................................................................30
Rule 10b-5(c) .....................................................................................................30

## PRELIMINARY STATEMENT

Plaintiffs' SAC directly addresses the Court's concerns expressed in its Memorandum Order dismissing the prior Amended Complaint without prejudice (D.I. 65).[1] Accordingly, the SAC satisfies the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") in alleging that Plug Power Inc. ("Plug") and its most senior executives (together, "Defendants") misled Plug's investors about its existing operations and near-term prospects.

From January 19, 2022 to March 1, 2023 (the "Class Period"), Defendants repeatedly claimed that Plug would produce 70 tons per day ("TPD") of hydrogen by the end of 2022 and earn $900-925 million in revenue that year. Those assertions had no basis in reality. Defendants touted Plug's hydrogen production schedules *after* project managers warned that they were fanciful, and Defendants asserted inflated 2022 revenue targets *after* acknowledging internally that Plug's revenue would be far lower. Defendants' representations about the milestones that Plug's hydrogen production facilities had supposedly *already* reached were also false and misleading.

In response to the Memorandum Order, the SAC reduces the number of alleged misstatements, organizes them by category, and immediately follows each misrepresentation with a specific explanation of how contemporaneous, undisclosed material facts made each statement both affirmatively false and misleading by omission. The categories of Defendants' misstatements, focusing on the nine statements at issue on this motion, are as follows.

<u>First</u>, Defendants asserted in January and March 2022 that Plug's Georgia liquid hydrogen plant was "under construction" at that time, but their own later admissions demonstrate that it was

---

[1] "SAC" and "¶" refer to the Second Amended Class Action Complaint (D.I. 67). "MTD" refers to the Opening Brief in Support of All Defendants' Motion to Dismiss the Second Amended Complaint (D.I. 73). Emphasis is added and internal quotation marks are omitted unless otherwise specified. Capitalized terms not defined herein have the same meanings as in the SAC.

not. ¶¶131-32. Rather, the plant's construction only began in summer 2022. ¶¶134-36.

Second, Defendants' August 2022 statement that the Georgia facility had "2.5 TPD Green gaseous production online" (¶139) was false and misleading because, according to two Witnesses, the plant had not produced a measurable amount of hydrogen at that time. ¶¶89-90, 141.

Third, Defendants' statements in August 2022 that Plug was "on track" to produce 70 TPD of hydrogen by year-end (¶150(a) & (c)), and in November 2022 that Plug would produce 45-50 TPD of hydrogen by year-end, including 15 TPD from the Georgia plant (¶152), were false and misleading because the employees responsible for Plug's hydrogen projects warned Defendants by July 2022 that the projects were so delayed that these projections could not be met. ¶¶153, 155.

Fourth, Defendants' statements in January and May 2022 that Plug would meet or exceed its 2022 revenue goal of $900-925 million (¶157(b) & (f)) were false and misleading because ten Witnesses who worked at Plug during that period reported that Plug was suffering severe manufacturing problems, which made Plug's 2022 revenue goal unrealistic. ¶¶158-59.

Fifth, Defendants' statement in November 2022 that Plug would earn $810-880 million in revenue in 2022 (¶163(b)) was false and misleading both because of the manufacturing problems described above, and because Defendant Marsh announced on an internal call between late August and late September 2022 that Plug projected only $700 million in revenue for the year. ¶¶164-65.

The SAC also adds to the allegations attributed to seventeen Witnesses by specifying when each Witness worked at Plug by starting and ending month, how each knew the information, when each learned the information, and, where applicable, when each communicated information to a particular Defendant. These facts also demonstrate that Plug's hydrogen production and revenue projections are outside the PSLRA safe harbor because they were made with actual knowledge of their falsity and lacked meaningful cautionary language. And because Defendants knew the truth,

- 2 -

with employees resigning in protest when internal warnings were ignored, Defendants' arguments that their statements were inactionable opinions or were made without scienter are wrong.

Defendants ignore the SAC's revisions, which make clear Defendants knowingly misled investors when describing Plug's existing status and near-term projections, and Defendants do not contest other elements (*e.g.*, materiality and loss causation). Defendants' motion should be denied.

## PROCEDURAL HISTORY

Plaintiffs filed the prior Amended Complaint in September 2023 (D.I. 45), and Defendants moved to dismiss. In February 2025, the Court dismissed the prior Amended Complaint without prejudice. D.I. 65. Plaintiffs then filed the SAC, which extensively revised the prior Amended Complaint to address the Court's concerns. D.I. 67. In accordance with the Court's instructions, the parties stipulated to nine alleged misrepresentations to be addressed on this motion. D.I. 71.[2]

## SUMMARY OF FACT ALLEGATIONS

### I.    Plug Launched a Vertical Integration Plan in an Effort to Become Profitable

Plug is a hydrogen energy company with three primary operations: (1) manufacturing hydrogen fuel cells (which convert hydrogen fuel into energy) for use in material handling vehicles (*e.g.*, forklifts); (2) selling hydrogen fuel to its fuel cell customers; and (3) manufacturing electrolyzers (which generate hydrogen). ¶¶28-31. Plug derives most of its revenues from selling hydrogen fuel cells. ¶¶32, 36. Because Plug did not *produce* liquid hydrogen, it was forced to purchase hydrogen at high prices from others and resell it to customers at a loss. ¶¶30, 36, 65-71.

Desperate to end years of losses, in 2019 Plug announced a vertical integration plan to produce its own liquid hydrogen, manufacture electrolyzers, and increase fuel cell manufacturing.

---

[2] ¶¶131, 132, 139, 150(a) and (c), 152, 157(b) and (f), and 163(b). D.I. 71 ¶1. One category of alleged misrepresentations, Plug's 2022 hydrogen production projections from January to May 2022 (¶¶142-48), is not being briefed on this motion. Plaintiffs submit that this category, and the remaining misstatements alleged in the SAC, are actionable for the same reasons set out herein.

¶¶37-38. Plug also announced plans to build a facility in Georgia to generate gaseous and easier-to-transport liquid hydrogen using Plug's own electrolyzers, plus additional hydrogen plants based on the Georgia "roadmap." ¶¶39-40. Plug told investors that ramping up its liquid hydrogen production and manufacturing were key to becoming profitable. *E.g.*, ¶¶41, 143(a).

## II.    Defendants Dramatically Overstated Plug's Existing Progress and Issued Unrealistic Projections

During the Class Period, Defendants trumpeted Plug's progress to date in constructing its Georgia plant and producing hydrogen there, and issued unrealistic hydrogen production and revenue projections. Seventeen former Plug employees' accounts and Defendants' own admissions reveal that these public statements were materially false and misleading, as Plug had not actually met the construction and operational milestones it claimed to have already met at the Georgia facility, and its hydrogen production and revenue targets were known to be unachievable.

