# EXHIBIT A

2025 WL 2216149
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

BRENDA HAWKINS, et al., Plaintiffs,
v.
DANAHER CORPORATION, et al., Defendants.

Civil Action No. 23-02055 (AHA)
|
Filed 08/04/2025

#### Memorandum Opinion and Order

[AMIR H. ALI](#) United States District Judge

 **\*1**  Two shareholders bring this putative class action against Danaher Corporation and three of the corporation's officers alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b–5. Danaher and its officers move to dismiss the amended complaint for failing to state a claim. The Court grants the motion in part and denies it in part.

## I. Background [1]

[1] As required at the pleading stage, the Court accepts the amended complaint's well-pled factual allegations and draws all reasonable inferences in the shareholders' favor. *[Banneker Ventures, LLC v. Graham](#)*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). This includes the shareholders' allegations about what the defendants said on earnings calls, in press releases, and in other communications. The defendants move the Court to take judicial notice of transcripts and SEC filings that include more than the particular statements referenced in the amended complaint. ECF No. 29. The shareholders accept that the Court can "take notice of the statements contained in the exhibits identified in the [Request for Judicial Notice] for the fact that they were publicly available, not their truth." ECF No. 33 at 3. The Court grants the defendants' motion to take judicial notice but continues to accept the shareholders' well-pled allegations as true.

Danaher is a global conglomerate; it owns companies that design, manufacture, and market professional, medical, industrial, and commercial products and services worldwide. ECF No. 24 ¶¶ 2, 22. Danaher organizes those companies into three segments: biotechnology, life sciences, and diagnostics. *Id.* ¶ 2. In 2020, the life sciences and diagnostics segments made about three quarters of Danaher's annual revenues. *Id.* ¶ 27. During the COVID-19 pandemic, those two segments were uniquely positioned to succeed. Danaher's diagnostics companies developed and sold some of the earliest tests on the market. *Id.* ¶¶ 33–37. And the bioprocessing division of Danaher's life sciences segment sold equipment and services to large pharmaceutical companies and small biotechnology startups working on vaccines and therapies to prevent and treat COVID-19. *Id.* ¶ 39. Because of the high demand for its operating companies' products and services during the pandemic, Danaher's revenues rose sharply from $18 billion in 2019 to $29 billion in 2021. *Id.* ¶ 40. Virtually all of that growth was generated by the life sciences and diagnostics segments. *Id.* Danaher's stock price also rose, from $121.39 per share in March 2020 to $329.01 per share in December 2021. *Id.* ¶ 41.

According to the amended complaint, investors focused on Danaher's bioprocessing division as COVID-19 evolved from an uncontrolled pandemic to a more predictable endemic illness. *Id.* ¶¶ 42–47. The amended complaint alleges that Danaher and its officers knew of internal forecasts that revealed upcoming challenges for the bioprocessing division due to a variety of market forces. *Id.* ¶ 56. First, COVID-19 was less widespread and demand for Danaher's related products and services had begun to wane. *Id.* ¶ 57. Second, the pandemic's disruption of global supply chains had led to delayed orders, so many of Danaher's large pharmaceutical company customers could rely on stockpiles of inventory that had accumulated over time instead of placing new orders. *Id.* ¶ 58. Third, funding began to dry up for many of Danaher's smaller biotechnology customers, which became more conservative with their ordering as a result. *Id.* ¶ 59.

 **\*2**  The amended complaint alleges Danaher and its executives knew about these changing conditions but continued to give investors bullish projections anyway. *Id.* ¶¶ 6–7. In January 2022, Danaher's CEO maintained the bioprocessing division would make as much revenue from the sale of its COVID-19 products as it had a year earlier, during the height of the pandemic. *Id.* ¶ 65. He added that the bioprocessing division would, as a whole, do even more business in 2022 than it did in 2021—that is, the combined

amount of COVID-19 sales and non-COVID-19 sales would grow compared to the previous year. *Id.* Danaher and its executives made similar optimistic forecasts on earnings calls, at conferences, and in press releases, despite pointed questions from investors and analysts asking them about the new headwinds. *Id.* ¶ 59. The amended complaint alleges that they eventually revised these expectations downward, but that it was too little, too late—not until October 2023 did the CEO tell investors that Danaher's bioprocessing division was now expected to see a decline in revenue. *Id.* ¶ 166.