### A.    Defendants' Statements About the Existing State of Construction of Plug's Georgia Liquid Hydrogen Plant Were Knowingly or Recklessly False and Misleading

On January 19 and March 1, 2022, Defendants claimed that Plug's critical Georgia liquid hydrogen plant was "under construction" and "being constructed." ¶¶131-32. These statements were false and misleading when made because, as Plug acknowledged in May 2023, the Georgia liquid plant was "being completed in eleven months," meaning construction of the plant could not have begun until eleven months earlier in June 2022. ¶134. Similarly, Defendant Shrestha stated in August 2023 that this plant had not begun producing liquid hydrogen but was "coming online in 12 months since we actually issued the [engineering, procurement, and construction] contract." ¶135. Under such a contract, a contractor designs and builds a project "from start to finish," meaning the Georgia liquid hydrogen plant's construction began no earlier than August 2022. ¶135 & n.5. This timing was confirmed when Plug announced the start of liquid hydrogen production

at the Georgia facility in January 2024 and said the plant had been finished in "18 months," again placing the start of construction in summer 2022, months after Defendants' false and misleading statements in January and March 2022 that the plant was then under construction. ¶136.

**B.    Defendants' Statement About the Existing Status of Gaseous Hydrogen Production at Plug's Georgia Plant Was Knowingly or Recklessly False and Misleading**

On August 9, 2022, Plug issued an investor letter stating that "2.5 TPD Green gaseous [hydrogen] production [was] online at Georgia facility." ¶139. This statement was false because, at that time, the Georgia plant had not produced any measurable amount of hydrogen. As an inspector at the plant told Witness 3 in August 2022 or later, and as Witness 2 corroborated, Plug had only briefly turned the electrolysis equipment on and registered a change in the readings on the display panel of the transformer that powered the plant, without measuring any hydrogen actually produced. ¶¶89-90, 141. The statement was also misleading by omission because Defendants failed to disclose that Plug had not actually measured any hydrogen production. *Id.*

**C.    Defendants' Hydrogen Production Projections Were Knowingly False and Misleading**

On August 9, 2022, Plug issued an investor letter signed by Marsh and Middleton stating that Plug was "on track" to generate "70 TPD" of hydrogen by year-end 2022. ¶150(a) & (c). Then, on November 8, 2022, Plug slightly reduced this projection but stated that it "remain[s] confident to exit 2022 with 45-50 TPD of hydrogen generation plants being commissioned." ¶152. The November 8 letter also asserted that Plug "continue[s] to make significant progress on the build out of the Georgia plant and Plug plans to commission 15TPD by YE22," and that construction progress is "keeping us on track to commission the plant by YE22." *Id.*

Defendants knew at the time that these assertions were baseless. By July 2022, project managers had reported to senior management, including Shrestha and Marsh, that Plug's 70 TPD

projection was unachievable because Plug's hydrogen production projects were years behind schedule. ¶153. In particular, Witness 2 explained that Shrestha was regularly updated about the delays in Plug's hydrogen projects, and that by June or July 2022 Plug's Project Group told Shrestha that Plug's production target was impossible. ¶¶85, 91. Witness 2 explained that Witness 1 gave senior management the most realistic hydrogen production schedule, which did not support Plug's 70 TPD projection. ¶¶91, 225. The next day, Shrestha and Marsh disregarded that warning and publicly stated that Plug would meet its 2022 hydrogen projection. *Id.* According to Witness 2, Witness 1 left Plug in July 2022 due to her disagreements with Plug's public statements, and told Witness 2 she was "not going to jail for anybody." ¶¶47, 91. Witness 3 recalled a "strong awareness" that the May 2022 projected completion date for the gaseous hydrogen component of the Georgia plant was unattainable (¶86), and recounted Witness 1 saying that Witness 1 was leaving Plug because executives were "bullying" her to sign off on unrealistic completion dates. ¶92. Witness 2 similarly left Plug in November 2022 because she was put in an "impossible situation" when senior management publicized impossible hydrogen production figures. ¶¶48, 93.

Witness 2 also explained that the Georgia liquid plant was about *two years behind schedule* in November 2022, had only one functioning electrolyzer, and lacked sufficient capacity to cool and liquefy hydrogen. ¶¶78, 155. Thus, Plug's statement that month that the plant would produce 15 TPD of Plug's 45-50 TPD year-end 2022 projection was impossible to achieve and false. ¶155.

The degree to which Defendants' projections were untethered from reality is underscored by later developments: the Georgia plant did not begin producing liquid hydrogen until *January 2024*, and Plug had not achieved hydrogen production of even 50 TPD as of *February 2025*. ¶154. But rather than disclosing the truth about Plug's hydrogen plants, Defendants actively worked to conceal it by constructing empty frames, without the electrolyzers, just "to show progress." ¶88.

### D.    Defendants' Revenue Projections Were Knowingly False and Misleading

On January 19, 2022, Defendant Marsh told investors that Plug would at least achieve and possibly exceed its 2022 revenue projection of $900-925 million, and on May 9, 2022, he repeated his assurance that Plug would achieve this projection. ¶¶157(b) & (f). On November 8, 2022, an investor letter signed by Defendants Marsh and Middleton reaffirmed Plug's "recently updated 2022 guidance" that was "5-10% below" the original guidance, or $810-880 million. ¶163(b).

Defendants knew that Plug had no realistic prospect of achieving these figures. Per Witness 5, in 2Q 2022, Plug reduced its *internal* projection for 2022 production of GenDrive fuel cell units, its primary revenue source, from 15,000-16,000 to just over 10,000 due to customer push-outs and supply chain issues, slashing its revenue. ¶¶125-26, 202. Moreover, Witness 17 said that in late August to late September 2022, Marsh acknowledged internally that Plug was behind on its $900 million target, and *at that time*, Plug projected ending 2022 with ~$700 million in revenue. ¶128.

Plug's inability to meet its revenue projection stemmed from serious manufacturing and customer service problems. For example, Plug suffered major supply chain deficiencies, causing constant parts shortages. ¶¶95-100, 104-05. Plug shipped unfinished products to customers, warehoused unfinished units, used makeshift parts, shut production lines, and paid millions for air freight for necessary parts. ¶¶101-06. Plug also had poor inventory control, leading it to order excess and incorrect parts. ¶¶107-08. Plug's material handling business also had significant undisclosed problems. ¶¶115-22. Plug struggled to keep its fuel cells operational, resulting in penalties for downtime and postponed or reduced customer orders, hurting Plug's revenue. ¶¶116-20. This led critical customers to push out contracts and scale back orders. ¶¶126-27. As a result, Plug had no realistic ability to achieve its financial targets, as Defendants recognized internally.

### III.    Investors Suffered Massive Losses When the Truth Was Revealed

The truth began to be revealed on October 14, 2022, when Plug announced that its 2022 revenue could be 5-10% below its guidance (*i.e.*, $810-880 million, above the $700 million Marsh had already acknowledged internally). ¶167. On October 19, 2022, Plug slashed its year-end 2022 hydrogen target of 70 TPD to a still-unachievable 50 TPD. ¶173. Further revelations took place on November 8, 2022, and January 25, 2023. ¶¶178-79, 191-92. Finally, on March 1, 2023, Plug announced 2022 revenue of only $701.4 million (matching the internal projection Defendants had concealed), delays in building hydrogen plants, and a decline in fuel cell revenue. ¶¶198-202. Plug's stock price plunged in response to each of these disclosures. ¶¶171, 177, 182, 197, 206.