The plaintiffs are shareholders who acquired Danaher stock between January 2022 and October 2023. *Id.* ¶ 1. They allege that they suffered financial losses because they relied on various misleading statements that caused them to misjudge the value of Danaher stock. *Id.* ¶¶ 196–97. They bring this putative securities fraud class action against Danaher and three of its officers: President and CEO Rainer Blair, Chief Financial Officer Matthew McGrew, and former senior executive Emmanuel Ligner. Specifically, the shareholders allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. The defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. Legal Standard

To survive dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint should be allowed to proceed 'even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely.' " *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (second alteration in original) (quoting *Twombly*, 550 U.S. at 556).

Securities fraud claims must satisfy a higher pleading standard. Federal rules require a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). And, under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff must further "specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). A strong inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 314, 323).

## III. Discussion

### A. The Shareholders' First Count Survives In Part

**\*3** The shareholders' first count asserts a claim under section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5, which "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see* 15 U.S.C. § 78j(b) (barring the use of a "manipulative or deceptive device or contrivance" related to "the purchase or sale of any security" that contravenes "such rules and regulations as the [SEC] may prescribe"); 17 C.F.R. § 240.10b–5(b) (clarifying that unlawful "manipulative and deceptive devices" include untrue statements of material fact and misleading omissions of material fact). According to the shareholders, Danaher and its officers made dozens of statements on earnings calls, at conferences, and in press releases throughout 2022 and 2023 that violate section 10(b) and Rule 10b–5. The defendants argue that most of those statements were forward-looking and entitled to greater protection, which forecloses the shareholders' claim. Moreover, while the defendants acknowledge that some of the challenged statements are not forward-looking, they say that the shareholders have failed to sufficiently plead the requisite falsity and scienter under section 10(b) and Rule 10b–5. [2]

[2]  The defendants also argue that plaintiff Derek Einersen lacks standing because the amended complaint "fails to specify whether and when

Einersen purchased Danaher stock, and whether Einersen held any Danaher stock at the time of the purported corrective disclosures." ECF No. 28-1 at 35. However, the amended complaint explicitly alleges "Plaintiffs acquired Danaher securities ... during the Class Period" and defines "Plaintiffs" to include Einersen. The shareholders point this out in their opposition to dismissal, and the defendants make no argument in response. The Court therefore concludes Einersen has pled standing.

To state a claim of section 10(b) and Rule 10b–5 securities fraud, an investor must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection to the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). In the PSLRA, Congress created a safe harbor from liability for certain forward-looking statements. 15 U.S.C. § 78u–5(c). A forward-looking statement cannot be the basis for liability if it meets one of three conditions: (1) the statement is "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) the statement is "immaterial"; or (3) "the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." *Id.*; *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (observing that only one condition need apply because the safe harbor is written in the disjunctive). [3]

[3]  The PSLRA states the first condition of the safe harbor is "deemed to be satisfied" for certain oral forward-looking statements. 15 U.S.C. § 78u–5(c)(2). The defendants do not rely on this provision; the Court therefore analyzes forward-looking statements under the general framework.

As the parties acknowledge, these differing standards often require courts to distinguish between statements that are about the present or past, which can be the basis for liability under section 10(b) and Rule 10b–5, and those that are forward-looking within the meaning of the statute, which are shielded from liability if eligible for the safe harbor. This may also require courts to sever a statement into components, where part of the statement refers to the future and part does not. *See, e.g.*, *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (holding that "a mixed