ARGUMENT

### I.    Defendants' False and Misleading Statements of Purportedly Existing Fact

Defendants made numerous materially false and misleading statements about Plug's then-existing operations. None of these statements is forward-looking for safe harbor purposes, even if made in conjunction with forward-looking statements. *See Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). As detailed below, Defendants' attempts to support these statements fail and, at most, raise fact issues for resolution at a later stage.

### A.    False and Misleading Statements About the Existing State of Construction of the Georgia Liquid Hydrogen Production Facility

On March 1, 2022, Defendants falsely asserted that Plug's Georgia site was "under construction for a 15 TPD liquid [hydrogen] plant." ¶132. The "under construction" portion of this statement was not forward-looking. Marsh's January 19, 2022 statement that Plug had a "site that's being constructed in Georgia" that "will be 15 tons, a little bit more by the end of the year" (¶131) is similarly non-forward-looking in asserting that the plant was then "being constructed." Unlike

- 8 -

*Avaya*, 564 F.3d at 255, where defendants "[did] not justify the . . . projections in terms of any particular aspect of the company's current situation," Defendants here did just that.

Defendants' representations that Plug's Georgia liquid hydrogen plant was under construction in January and March 2022 were false and misleading when made. In addition to Witness reports that this facility was delayed (*e.g.*, ¶78), later admissions belie these statements. On May 9, 2023, Plug stated that its Georgia liquid plant "is being completed in eleven months," meaning construction could not have begun before June 2022. ¶207. Then, on August 9, 2023, Shrestha stated that the plant had not begun producing liquid hydrogen but was "coming online in 12 months since we actually issued the [engineering, procurement, and construction, *i.e.* EPC] contract." ¶209. Thus, that contract could not have been issued until August 2022 at the earliest, seven months after Defendants first represented the plant was under construction. And when the plant finally began producing liquid hydrogen in *January 2024*, Plug said it had been finished in "18 months," meaning construction could not have started before summer 2022. ¶210.[3]

Defendants respond by raising fact disputes that cannot be decided on the pleadings. First, they posit that the EPC contract might have been issued after construction began (MTD at 18), ignoring that an EPC contractor manages "the entire project lifecycle," "executing all project phases from start to finish." ¶135 n.5. Defendants are not entitled to an inference that construction began well before the construction contract was issued. Defendants also cite their August 2021 announcement that Plug broke ground in Georgia, and a March 2022 photograph (MTD at 18), but conflate Plug's co-located Pathfinder gas hydrogen project (*see* ¶141) and the Peachtree "15 TPD

---

[3]    Defendants argue "Plaintiffs contradict themselves" because Defendants' admissions indicate that construction began in either June or August 2022. MTD at 18 n.6, 26. But the SAC quotes Defendants' *own admissions*, which use different formulations but all make clear that the Georgia liquid plant was not under construction in January or March 2022, as Defendants represented.

liquid plant" that was the subject of these misstatements and Defendants' later admissions (¶¶130-32, 153(a), 207-10).[4] "[T]he Court accepts the factual allegations in the SAC as true and draws all inferences in the light most favorable to Plaintiffs," *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *1 (D.N.J. Sept. 5, 2024), despite Defendants' "version of contested issues[.]" *In re Cell Pathways, Inc.*, 2000 WL 805221, at *8 (E.D. Pa. June 20, 2000). Evaluating Defendants' evidence in light of their later admissions poses fact questions that cannot be decided now.

## B.    False and Misleading Statements About the Existing State of Gaseous Hydrogen Production at the Georgia Plant

On August 9, 2022, Plug asserted that it had "2.5 TPD Green gaseous production online at Georgia facility." ¶139. This statement was not forward-looking, and Defendants do not assert that it was. MTD at 18-19. The statement was materially false and misleading because this facility was not producing any meaningful amount of hydrogen. Witness 3 stated that, in August 2022 or later, an inspector at this facility told her that Plug "had turned on the electrolyzer and a transformer that powered the plant, and that the readings on the transformer's display panel changed numbers"; "the Company immediately shut off the power and concluded from this change on the display panel that hydrogen had been produced"; and "based on this event, Plug deemed the Pathfinder project to be 'in service.'" ¶¶89, 141. Witness 2 corroborated this account. ¶90.

Defendants focus on Witness 3's caveats that she did not have personal knowledge of the

---

[4]    Defendants also note that Plug learned faulty pipes had been installed "at the site by 'May 2022.'" MTD at 18, quoting ¶86. But learning this in *May 2022* does not mean the plant was "under construction" on *January 19 or March 1, 2022*. In fact, Plug installed the wrong pipes at the Pathfinder *gas* project that was supposed to be finished in May 2022, not the co-located Peachtree *liquid* project that is the subject of these misrepresentations. ¶¶86, 141; *see also* Exhibit 1 to the Request for Judicial Notice filed herewith (Plug's January 23, 2024 press release, quoted at ¶210 and thus properly considered on this motion, describing the Georgia gas and liquid hydrogen production facilities as co-located but distinct plants). Defendants' assertion that Witness 2's allegations in ¶¶78 and 90 about when electrolyzers were delivered to the Georgia plant are contradictory (MTD at 25 n.9) also conflates the co-located gas and liquid facilities.

relationship between this event and Plug's public statements. MTD at 19. But courts credit witness statements, even if based on hearsay or indirect knowledge, when the complaint contains sufficient information to "support the probability that a person in the position occupied by the [witness] would possess the information alleged." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186-87 (D.N.J. 2022) (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004)); *see also Steamship Trade Ass'n of Balt. v. Olo Inc.*, 2023 WL 8287681, at *11 (S.D.N.Y. Nov. 30, 2023) (same).[5] Here, Witness 3 worked for Plug as a project engineer from April 2022 until August 2022; "worked on the Pathfinder project" at the Georgia plant; "reported to the Director of Execution, who reported to the Director of Project Management"; and "was responsible for identifying items that needed to be completed at the Pathfinder project in order to bring it online." ¶49. Thus, Witness 3 was in a position to have learned how Pathfinder purportedly entered service, as was Witness 2. ¶¶48, 90.

## II. Defendants' Projections Were Materially False and Misleading

### A. Defendants' False and Misleading Hydrogen Production Projections

Defendants' repeated statements that Plug would produce 70 TPD of hydrogen by the end of 2022 lacked a reasonable basis and were false and misleading when made. "Courts have found that projections lack a reasonable basis where defendants were aware of contradictory internal forecasts." *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *1, *3 (D. Del. Feb. 7, 2020) (citing cases) (projections were actionable when defendants "knew" they "were

---

[5] *See also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (same); *Marsden v. Select Med. Corp.*, 2006 WL 891445, at *13 (E.D. Pa. Apr. 6, 2006) (same), *vacated in part on other grounds*, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007). By contrast, in *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007), the court did not credit a witness's vague allegation that it was "common knowledge" that the defendant was "always playing fast and loose with the numbers," and allegations dismissed as "speculation" in *Chubb*, 394 F.3d at 155, were "attributed to no source" at all. MTD at 16, 19, 21.

unattainable"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997) (projections actionable when "made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology").