present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present"); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 212–13 (1st Cir. 2005) (holding that "[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement"). As is common, here, many of the challenged earnings calls, conferences, and press releases have statements about both the present and the future. *See, e.g.*, ECF No. 24 ¶¶ 65, 96 (April 2022 earnings call informing analysts that defendants did not "see a significant buildup in the supply chain" and predicting that the revenue from COVID-19-related sales would remain the same in 2022 while the revenue for the bioprocessing division as a whole would grow); *id.* ¶¶ 112–13 (July 2022 earnings call assuring analysts and investors that "we really haven't seen much of an impact of the biotech funding crunch here affecting the customer activity levels that we have" and offering growth rate projections for 2023); *id.* ¶¶ 137–38 (January 2023 earnings call explaining that orders were down because "customers continued to adjust for our shorter lead times" and predicting growth rates for 2023). As explained below, the Court concludes the shareholders have stated a claim as to some present statements and, with respect to forward-looking statements, have stated a claim only as to projections made during the April 2022 earnings call.

### 1. The Shareholders Have Stated A Claim As To Certain Present Statements

**\*4**  The amended complaint identifies many statements in the 2022 and 2023 earnings calls, conferences, and press releases that make representations about present circumstances. These include general statements about the company's performance and operations, as well as statements about current demand, growth, and build-up of inventory. The defendants acknowledge that these communications include present statements, but they argue the shareholders have failed to state a claim under section 10(b) and Rule 10b–5 for a few reasons.

First, the defendants argue that many of the present statements are simply corporate puffery—that is, "generalized statements of optimism that are not capable of objective verification" and "too general to cause a reasonable investor to rely upon them" in a way that could create liability. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *ECA*, 553 F.3d at 206); *see* ECF No.

28-1 at 15 n.4. As set forth above, section 10(b) and Rule 10b–5 require a misrepresentation or omission to be material, i.e., that there be a "substantial likelihood" a reasonable investor would consider the information "important." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The D.C. Circuit has accordingly recognized that puffery is "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Harman*, 791 F.3d at 109 (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)). At the same time, a "complaint should not be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant ... that reasonable minds could not differ on the question of their importance." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 514 (D.C. Cir. 1986); *see also SEC v. Kokorich*, 663 F. Supp. 3d 63, 77 (D.D.C. 2023) (concluding that the materiality of challenged statements could not be decided on a motion to dismiss when it was not clear that the statements were so "palpably unimportant" as to be immaterial (quoting *In re Newbridge Networks Sec. Litig.*, 767 F. Supp. 275, 279 (D.D.C. 1991))).

The defendants' argument is well-taken as to several of the statements that the shareholders challenge. For example, in their January 2022, July 2022, and October 2022 press releases, the defendants made generalized statements about the company's "exceptional portfolio," "talented team," and the "strong foundation" provided by the "power of the Danaher Business System." ECF No. 24 ¶¶ 84, 107, 121. And at a September 2022 investor and analyst conference, the defendants announced that Danaher had made changes to its internal structure by "taking ... 2 outstanding companies and putting them together," thereby "creating an undisputed leaders [sic] in the bioprocessing." *Id.* ¶ 116. These are the type of "generalized statements of optimism" that are "too general to cause a reasonable investor to rely upon them" so as to be puffery, even drawing all reasonable inferences for the shareholders. *Harman*, 791 F.3d at 109 (quoting *Grossman*, 120 F.3d at 1119; *ECA*, 553 F.3d at 206). The shareholders accordingly have not stated a claim as to these and similar statements.

Several other present statements alleged in the amended complaint cannot be characterized as mere puffery, however, especially when considered alongside the shareholders' specific allegations about what business components investors were focused on. *See Harman*, 791 F.3d at 109 (recognizing that whether a statement is puffery depends on the "context in which [the statement] is made"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (recognizing that a statement may seem like puffery "in isolation" but be material in context, especially if the statement addresses matters "particularly important to the company and investors" (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015))). In particular, the amended complaint identifies numerous communications across earnings calls, conferences, and press releases about present demand. These include statements specifically concerning the impacts of the COVID-19 pandemic, inventory stockpiling, and biotechnology funding on demand for the bioprocessing division's products and services—the core of the shareholders' allegations of misleading statements. *See* ECF No. 24 ¶¶ 6–7. For example:

**\*5** • On an April 2022 earnings call, the defendants responded to an analyst's question about customers stockpiling products in a way that would reduce their need to place orders in the future by insisting that they "are very, very sensitive to this particular topic and stay extremely close with our customers," even "working together with them ... to ensure that we don't have inventory buildup in the system." *Id.* ¶ 96. The defendants concluded by saying they "don't see a significant buildup." *Id.* The defendants concede that these statements were not forward-looking. *See* ECF No. 28-2 at 2–3.