Multiple witnesses reported critical, undisclosed facts that made Plug's hydrogen production projections misleading *when made*, with no "clairvoyance" necessary (*contra* MTD at 1). Witness 2, a senior member of the team responsible for developing all of Plug's hydrogen production plants from April 2021 to November 2022 (¶48), said that during her tenure, *all* of these plants were far behind schedule and over-budget, because Plug lacked a formalized construction process, qualified employees, and sufficient electrolyzer manufacturing capabilities to supply these plants; constantly changed plans; purchased components piecemeal; and assumed it would obtain unrealistic discounts. ¶¶73-78. Yet when project managers presented schedules reflecting the "absolute shortest path," Plug senior management baselessly replied that construction would take less time, even when told it was "impossible." ¶76. For example, senior management knew in February 2022 that Plug would be unable to power its New York hydrogen plant until late *2024*. ¶¶81, 230. Witness 2 said "senior management knew by June or July of 2022 that their published hydrogen production targets were impossible to meet," and that "no amount of liquid hydrogen production was possible by the end of 2022 based on the actual state of Plug's hydrogen production facilities in 2022." ¶85. Indeed, Plug's Georgia plant only began producing liquid hydrogen in January 2024, and Plug did not reach 50 TPD by February 2025. ¶154.

When Witness 1 gave senior management the most realistic production schedule, which did not support 70 TPD by year-end 2022, Marsh and Shrestha publicly affirmed that projection *the next day*, leading Witness 1 to quit in protest in July 2022. ¶¶47, 84, 91, 225. Witness 2 left Plug in November 2022 because she was put in an "impossible situation" when Plug issued

- 12 -

hydrogen projections that she and others had told senior management were unrealistic. ¶93. At that time, the Georgia liquid plant was two years behind schedule, with only one working electrolyzer and insufficient cooling and liquefaction (¶¶78, 155), meaning Plug's November 2022 statement that the plant would produce 15 TPD by year-end (*i.e.*, the end of the very next month) was impossible. ¶155. In short, there was "no chance in hell" Plug would meet its targets. ¶93.

### B.    Defendants' False and Misleading Revenue Projections

Defendants' projections that Plug would reach $900-925 million in 2022 revenue were likewise false and misleading due to undisclosed material facts. *See* ¶157(b) (Marsh: "we look at the $900 million, $925 million, and I can sit here and say, 'I'm not going to be debating with you guys whether we made it or not.' . . . I think we all look to this number and said, we're not going to be sweating it. And so I wouldn't be surprised if gradually throughout the year, we've increased the numbers."). Eight witnesses made clear that Plug's manufacturing operations suffered constant, critical shortages throughout 2022 (¶¶97-100, 105), resulting in products missing parts (¶101), or being warehoused for months (¶102). Plug also suffered major, undisclosed delays at its Rochester "gigafactory" (¶¶110-13), and Slingerlands plant (¶109). Three witnesses said Plug could not keep its fuel cells sufficiently operational and had to pay penalties to customers as a result. ¶¶116-20. And Witness 5 said that, in 2Q 2022, Plug *internally* slashed its projections for manufacturing GenDrive fuel cell units—its primary source of revenue—from 15,000-16,000 to just over 10,000. ¶¶125-26. Plug did not reveal this reduction publicly as it continued touting its 2022 revenue projection. ¶¶157(f), 163(b). In fact, Plug sold only 8,274 GenDrives in 2022. ¶202.

Further, Witness 17 explained that, in late-August to late-September 2022, Defendant Marsh announced *internally* that Plug was behind on its "$900 million" target (*i.e.*, its $900-925 million revenue target for 2022) and that "*at the time of the meeting*, Plug was projecting to end 2022 at around $700 million based on its performance to date and projections for the rest of the

- 13 -

year." ¶¶128, 165. This closely corresponds to the $701.4 million in 2022 revenue that Plug publicly disclosed half a year later, on March 1, 2023. *Id.* Instead of disclosing this revenue-projection reduction to investors in 2022, Plug misleadingly set out adjusted guidance of $810-880 million on October 14, 2022 (¶163(a)), and then reaffirmed that misleading guidance on November 8, 2022 (¶163(b)). Analysts seized on the misleading November 8 update, with one noting that Plug's revenue guidance "impl[ied] a big ramp into 4Q." ¶¶187-90. Yet Plug's $810-880 million 2022 revenue guidance far exceeded the $700 million internal projection at the time.

Defendants respond by asserting that some of Plug's challenges were publicly known (MTD at 13), but investors would have understood that Defendants' revenue projections accounted for those issues, not that Plug was *internally* slashing its revenue and GenDrive projections. Defendants also make irrelevant comparisons to Plug's projections and results in prior years (*id.*), when Plug was a smaller company and was not attempting to ramp up hydrogen and electrolyzer production as it did during the Class Period.[6] Defendants also claim (citing only their own assertion) that Plug had historically earned greater revenue in the second half of the year (*id.*), but that does not explain why Defendants' internal projections did not match their public statements. Defendants' arguments conflict with Witness statements that the projections were known to be unrealistic, and raise fact issues for resolution at a later stage. *See In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *20 (D.N.J. Jan. 30, 2002) (sustaining claims where plaintiffs alleged that build-out "was over budget and behind schedule and . . . provided reasons for these delays which they claim make defendants' statements false," and defendants' contrary assertions raised fact

---

[6] *Cf. Avaya*, 564 F.3d at 275-76 (MTD at 22) (holding that financial results that met or exceeded analyst expectations undermined scienter for an allegedly misleading projection where the positive results and the projection were made on the *same day*).

issues "beyond the scope of a motion to dismiss").[7]

### C.    The Safe Harbor Does Not Shelter the False and Misleading Projections

As discussed above in §I, Defendants' false and misleading statements about the purported existing state of the Georgia plant's construction and hydrogen production are not covered by the safe harbor for forward-looking statements (15 U.S.C. §78u-5), because they are not forward-looking. Defendants' remaining misrepresentations—their near-term hydrogen production and revenue projections—do not fall within the safe harbor because they were not "accompanied by meaningful cautionary statements" and were made with "actual knowledge" of their falsity. 15 U.S.C. §78u-5(c)(1). This section concerns the absence of meaningful cautions; "actual knowledge" is addressed in §III below as part of the scienter element.

The purported cautions that Defendants identify (MTD at 10-11) were not meaningful because they were overly general, omitted material adverse facts, and misleadingly described as hypothetical risks that had already occurred and were continuing to make Plug's projections impossible to achieve. "Cautionary language must be extensive and specific," and a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Avaya*, 564 F.3d at 256; *see also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *18 (E.D. Pa. Mar. 25, 2020) ("generic warning" that is "inherently true" of entire industry is not meaningful, particularly where, like Plug, company "did not develop

---

[7] *Cf. In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1335, 1341-42 & n.9 (10th Cir. 2012) (MTD at 15) (statements that project was "ahead of plan" and "under budget" actionably false due to internal report that it was "behind schedule and over budget"; no scienter for separate reasons).

its disclosures in an attempt to tailor its risks over time"); *cf. OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 502 & n.23 (3d Cir. 2016) (non-misleading cautions with "considerable detail" about facts at issue were adequate) (MTD at 8).