• At a May 2022 conference, the defendants assured analysts that they "don't worry much about" the biotechnology funding environment because "early-stage biotechs" have only a marginal impact on the business. *Id.* ¶ 105.

• On a July 2022 earnings call, the defendants assured analysts that "as always we're working closely with customers to ensure they have the right inventory levels to support their planned activity." *Id.* ¶ 108. And they explained that they "really haven't seen much of an impact of the biotech funding crunch here affecting the customer activity levels that we have." *Id.* ¶ 113.

• On an October 2022 earnings call, the defendants commented on the prevalence of inventory stockpiling, reassuring investors that they "feel as though we are well positioned to understand the inventory situation" and they "don't believe that there is a general overstocking in the market," but recognizing that "there are pockets where inventories are high" due to customers "canceling

orders specifically for COVID." *Id.* ¶ 124. The defendants also told investors that orders were down because they had "meaningfully reduced our lead time," which reduced customers' need to place several orders at once to account for delivery delays.

- At a November 2022 conference, the defendants stated that they "really don't see an enormous amount of stocking going on," because although "there are pockets where there has been some inventory buildup and they tend to be related to customers who had larger COVID-related programs," those are "really just pockets with larger players who are quite well positioned to draw that down." *Id.* ¶ 129.

- In January 2023, the defendants informed investors they were "working through the inventory pockets that we spoke about that were related primarily to COVID programs"; explained that orders were down because "customers continued to adjust for our shorter lead times"; and described how they had "spent the last several weeks talking to our customers to understand their planning assumptions for the year," which left them with the "clear message" that "underlying demand remains robust and unchanged." *Id.* ¶¶ 136, 137, 139.

- On an April 2023 earnings call, the defendants stated that "demand at our large customers ... remains robust and they're steadily working through the inventory they built during the pandemic." *Id.* ¶ 145. The defendants recognized that "[d]uring the quarter, we also saw softer demand globally at many of our emerging biotech customers as more pronounced pressures on liquidity and funding accelerated their efforts to conserve capital leading to project delays and cancellations." *Id.*

The shareholders have plausibly alleged a section 10(b) and Rule 10b–5 claim as to these statements. The defendants do not contest that, crediting the amended complaint's allegations, such statements would be material to a reasonable investor, such that they could be relied upon and cause economic loss if misleading when made. The amended complaint alleges investors were focused on the bioprocessing division. Shortly before the class period, analysts informed the defendants that the question investors asked most was about the bioprocessing division's performance going forward. *Id.* ¶ 46. During the class period, analysts asked about bioprocessing "on *every single call* hosted by Danaher." *Id.* ¶ 47. Indeed, they told the defendants explicitly that bioprocessing was "obviously an

area of interest for most of us." *Id.* Immediately after the class period, analysts emphasized the "tremendous amount of focus" directed at the bioprocessing division. *Id.* Analysts were specifically interested in how the three market forces at issue here—the increasingly endemic nature of COVID-19, inventory stockpiling, and shrinking funding opportunities for biotechnology companies—affected the biotechnology division. *See, e.g., id.* (noting that an analyst told the defendants that there was "interest" from investors in "dissecting COVID" and its effects on bioprocessing); *id.* ¶ 136 (describing a question from an analyst about overstocking); *id.* ¶ 104 (describing how an analyst told the defendants that "investors were interested in knowing whether the Company was worried about the biotech funding environment"); *id.* ¶ 113 (describing how an analyst noted "concerns about the potential slowdown in biotech funding" and asked the defendants whether they had observed any corresponding impact on demand). Rather, the defendants argue that the shareholders have failed to adequately allege that the statements were misleading when made and made with the requisite scienter. But the amended complaint alleges particularized facts as to both. [4]