Among the cautions that are far too general to be meaningful are those that warn that Plug "will continue to incur losses until we can produce and sell our products and services on a large-scale and cost-effective basis," and "may not be able to achieve our growth strategy and increase production capacity as planned during the foreseeable future," and that "[d]elays in or not completing our product development goals may adversely affect our revenue and profitability." MTD at 10-11. These statements merely reflect the truism for any company that its results could be unfavorable. *See, e.g.*, *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *10-*11 (D.N.J. Dec. 15, 2015) (rejecting cautions applicable to "*any* company in *any* industry") (emphasis in original); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 599 (7th Cir. 2006) ("generalized statements" of risk not meaningful where company failed to disclose "production of [key product] was far behind schedule"), *vacated on other grounds*, 551 U.S. 308 (2007).

The remaining cautions are likewise overly general and are misleading (*see* ¶¶146-47) because they described as hypothetical risks that had already occurred and were continuing, and omitted critical, then-existing facts. "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading. . . . Consistent with this principle, courts are skeptical of companies treating as hypothetical in their disclosures risks that have already materialized." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241-42 (3d Cir. 2017); *see also Enzymotec*, 2015 WL 8784065, at *11 (cautions not meaningful when risks "had already come to pass").

Accordingly, courts in the Third Circuit have made clear that omitting material, adverse,

then-existing facts when touting corporate projections—as Defendants did here—makes cautionary language non-meaningful and the safe harbor inapplicable. *See Becton*, 620 F. Supp. 3d at 191-92 (no safe harbor for sales projections "unmoored from the [c]ompany's immediate reality" due to undisclosed facts; cautions were "not meaningful" because "risks the 10-K warned of had already materialized"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 (W.D. Pa. 2020) (no safe harbor for projections when "knowable, quantifiable facts" made them "impossible" to meet); *In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *13 (D. Del. Oct. 4, 2018) (no safe harbor when cautions did not disclose "*then-existing* bottlenecks . . . would absolutely prevent" company from meeting production goal) (emphasis in original), *adopted*, 2019 WL 1409454 (D. Del. Mar. 28, 2019); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4-*5 (D.N.J. Jan. 9, 2018) (no safe harbor when projections were "misleading by virtue of omission of existing facts").[8] Defendants fail to address the extensive case law that sets out this fundamental principle, despite having had an additional opportunity to do so in their second motion to dismiss.

Here, Plug's putative cautions were overly general, omitted critical existing facts, were themselves misleading because they described as hypothetical risks that had already occurred and

---

[8] *See also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 902 (E.D. Pa. 2018) (no safe harbor when cautions omitted existing adverse facts); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9, *12 (S.D.N.Y. Apr. 22, 2016) (safe harbor "does not protect material omissions"; repeating stale cautions "renders them meaningless in light of the changing circumstances and risks"); *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *10, *13 (D. Del. June 14, 2011) (no safe harbor for projections defendants had been told were inaccurate; cautions did not warn of "the issue that [p]laintiff here claims [d]efendant failed to disclose"); *City of Hialeah Emps.' Ret. Sys. v. Toll Brothers, Inc.*, 2008 WL 4058690, at *2-*4 (E.D. Pa. Aug. 29, 2008) (no safe harbor where cautions were "not meaningful in light of [d]efendants' alleged failure to disclose then-existing material facts" that made defendants' projections "unreasonable at the time they were made").

were continuing, and were not updated after March 1, 2022, even as Plug's situation deteriorated.[9] As Plug's hydrogen production delays and cost overruns mounted, Defendants repeatedly invoked the same formulaic warnings that "[w]e *may be* unable to successfully execute and operate our green hydrogen production projects and such projects *may* cost more and take longer to complete than we expect"; "[o]ur hydrogen production projects are *dependent*, in part, upon the Company's *ability* to meet our internal demand for electrolyzers required for such projects"; and "[t]he timing and cost to complete the construction of our hydrogen production projects are subject to a number of factors outside of our control and such projects *may* take longer and cost more to complete and become operational than we expect." MTD at 10. While Defendants repeated these statements, Plug's hydrogen production plants were already far behind schedule and over budget, and Plug was already unable to manufacture the electrolyzers necessary to supply those plants. Likewise, as undisclosed manufacturing setbacks piled up, Defendants referred generally to the "impact" of supply chain issues in the "foreseeable future," "which *could* adversely affect our results of operations" and "*could* impair our ability to manufacture our products." *Id.* at 11. As Plug struggled to keep the fuel cells in its materials handling equipment operational for its key customers, Plug generally observed that "[s]ome of the orders we accept from customers . . . *may* be cancelled" and that time periods from order to shipment "vary widely." *Id.* at 10. And the warning that Plug

---

[9] In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193, 1195-96 (9th Cir. 2021) (MTD at 11), the adequacy of Tesla's cautions was largely undisputed, and Tesla expressly disclosed that it had already experienced the problems at issue. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) (distinguishing *Tesla* on this basis; warning that risk that already occurred "could" occur was misleading). By contrast, Plug did not revise its purported cautions as 2022 progressed to reflect that it was already experiencing the problems that made its projections unrealistic. Plug's revised *projections* did not make Plug's prior inadequate *cautions* meaningful, and in any case came after Defendants had already misled the market, and were themselves still misleading (*see* §II.B). *Cf. Avaya*, 564 F.3d at 257-59 (cautions were "extensive and specific"; not addressing cautionary language that "identifies possible risks . . . defendants know have already eventuated").

expected to "continue to incur losses" concealed that the individual Defendants knew Plug could not meet its *production* and *revenue* targets. *Id.* at 11.

In light of Plug's pervasive, then-existing, undisclosed problems, none of the cautions Defendants identify was meaningful for safe harbor purposes. A reasonable investor would have understood Plug's publicly stated projections, together with its cautionary language, to represent its best understanding at the time—not that its *internal* revenue projections were materially lower (¶128), or that numerous employees had made clear *internally* that Plug's publicly stated hydrogen projections were wildly unrealistic (¶¶84-86). Defendants' argument to the contrary has no limiting principle; under their incorrect formulation, the same cautionary language would presumably be considered meaningful, and shield Defendants from all liability, even if Plug's false and misleading projections had been millions of times higher, and even if Defendants had been caught on tape bragging about how they had intentionally deceived Plug's investors by making those projections. To avoid that absurd outcome, the voluminous case law cited above makes clear that cautionary language is not considered "meaningful," and thus the safe harbor does not apply, when defendants knowingly omit then-existing adverse material facts, as Defendants did here.

### D. Even If Viewed as Opinions, Defendants' Projections Are Actionable Under *Omnicare*

Defendants' misstatements of then-existing fact are not opinion statements, and Defendants do not contend otherwise. Rather, Defendants argue that their projections of hydrogen production and revenue are inactionable opinions. MTD at 12-17. An opinion statement is actionable if it "omits material facts about the [speaker's] inquiry into or knowledge concerning" the opinion, and those facts "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see also City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th

668, 685 (3d Cir. 2023) (*Omnicare* applies to §10(b) claims).