[4]    The defendants say some of the challenged statements are opinions and that they are not actionable because the shareholders did not allege them to be misleading. Courts apply a different standard for analyzing whether an opinion is false or misleading. A plaintiff either must allege that the speaker did not actually hold the opinion or "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). If a reasonable investor would "understand an opinion statement to convey facts about how the speaker has formed the opinion," and "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188; *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (opinion statements are "misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made"). The shareholders' allegations in this case

are relevant to the falsity standard for statements of facts and statements of opinion: their theory is that the defendants either had access to or actually were aware of facts that they omitted from both kinds of statement, which, if adequately alleged, would satisfy either standard.

**\*6** The amended complaint adequately alleges that the statements were misleading when made. Once a company "chooses to volunteer ... information" on a topic, "its disclosure must be full and fair." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994). "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187–93 (2015). The amended complaint includes particularized allegations that the defendants' statements omitted important information about demand. The defendants assured investors that there was still significant demand for COVID-19 products through mid-March 2022. ECF No. 24 ¶¶ 85, 92. The defendants also denied any suggestion that inventory stockpiling and funding constraints were affecting sales until 2023. *Id.* ¶¶ 96, 105, 108, 113, 122, 124. But the shareholders allege that by early 2022, demand for COVID-19 products had declined as the virus transitioned from pandemic to endemic and customers shifted their attention to non-COVID-19 products. *Id.* ¶¶ 57, 66. By mid-2022, larger pharmaceutical companies had stockpiled enough inventory to obviate the need to place new orders. *Id.* ¶¶ 58, 74–77. Around the same time, smaller biotechnology startup customers had started to scale back their projects after losing access to capital. *Id.* ¶¶ 59, 74–77. The shareholders also allege that by early 2023, these same trends had started to make waves in the Chinese market, which had until that point "remained a strong market for the bioprocessing division." *Id.* ¶¶ 78–79.

The shareholders have adequately alleged scienter as well. The scienter required for section 10(b) and Rule 10b–5 claims includes both "intent to deceive or defraud" as well as "extreme recklessness to that effect." *Lorenzo v. SEC*, 872 F.3d 578, 589 (D.C. Cir. 2017). Extreme recklessness is an "extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware." *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (quoting *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992)). Under the PSLRA, the shareholders must plead facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)

(2)(A). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.' " *Tellabs*, 551 U.S. at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). And the Court must review the allegations holistically to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

The amended complaint adequately alleges extreme recklessness. The shareholders describe a series of market forces placing downward pressure on demand for Danaher's products and explain how the defendants had access to information about these market forces. The defendants had sophisticated means of gathering information from Danaher customers, including by conducting regular surveys and engaging in frequent dialogue on important topics. ECF No. 24 ¶¶ 124, 171–75. Indeed, this was a practice that the defendants advertised to investors and analysts as a major strength of the business. *Id.* ¶ 171. The shareholders allege even more specifically that the defendants were not just gathering general information from customers, but that they were actively collecting information about *these* market forces and their effect on demand. They base that allegation on the defendants' own statements to analysts who pressed the defendants for answers about these market forces and their likely impact on revenues. In response to pointed questions, the defendants reassured investors that they were confident in their projections because they were based on recent interactions with customers. *See, e.g.*, *id.* ¶ 188. The shareholders also allege that the defendants prioritized the bioprocessing division, and that they knew their investors felt the same way. *Id.* ¶¶ 190–93.