Here, as detailed above, Defendants omitted such facts when touting unrealistic hydrogen production and revenue forecasts. *See Pino v. Cardone Cap., LLC*, 2025 WL 1642422, at *5 (9th Cir. June 10, 2025) (opinions actionable when "the projections lacked a basis"); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 212 (E.D. Pa. 2021) (opinions as to construction timeline actionable due to "numerous facts on the ground that directly contradicted the statements"); *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 672 (D.N.J. 2021) (undisclosed adverse facts made opinion actionable); *Advance*, 2020 WL 599543, at *4-*5 (sales projections that omitted adverse facts were actionable opinions). An investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188-89. Even if isolated facts supported Defendants' statements, which they did not, this would raise fact issues to assess after discovery. *See Advance*, 2020 WL 599543, at *4 ("it is plausible to find that a projection lacks a sound methodology where it is based on a single data point in a sea of contrary data points").[10]

In addition, opinion statements are actionable when they are not believed by the speaker, which is consistent with the well-pled allegations that Defendants' external projections were unreasonable and inconsistent with Plug's internal projections. *See Omnicare*, 575 U.S. at 184; *see also Energy Transfer*, 532 F. Supp. 3d at 212 (holding that plaintiffs adequately alleged that projections were known to be false when made).

---

[10] *Cf. City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (MTD at 17) (statement about drug trial was supported by evidence of efficacy). To the extent *Mylan* suggests opinions are actionable only if they are "impossible" to achieve (MTD at 13, citing *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *13 (W.D. Pa. May 18, 2023)), Plaintiffs meet that burden here, but respectfully submit that *Mylan* incorrectly narrows the *Omnicare* standard.

## III.  The SAC Alleges a Strong Inference of Each Defendant's Scienter

To allege scienter, a plaintiff "must sufficiently plead defendants' knowledge of facts or access to information contradicting their public statements . . . [*i.e.*, that] defendants knew or, more importantly, should have known that they were misrepresenting material facts[.]" *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *18 (D.N.J. July 27, 2018). Motive allegations are not necessary, *Avaya*, 564 F.3d at 276,[11] and "circumstantial evidence of reckless or conscious misbehavior" suffices. *Burlington Coat Factory*, 114 F.3d at 1422; *Innocoll*, 2020 WL 1479128, at *12-*13 (scienter based on "easy *access*" to data contradicting public statements) (emphasis in original). A scienter inference need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. At issue is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324.[12]

### A.  Defendants Knew or Had Access to Information Contradicting Their Public Statements About the Existing State of Plug's Georgia Plant

The SAC's allegations support an inference of scienter as to Marsh and Middleton's January and March 2022 statements of present fact that the Georgia liquid hydrogen plant was

---

[11] Defendants' assertion that "motive and opportunity" allegations are needed (MTD at 19) is wrong. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007); *cf. Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *10-*12 (D.N.J. Mar. 14, 2023) (MTD at 19) (analyzing motive and opportunity separately from conscious misbehavior and recklessness).

[12] On the prior motion to dismiss, Defendants mischaracterized *Avaya* as holding that access to contrary information is insufficient for scienter (D.I. 61 at 15), but *Avaya* held that a CFO's scienter was alleged even though plaintiffs did not identify specific internal reports to which the CFO would have had access. *See* 564 F.3d at 268-71. And unlike *Baker v. MBNA Corp.*, 2007 WL 2009673, at *7 (D. Del. July 6, 2007) (D.I. 61 at 15), Plaintiffs here do not rely on a bare allegation that defendants had access to an unspecified "package" of "some" financial information.

"under construction." The importance of this project, which Defendants' own motion highlights (MTD at 26 n.10; *see also* ¶40), supports a strong inference that the Defendants knew or recklessly ignored that it was not "under construction" in January or March 2022 when Marsh and Middleton said it was. Likewise, the Defendants would have known that the EPC contract providing for the start of construction on this vital project had not yet been issued. *See* §I.A.  The SAC also properly alleges scienter for Defendants' statement that Plug was producing 2.5 TPD of gaseous hydrogen in Georgia in August 2022. MTD at 27. Whether or not Defendants knew of the exact test Witness 3 described, it is reasonable to infer that Plug's executives knew the basic status of this key Plug facility. Shrestha led Plug's hydrogen production operations (¶¶24, 64), and Marsh and Middleton touted their personal knowledge of Plug's operations (¶¶231, 237, 242). By speaking "explicitly and repeatedly" about Plug's Georgia plant, these Defendants held themselves out as knowledgeable about both its construction and its operations. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-*17 (D.N.J. Aug. 28, 2017).

> **B.      Defendants Knew Information Contradicting Their Public Hydrogen Production and Revenue Statements**

The SAC alleges scienter for Defendants' hydrogen production and revenue projections by pleading that each Defendant "knew facts or had access to information suggesting that their public statements were not accurate." *EQT*, 504 F. Supp. 3d at 497. The SAC's allegations of actual knowledge of these statements' falsity also satisfy the PSLRA safe harbor's knowledge prong.

Throughout the Class Period, Defendants knew facts that made their 2022 hydrogen production statements misleading. Before the start of the Class Period, in April or May 2021, Witness 2 told Marsh that Plug's hydrogen production schedules were unrealistic, and the problems persisted throughout Witness 2's tenure until she left in protest in November 2022. ¶¶74, 79, 82, 224-25, 227. Witness 1 met each month (before and during the Class Period until July

2022) with members of Plug's senior management and told them Plug's projections for hydrogen production were unattainable and "hilariously off." ¶¶84, 223. Witness 1 also told Marsh that Plug's hydrogen production facilities would not be in service for three years. *Id*. By February 2022, Plug executives knew the first phase of targeted production for a New York plant was unattainable, and by March 2022 knew there would be no power to that plant until 2024. ¶¶81, 230. Witness 2 also explained that all of Plug's hydrogen production plants were behind schedule throughout her tenure. ¶¶48, 145(a). Shrestha was regularly updated on delays and cost overruns, and was specifically informed by the Project Group that Plug's hydrogen production goal was unattainable. ¶¶85, 91, 224; *see also* ¶¶87, 93 (VPs of Project Development also knew of these delays). Witness 2 explained that senior management knew by June or July 2022 that the hydrogen production target was impossible to meet. ¶¶85, 153(a), 224. When Witness 1 gave Plug's senior management the most realistic hydrogen production schedule, which did not support 70 TPD by year-end 2022, Marsh and Shrestha publicly reaffirmed Plug's unrealistic target the next day, leading Witness 1 to leave Plug in July 2022. ¶¶47, 91, 225.

Defendants' revenue projections were also knowingly false when made. Witness 17 explained that, in late-August to late-September 2022, Marsh announced during an internal meeting that Plug was behind on its $900 million target, and *at that time*, Plug projected ending 2022 at roughly $700 million (¶¶128, 241), far below Plug's original public 2022 revenue projection of $900-925 million and its later revised projection of $810-880 million.[13] Further,

---

[13] Defendants' suggestion that the SAC alleges only generalized delay and mismanagement (MTD at 27) is simply wrong. In any event, "[a] complaint is not subject to dismissal if [the] plaintiff[] plead[s] specific facts permitting the inference that defendants were intentionally concealing [mismanagement]." *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 950 (E.D. Pa. 1999); *see also Ravens v. Republic N.Y. Corp.*, 2002 WL 1969651, at *9 (E.D. Pa. Apr. 24, 2002) (misrepresentation actionable where "defendant was aware that mismanagement had occurred and made a material public statement . . . inconsistent with the existence of the mismanagement").