In addition, the amended complaint incorporates the allegations of a confidential witness who says that they heard Blair admit to making up more favorable numbers for an April 2022 earnings call—a call which the shareholders allege involved extensive discussion about the bioprocessing division's anticipated performance. *Id.* ¶¶ 64, 96–100. Regardless of whether the projections ultimately proved accurate or not, *see* ECF No. 34 at 20, this allegation is significant because it indicates that at least once during the class period, Blair had actual knowledge of information that made his public statements inaccurate, but he ignored that information in favor of making statements that would appeal to investors. This instance of actual knowledge combined with the shareholders' other allegations indicating the defendants had access to crucial information throughout

the class period supports the inference that the defendants disregarded the obvious danger of misleading investors. That inference is further bolstered by the fact that the shareholders have identified a plausible profit motive for these misstatements. ECF No. 24 ¶¶ 177–83. In sum, these allegations support an inference that is at least as compelling as the competing inference that the defendants did not act extremely recklessly by making optimistic statements about the state of demand while omitting troubling information that was available to them.[5]

[5]   The shareholders briefly allege that, in addition to making misleading statements on earnings calls, at conferences, and in press releases, the defendants "failed to disclose the known uncertainties associated with volatility in demand for its COVID-related and non-COVID products" in annual and quarterly reports they were required to file with the SEC during the class period. According to the amended complaint, this silence violated Item 303 of Regulation S–K, which requires the disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The defendants argue "Item 303 does not provide a basis for a private suit" under section 10(b) or Rule 10b–5. ECF No. 28 at 22. The Supreme Court has since clarified that "[p]ure omissions are not actionable under Item 303." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024). However, failure to disclose the information required by Item 303 can amount to a section 10(b) and Rule 10b–5 violation "if the omission renders affirmative statements made misleading." *Id.* at 265.

In their briefing, the shareholders point the Court to allegedly misleading affirmative statements in specific sections of certain SEC filings, noting they "did not have the benefit of the *Macquarie* decision at the time the [amended complaint] was filed and therefore did not specify these misstatements." ECF No. 32 at 29 n.5. The defendants argue amendment of the complaint would be futile because the shareholders have not identified trends or uncertainties they failed to disclose. ECF No. 32 at 14 n.7. The Court will consider any request to further amend the complaint, as well as any

opposition, in the context of a motion addressing the applicable legal standards.

*2. The Shareholders Have Not Adequately Pled A Claim As To Forward-Looking Statements, Except For Projections During The April 2022 Earnings Call*

**\*7**  As discussed, the shareholders also challenge communications that include forward-looking statements. The defendants argue those statements are shielded under the PSLRA's safe harbor. That point is well-taken. The shareholders do not allege sufficiently particularized facts as to the future statements, with the exception of projections in the April 2022 earnings call.

The term "forward-looking statement" is "broadly defined" in the statute. *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). It includes statements "containing a projection of revenues, income (including income loss), [and] earnings (including earnings loss) per share"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to ... products or services"; statements of "future economic performance"; and "any statement of the assumptions underlying or relating to" these topics. 15 U.S.C. § 78u–5(i)(1). As described above, the defendants are not liable for forward-looking statements if one of three conditions are met: (1) the statements are identified as forward-looking and accompanied by meaningful cautionary language; (2) the statements are immaterial; or (3) the shareholders fail to allege that the defendants had actual knowledge that the statements were misleading. *Id.* § 78u–5(c)(1). Actual knowledge is a more demanding scienter requirement than extreme recklessness. Actual knowledge can take a few different forms: it can mean that the speaker did not genuinely believe the statement, or that the speaker knew there was no reasonable basis for it, or that the speaker was aware of undisclosed facts that seriously undermined the accuracy of the statement. *Slayton*, 604 F.3d at 775.[6]

[6]   The shareholders appear to argue that a seemingly forward-looking statement is not forward-looking for safe harbor purposes if it is based on an omission of a present or historical fact. *See* ECF No. 32 at 13. But nothing in the text of the statute suggests that a statement that otherwise fits its definition of a forward-looking statement loses its forward-looking character if it omitted certain information. The statutory definition does not contain qualifiers or exceptions indicating that only

*some* kinds of revenue projections or predictions of future economic performance are forward-looking. *See Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) ("The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made."); *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (same); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1106, 1111 (9th Cir. 2010) (concluding that an "earnings projection is by definition a forward-looking statement," even where the plaintiffs alleged that the projection was "false and misleading" because the defendant failed to disclose material facts that affected the projection); *Baron v. Smith*, 380 F.3d 49, 53–54 (1st Cir. 2004) (describing allegedly deceptive statements as forward-looking despite the material omissions of present fact that plaintiffs claimed rendered the statements unreliable).