David Mindnich, Plug's Executive VP of Global Manufacturing, whose scienter can be attributed to Plug (*see* §III.D), knew that in Q2 2022, Plug had slashed its internal production forecast for fuel cells (the Company's primary source of revenue) by a third, indicating a substantial reduction in projected revenue. ¶¶125-26, 202, 240. Additionally, Marsh attended daily meetings led by Mindnich where Plug's supply chain and other issues impacting production were discussed (¶¶52, 98, 233-34), and senior management received daily supply chain reports. ¶235.[14]

These allegations establish Defendants' actual knowledge of contemporaneous facts contradicting their repeated reiteration of Plug's hydrogen and revenue projections, demonstrating both a strong inference of scienter and satisfaction of the safe harbor's "actual knowledge" prong. *See Becton*, 620 F. Supp. 3d at 190-94 (scienter well-pled based on CEO's knowledge of adverse FDA comments that made subsequent financial projections "unmoored from the Company's immediate reality"); *EQT*, 504 F. Supp. 3d at 481, 497-98 (scienter well-pled when defendants were repeatedly warned that projections were "grossly exaggerated" and "unattainable"); *Advance*, 2020 WL 599543, at *8 (scienter well-pled based on "actual knowledge" that projections were incompatible with internal forecasts "indicating that the company could not meet the projected revenues"); *Swanson*, 2011 WL 2444675, at *12-*13 ("actual knowledge" that projections were misleading for scienter and safe harbor purposes based on defendants' statements reflecting knowledge of topic, communications with employees, and access to internal reports); *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *21 (N.D. Ill. Sept. 21, 2005) (similar).[15]

---

[14] Defendants' argument that Mindnich's participation in supply chain meetings undermines scienter (MTD at 24) misses the point. Seeking to address problems does not negate the strong inference that Plug misled investors.

[15] Defendants wrongly assert that Plaintiffs rely on "group pleading" and fail to allege scienter for each Defendant. MTD at 19-20. The SAC properly "identifie[s] particularly which statements are attributable to which Defendants and which scienter arguments are applicable to which

Moreover, multiple employees' resignations in protest of Plug's unreasonable public hydrogen projections (¶¶91-93, 225-26) bolster the strong inference of scienter. *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 579, 586 (W.D. Tex. 2022); *Menkes v. Stolt-Nielsen S.A.*, 2006 WL 1699603, at *5-*6 (D. Conn. June 19, 2006). Defendants' efforts to conceal Plug's setbacks by constructing empty frames just "to show progress" (¶88), and by prematurely declaring a hydrogen facility operational just because a power display panel changed numbers (¶¶89-90), further support scienter. *See S.E.C. v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) ("effort to mask . . . violations of federal securities law demonstrates a high degree of scienter").

Defendants cite "updates" in which they belatedly reduced Plug's 2022 hydrogen projection to a still-impossible 45-50 TPD, and claimed Plug would earn $810-880 million in 2022 despite projecting $700 million internally. MTD at 27-29. But incremental corrective disclosures do not negate scienter, particularly when the "updates" were still misleading. *See Energy Transfer*, 532 F. Supp. 3d at 203-05, 227-31 (scienter well-pled; "the truth was revealed to investors only slowly and through numerous corrective disclosures"); *Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*, 2018 WL 6137169, at *15 (C.D. Cal. Aug. 29, 2018) (that the truth was "*eventually revealed* . . . does not undercut the inference [of] scienter") (emphasis in original); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *19 (S.D.N.Y. Mar. 25, 2013) (scienter well-pled; untimely revision "understated the severity of the problems" to delay revealing their "full extent").[16] Indeed, the "amount by which the . . . results missed expectations," <u>even as</u>

---

Defendants." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018). *E.g.*, ¶¶84-85, 91, 97-98, 111, 125, 128, 223-25, 227, 229, 234-35, 236, 240-41.

[16] *Cf. Winer Fam. Tr. v. Queen*, 503 F.3d 319, 328, 331 (3d Cir. 2007) (accurate update followed event that made defendants aware of truth for the first time); *Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *18-*19 (E.D.N.C. Mar. 22, 2013) (no allegation defendants knew non-public information); *N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*, 2009

updated, supports the inference of scienter. *Avaya*, 564 F.3d at 272. Plug not only failed to reach 45-50 TPD of hydrogen production in the short time between the November 2022 update in which it provided those figures and year-end 2022; it did not even reach 50 TPD by February 2025. ¶154.

Further, the statements at issue concerned Plug's core operations (*i.e.*, hydrogen production and corporate revenues). ¶243. This supports "an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge," *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015), due to the "logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems[.]" *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019).[17]

## C. The SAC's Witness Allegations Are Reliable and Compelling

The SAC details each Witness's position, tenure, and basis for knowledge (¶¶47-63), which "support[s] the probability that a person in the position occupied by the [Witness] would possess the information alleged." *Chubb*, 394 F.3d at 148; *see also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 492-93 (D. Del. 2019) (same). Moreover, the "consistent [Witness] accounts reinforce one another," which further supports their reliability. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002); *see Urban Outfitters*, 103 F. Supp. 3d at 648-49 (same).

Defendants' argument that the SAC is insufficient because it now provides "date *ranges*" for the Witness allegations (MTD at 14, emphasis in original) makes no sense. The Witnesses describe serious, persistent problems at Plug, which naturally span a range of dates as opposed to

---

WL 3112574, at *13 (C.D. Cal. Sept. 25, 2009) (no contradiction between public statements and internal reports); *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *16 (S.D. Ind. Nov. 8, 2004) (defendants made "accurate" disclosure "once apprised of the situation") (MTD at 27-29).

[17] *See also Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *9 (E.D. Pa. Jan. 11, 2024) ("reasonable inference" that CEO "would be aware of critical facts bearing on [company]'s core business"); *Energy Transfer*, 532 F. Supp. 3d at 232 (revenue projection was within core operations); *cf.* MTD at 29 (citing cases where core operations allegation *alone* was insufficient).

a single day. In any event, witnesses are not required or expected to recall precise dates (*contra* MTD at 21). *See Becton*, 620 F. Supp. 3d at 193-94 ("precise date" of witness allegation not required); *Ortiz*, 537 F. Supp. 3d at 659 (Third Circuit does not "require plaintiffs to plead specific dates or categorically rule out allegations by confidential witnesses which relied on second-hand knowledge; the inquiry is a more holistic, multifactor assessment"); *Urban Outfitters*, 103 F. Supp. 3d at 648 (same).[18] The SAC makes clear Defendants' statements were false and misleading in light of information they knew at the time by tying the dates of the misstatements to the dates of the Witnesses' information. *E.g.*, ¶¶141, 145, 153, 155, 158-59, 164-65. Nothing more is required.