Of course, omissions of present or historical fact can still play an important role in analyzing whether a forward-looking statement is entitled to safe harbor protection. For example, the omission may be the reason why the forward-looking statement fails to satisfy the "meaningful cautionary language" condition. *See Harman*, 791 F.3d at 102 ("[C]autionary language cannot be 'meaningful' if it is 'misleading in light of historical fact[s]' 'that were established at the time the statement was made.' " (citations omitted) (quoting *Slayton*, 604 F.3d at 770, 779)). The omission may also factor into a plaintiff's allegations that the defendant had "actual knowledge" of the false or misleading nature of the forward-looking statement, which would seal off one of the defendant's alternative routes to safe harbor protection.

**\*8** The shareholders' allegations do not support a strong inference of actual knowledge for most forward-looking statements. The allegations must give rise to a strong inference that the defendants were actually aware of the true state of customer demand—not just that they recklessly ignored or overlooked that information. For almost all of the forward-looking statements identified in the amended complaint, the allegations are not strong enough to clear that higher threshold. As explained above, the allegations indicate that the defendants had critical information about the market forces undercutting demand throughout the class period, and that on one occasion, they actually knew about

that information. The allegations do not, however, support the strong inference that the defendants were actually aware of the information allegedly available to them on all relevant occasions.

The forward-looking statements made in April 2022 are a different story. Those are not protected by the actual knowledge prong of the safe harbor because the shareholders have alleged specific facts to support a strong inference of actual knowledge: Blair knew about projections that would not go over well with investors, so he "made up" new projections that "looked better." ECF No. 24 ¶ 64; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 249 (2d Cir. 2016) (explaining how a similar internal communication sufficed to establish actual knowledge). Neither of the remaining safe harbor prongs insulate the April 2022 statements from liability. The revenue projections are obviously material because they would have been "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halliburton Co.*, 573 U.S. at 278 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also TSC Indus. Inc.*, 426 U.S. at 449 (materiality usually depends on whether there is a "substantial likelihood" that a reasonable investor would consider the information "important"). The defendants do not argue otherwise. The revenue projections were not accompanied by meaningful cautionary language. Cautionary language cannot be meaningful if it is misleading in light of historical facts. *Harman*, 791 F.3d at 102 (quoting *Slayton*, 604 F.3d at 770, 779). Here, the shareholders have alleged that the projections were misleading because they ignored that demand for COVID-19-related equipment already tapered by the start of the class period in early 2022, and inventory stockpiling and funding pressures were impacting order placement for non-COVID-19 products by no later than mid-2022. ECF No. 24 ¶¶ 57–59, 74–79. The April 2022 projections are therefore not entitled to safe harbor protection. The shareholders have adequately pled that they were misleading and made with the requisite scienter.

**B. The Shareholders' Second Count Survives Dismissal**

The shareholders' second count asserts a claim under section 20(a) of the Securities Exchange Act of 1934 against defendants Blair and McGrew for control person liability. *See* 15 U.S.C. § 78t(a). To establish a prima facie case for control person liability under section 20(a) of the act, a plaintiff must show (1) "a primary violation by the controlled person," and (2) "control of the primary violator by the

2025 WL 2216149

targeted defendant." *Harman*, 791 F.3d at 111 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). The defendants' only basis for dismissing this count is that the shareholders failed to plead a primary violation of the securities laws. As discussed, the shareholders have adequately pled that several of the defendants' statements violated section 10(b). To the extent that claim goes forward, the shareholders' section 20(a) claim may proceed as well.

## IV. Conclusion

For these reasons, the defendants' motion to dismiss, ECF No. 28, is granted in part and denied in part. The defendants' motion to take judicial notice, ECF No. 29, is granted.

## All Citations

Slip Copy, 2025 WL 2216149

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.