Defendants also suggest that some Witnesses did not directly interact with individual Defendants. MTD at 21. But others did. For example, Witness 1 told Marsh that Plug's hydrogen plants were three years from starting service (¶¶84, 223); Witness 2 interacted with Middleton and "extensively" with Shrestha (who reported to Marsh), and made clear that Plug's Project Group (which included Witness 2) told Shrestha that Plug's hydrogen projections were unattainable (¶¶73, 75-76, 85, 91, 224-25, 227); Witness 7 said supply chain problems hampering production of GenDrives were reported to Marsh and Middleton (¶¶53, 97, 235); and Witness 10 said supply chain issues delaying construction of the Rochester plant were reported to Marsh (¶¶111, 236). *See Advance*, 2020 WL 599543, at *3, *8 (scienter well-pled based on witness' knowledge of communication to defendants of internal projection lower than public projection, where witness' manager was a "layer removed" from individual defendant).

In any event, the Third Circuit does not require a "direct link" between witnesses and

---

[18] *Cf. Globus Med.*, 869 F.3d at 244 (mere "conjecture based on subsequent events" inadequate); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020) (timing need only be "approximate" to establish falsity); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367 (D.N.J. 2010) (plaintiff did not specify when witnesses joined the company, or any basis for their knowledge other than rumors) (MTD at 21).

individual defendants, and requires courts to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Avaya*, 564 F.3d at 268-69 (emphasis in original); *see also Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019) (scienter well-pled where "confidential witnesses did not have contact with [defendants]"); *Toronto-Dominion Bank*, 2018 WL 6381882, at *5 ("It seems Defendants would only find these [witness] statements 'particular' if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, and product . . . That is not required."). Here, as detailed above, the allegations collectively support a strong inference of scienter.

Defendants also claim they simply disagreed with employees who warned that Plug's projections were unachievable. MTD at 28. This fact issue cannot be resolved at this stage, as the SAC supports a strong inference that Defendants had no realistic basis to dispute the facts their employees told them. *See, e.g.*, *Mylan*, 2023 WL 3539371, at *19 (management's belief that company could "remedy" concerns did not salvage statement that "flies in the face of the reality facing the company at the time"); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 483 (S.D. Tex. 2016) ("disregarding information" from employees in position to understand plant operations supports scienter); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 907 (D. Minn. 2011) (scienter well-pleaded when management's "hope" conditions would improve grew "untenable"). In all events, "push[ing] employees to meet difficult objectives" (MTD at 28) is no excuse for misleading investors about existing conditions or making unrealistic near-term projections.[19] Thus, "the totality of the direct contradictions of the truth, statements about core operations, [and] information

---

[19] *Cf. Tesla*, 985 F.3d at 1188 ("not reach[ing] . . . scienter"); *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *14 (D. Ariz. Feb. 7, 2023) (no link between "business practices" and securities fraud); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 686 (N.D. Tex. 2017) (no duty to disclose); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017) (no "red flags") (MTD at 28).

provided by Plaintiff's confidential witness[es] . . . support a strong inference of scienter." *Dr. Reddy's*, 2019 WL 1299673, at *17.

Lastly, Defendants again argue that the Witness 1 allegations should be discounted (MTD at 2, 21, 24), but the Court correctly denied Defendants' motion to strike these allegations. *See* D.I. 65 at 5. As Plaintiffs previously detailed, these allegations match the contemporaneous interview notes and are directly corroborated by Witnesses 2 and 3. D.I. 49 at 3-4; D.I. 59 at 32-33. The facts also support Plaintiffs' understanding that Witness 1 recanted certain statements because she does not wish to participate in this case for personal reasons, not because the statements were actually incorrect. *Id.* Nothing has changed on this issue, and while these allegations are not essential to overcoming this motion, they should be presumed accurate. *See, e.g.*, *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *10-*12, *21 (D.N.J. Aug. 8, 2018) (denying motion to strike recanting witness allegations, which "alone are sufficient to render [defendants'] statements . . . materially false and misleading"); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *11-*12 (D.N.J. Sept. 30, 2009) (declining to "reconcile competing facts" or strike witness who "dispute[d]" allegations; largely denying motion to dismiss); D.I. 59 at 33 n.25 (citing cases).[20]

**D.    The SAC Establishes a Strong Inference of Plug's Scienter**

The individual Defendants' scienter is properly imputed to Plug. *See Li v. Aeterna Zentaris,*

---

[20] On the prior motion to dismiss, Defendants noted that the recanting witness in *Cognizant* was contacted by the defense (D.I. 61 at 5 n.2), but here Plaintiffs' forthrightness and explanation for standing by the Witness 1 allegations support the Court's prior ruling on Witness 1. The cases Defendants cite (MTD at 21) are inapposite because they involved witnesses who provided contrary sworn declarations or testimony, and/or who did not work in the job or at the time alleged. *See City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759-61 (7th Cir. 2013) (witness never employed by company and denied allegations when deposed); *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1220-28 (N.D. Ga. 2012) (witness not employed by company at relevant time and denied allegations under oath); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (witness testimony did not support allegations).

*Inc.*, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016) (CEO's scienter established company's scienter). The SAC also "create[s] a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter," including non-Defendant senior executives like Mindnich (¶¶23, 125, 233-37, 240) and VPs of Project Development (¶¶87, 93). *See Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (corporate scienter pled through unnamed senior auditors); *Energy Transfer*, 532 F. Supp. 3d at 237-38 (corporate scienter well-pled).[21]

## IV.    Scheme Liability Is Properly Pleaded

The SAC also pleads a fraudulent scheme under Rules 10b-5(a) and (c) by pleading deceptive or manipulative acts in furtherance of the fraud. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020). Plug built empty frames with no electrolyzers at its hydrogen plants to conceal delays (¶88); deemed gaseous hydrogen production at its Georgia plant "in service" based merely on a power display panel changing numbers (¶89); and delivered hydrogen *to* that plant by truck as "showmanship to get good headlines because Pathfinder was supposed to be completed by then." *Id.* These deceptive acts furthered the fraud by perpetuating the myth that Plug's hydrogen build-out was proceeding as publicly stated. *See, e.g.*, *Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023) (scheme liability pled based on falsification of internal documents to inflate company's finances).

## V.    Control Person Liability Is Properly Pleaded

Defendants' only challenge to control person liability under §20(a) of the Exchange Act is that there is no primary violation (MTD at 29), which is incorrect as set out above.

### CONCLUSION

For these reasons, Defendants' motion should be denied.

---

[21] *Cf. City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) and *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) (MTD at 29) (declining to address whether corporate scienter can be established other than via an individual).

DATED: June 18, 2025                Respectfully submitted,

                                                                  **FRIEDLANDER & GORRIS, P.A.**

                                                                  */s/ Jeffrey M. Gorris*
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

*Liaison Counsel for the Class*

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted pro hac vice)
Desiree Cummings (admitted *pro hac vice*)
Jai Chandrasekhar (admitted *pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY 10170
(212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com
jaic@rgrdlaw.com

*Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Nathan A. Hasiuk (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
jwhitman@ktmc.com
nhasiuk@ktmc.com
ehoey@ktmc.com

*Additional Counsel for the Class*