**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE PLUG POWER INC. SECURITIES LITIGATION | C.A. No. 23-409 (JLH)<br>**PUBLIC VERSION - FILED NOVEMBER 16, 2026** |

**LEAD PLAINTIFFS' OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

**JOHNSON VAN KWAWEGEN LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted *pro hac vice*)
Aasiya Mirza Glover (admitted *pro hac vice*)
485 Madison Avenue, 15th Floor
New York, NY 10022
(646) 836-9630

*Lead Counsel for the Class*

**FRIEDLANDER & GORRIS, P.A.**
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500

*Liaison Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Nathan A. Hasiuk (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

*Additional Counsel for the Class*

Dated: November 9, 2026

## TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ......................................................................................................3

ARGUMENT.............................................................................................................4

I. The Statements at Issue Were Materially False and Misleading ......................................4

A. By January 18, 2022, Plug's 70 TPD Target Was Unrealistic and Misleading .....................................................................................4

B. Defendants Are Not Entitled to Improper and Unreasonable Fact Inferences .....................................................................................6

C. The New Allegations Provide Further Support for the May 9, 2022 Misstatements that the Court Previously Sustained............................................10

D. The Safe Harbor Does Not Protect the Hydrogen Projection Misstatements .......12

II. The TAC Pleads Actual Knowledge and Supports a Strong Inference of Scienter ..........12

III. The TAC Pleads Scheme Liability.........................................................................20

CONCLUSION.........................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Advance Auto Parts, Inc. Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ....................4

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ....................16, 19

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................16

*In re Catalina Mktg. Corp. Sec. Litig.*,
390 F. Supp. 2d 1110 (M.D. Fla. 2005) ....................13

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ....................20

*Doe v. Princeton Univ.*,
30 F.4th 335 (3d Cir. 2022) ....................7

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
2019 WL 1299673 (D.N.J. Mar. 21, 2019) ....................17

*In re Horsehead Holding Corp. Sec. Litig.*,
2018 WL 4838234 (D. Del. Oct. 4, 2018) ....................12

*In re Horsehead Holding Corp. Sec. Litig.*,
2019 WL 1409454 (D. Del. Mar. 28, 2019) ....................12

*Inst. Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................6

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ....................12-13, 16, 18

*Levon v. CorMedix Inc.*,
797 F. Supp. 3d 381 (D.N.J. 2025) ....................12, 18

*Lombardi v. Morris Cnty. Sheriff's Dep't*,
2007 WL 2363160 (D.N.J. Aug. 14, 2007) ....................4

*Lorenzo v. Sec. & Exch. Comm'n*,
587 U.S. 71 (2019) ....................20

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020)....................18

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)....................16

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016)....................11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023)....................18

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018)....................15

*Shulman v. Weston*,
816 F. Supp. 3d 495 (D.N.J. 2025)....................18

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
808 F. Supp. 3d 828 (M.D. Tenn. 2025)....................13

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)....................16

*Sun v. Han*,
2015 WL 9304542 (D.N.J. Dec. 21, 2015)....................16

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)....................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................7, 18, 19

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
595 U.S. 178 (2022)....................18

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015)....................17

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)....................13

## PRELIMINARY STATEMENT

The Third Amended Complaint ("TAC") adds well-supported allegations demonstrating that Defendants' January 19, March 1, and May 9, 2022 statements to investors announcing and reaffirming Plug's hydrogen production target for year-end 2022, ¶¶ 179-88 (the "Statements at Issue"), were knowingly false and misleading when made.[1] It does so without the benefit of a single document from Defendants, who produced zero documents in the months since the Court's April 20, 2026 order (D.I. 90, the "Order") sustaining in large part the Second Amended Complaint ("SAC"). Rather, the new allegations in the TAC are based on documents produced by non-parties. Those documents provide insight into substantial delays in Plug's hydrogen facility build-out, and Defendants' knowledge of those delays, as of January 18, 2022—the day before the first Statements at Issue. In particular, those documents support a strong inference that, by no later than January 18, 2022, Defendants knew that Plug's planned hydrogen production facilities in Georgia and Louisiana (the "Georgia Plant" and "Louisiana Plant") would not be online until 2023 at the earliest. Without the planned production from those facilities, Plug's year-end 2022 hydrogen production target of 70 tons per day ("TPD") was unrealistic and effectively impossible to achieve, making the Statements at Issue, which touted that figure, knowingly false and misleading.

The TAC's new allegations derive from documents produced by two non-parties: (i) Chart Industries, Inc. ("Chart"), which was hired to fabricate and deliver the hydrogen liquefaction systems for Plug's Georgia and Louisiana Plants; and (ii) the City of Kingsland, Georgia ("Kingsland"), which provided Plug with utility services for the Georgia Plant. Chart's documents establish that Chart [redacted] in the months leading up to Defendants' first

[1] "¶" refers to the TAC (D.I. 136). "Brief" or "Br." refers to Defendants' Opening Brief (D.I. 139). "Exh." refers to the exhibits to Defendants' Request for Judicial Notice (D.I. 141). Emphasis is added and internal quotation marks are omitted unless otherwise specified.

misstatements on January 19, 2022. Then, on [redacted], Chart [redacted]. Chart then [redacted]. Kingsland's documents reveal another telling communication on January 18, 2022, the day before the first Statements at Issue, when a Plug representative informed Kingsland that Plug's Georgia Plant would be only one-third complete by year-end 2022.

These non-party documents reinforce Plaintiffs' existing allegations, which describe the central role of Plug's planned hydrogen facilities in its vertical integration strategy, and the "myriad setbacks and challenges the Company had been facing with respect to the construction of its hydrogen facilities." Order ¶ 11. As multiple witnesses explained, by early 2022, when the Statements at Issue were made, Plug's first-of-a-kind Georgia Plant was already behind schedule, and its other planned hydrogen production facilities lagged even further behind. Defendants were repeatedly warned about these delays before making each of the Statements at Issue.

In their motion, Defendants inject factual disputes and ask this Court to infer that they were ignorant of the basic timelines for the very projects they told investors were "critical to our success." Such an inference cannot be squared with Defendants' own statements that they were "laser-focused" on, and closely monitored, the plants' development. Further, the Chart documents were delivered to Witnesses 1 and 2, who were senior managers responsible for the development of Plug's hydrogen facilities and who regularly updated Plug's executives on hydrogen project timelines, and Plug itself told Kingsland government officials about the timeline for the Georgia Plant. The far more compelling inference, consistent with the TAC's well-pleaded allegations, is that Defendants knew the Georgia Plant's timeline. Because Defendants raise fact disputes and unsupported inferences that should carry no weight at the pleading stage, and for all the reasons

set out below, the Court should deny Defendants' motion.

## BACKGROUND

On February 25, 2025, Plaintiffs filed the SAC. Defendants moved to dismiss, addressing certain "representative" statements and Plaintiffs' scheme claims under Rules 10b-5(a) and (c). D.I. 73. On April 20, 2026, the Court sustained claims based on representative statements made on August 9 and November 8, 2022, concerning Plug's projections for hydrogen production in 2022. The Court found that Plaintiffs adequately alleged that Defendants "failed to disclose then-existing adverse material facts," Order ¶ 11, and that Defendants had actual knowledge of the statements' falsity, *id.* ¶ 12. The Court also sustained claims based on one representative statement concerning Plug's revenues. *Id.* ¶¶ 14-15. The Court did not address Plaintiffs' scheme claims.

Following the Order, on May 29, 2026, Plaintiffs promptly served document requests on Defendants. D.I. 97. Plaintiffs conferred with Defendants numerous times and sent Defendants multiple letters seeking agreement on responsive documents, custodians, and search terms. Defendants produced nothing. Instead, they moved to preclude discovery concerning the May 9, 2022 hydrogen production misstatements and Plaintiffs' scheme claims, arguing that—although unaddressed in the Order—the Court had silently dismissed these claims. D.I. 120.[2] By the September 9, 2026 amendment deadline, over four months after the Order largely sustained the SAC, Defendants still had not produced a single document—even readily available documents they had agreed to produce, which concerned claims they do not dispute remain in the case.

In parallel, Plaintiffs served public records requests and subpoenas on third parties.

[2] Defendants also asserted that none of the actionable statements "relate[] to the status of the Georgia plant[.]" Br. 16 n.2. Actionable statements concerning Plug's hydrogen targets directly relate to the status of the Georgia Plant, which faced "myriad" setbacks impacting hydrogen production, Order ¶ 11, and the new allegations reinforce the relevance of such information.

Kingsland produced documents on June 30, 2026, and Chart produced documents on September 1, 2026, eight days before the deadline for amendment in this action.

On September 9, 2026, Plaintiffs timely filed the TAC. D.I. 129; D.I. 136. Defendants now move to dismiss the scheme claims and the claims based on the Statements at Issue on falsity and scienter grounds, but do not challenge the claims the Court sustained in the Order. D.I. 140.[3]

## ARGUMENT

### I. The Statements at Issue Were Materially False and Misleading

#### A. By January 18, 2022, Plug's 70 TPD Target Was Unrealistic and Misleading

The recently produced Chart and Kingsland documents show that, no later than January 18, 2022, the day before Plug announced its goal of "70 [TPD] of green hydrogen production by year-end," ¶¶ 180(a)-(b), Defendants knew that target was unattainable, and thus false and misleading when publicized to Plug's investors. *See In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *1, *3 (D. Del. Feb. 7, 2020) (holding projections actionable when defendants "knew" they "were unattainable"); *see also id.* at *3 ("Courts have found that projections lack a reasonable basis where defendants were aware of contradictory internal forecasts.").

On [redacted], Chart sent Plug a [redacted] letter ("[redacted] Letter"). ¶¶ 99, 118. That letter, addressed to Witness 1 (Project Manager, December 2021 to July 2022) and Witness 2 (Director of Project Management, April 2021 to November 2022), [redacted]. ¶¶ 100-01, 106, 108, 118. [redacted]. *Id.*

---

[3] Without requesting leave, Defendants filed a 22-page opening brief in violation of the 20-page limit set by L.R. 7.1.3(a)(4). The Court may decline to consider an over-length brief. *See Lombardi v. Morris Cnty. Sheriff's Dep't*, 2007 WL 2363160, at *2 n.1 (D.N.J. Aug. 14, 2007).

The [redacted] Letter stated that [redacted]. ¶ 118. [redacted]. ¶¶ 102-03, 119, 125. [redacted]. *Id.* [redacted], neither plant could produce liquid hydrogen until 2023. ¶¶ 103, 113, 187.

These facts made Plug's 70 TPD target for year-end 2022 a practical impossibility. The Georgia and Louisiana Plants were each intended to produce 15 TPD of liquid hydrogen, totaling nearly half of Plug's 70 TPD target for 2022. ¶¶ 130, 169, 180(d), 186, 188, 190(b), 196.[4] Without those 30 TPD, Plug's 70 TPD target was out of reach. The Georgia Plant in particular was the furthest along of Plug's planned facilities and was intended to serve as a "roadmap" for their construction, so delays at that plant held up Plug's entire build-out. ¶¶ 40, 188. Defendants' March 1, 2022 statement that the Georgia Plant (Plug's "15 TPD plant in the southeast") was "on schedule to be commissioned by the end of 2022," ¶ 180(d), was false and misleading for the same reasons.

Other newly alleged facts further support that 70 TPD was unrealistic by no later than January 18, 2022, before the first Statement at Issue. That same day, Plug informed Kingsland that only one-third of the Georgia Plant's total build-out—*i.e.*, 5 TPD out of 15 TPD—would be complete in 2022, further undermining any purported expectation of producing 70 TPD in the aggregate by year-end 2022. ¶¶ 95-97. Moreover, Chart [redacted] letter [redacted] ¶ 117, and informed Plug in a [redacted]

[4] The Georgia Plant was also designed to produce a small quantity of gaseous hydrogen. ¶ 180(d).

[redacted] report that [redacted]. ¶ 113. The [redacted] report also [redacted] ¶ 129. As a result, Defendants already knew before they received the [redacted] Letter that producing any liquid hydrogen at the Georgia Plant in 2022 was highly precarious.

Chart informed Plug of [redacted]. Notably, in ***every*** [redacted] report issued throughout 2022, Chart informed Plug that [redacted] ¶¶ 112-14. For example, in a [redacted] report, [redacted], Chart [redacted]. ¶ 120. [redacted], Chart [redacted]. *Id.* [redacted]. ¶¶ 112-14, 120-26. [redacted]. ¶ 130.

**B. Defendants Are Not Entitled to Improper and Unreasonable Fact Inferences**

In their motion, Defendants ask the Court to accept an array of unfounded factual assertions that contradict the TAC's well-pleaded allegations and would require the Court to draw unreasonable inferences in Defendants' favor from those disputed facts. In so doing, Defendants ignore that courts "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 n.31 (3d Cir. 2009) (rejecting defendants' assertion of facts "in tension with the reports of" witnesses) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Courts "do not resolve factual disputes—even in cases governed by the PSLRA." *Id.*;

*see also Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (where defendants dispute "the well-pleaded facts of a complaint, the facts in the complaint must prevail"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006) (rejecting contrary factual assertions because "plaintiffs are entitled to the benefit of all reasonable inferences").

*First*, Defendants ask the Court to find that the Georgia and Louisiana Plants could produce at full capacity, 15 TPD each, before [redacted] that Defendants knew could not take place until 2023. Br. 7, 14. Defendants cite nothing to support this assertion, which contradicts the TAC's well-pleaded allegations that (i) [redacted]; (ii) Chart's [redacted]; and (iii) [redacted]. ¶¶ 102-03, 119, 125. As Witness 2 specifically noted, Plug required "functional ***and tested*** equipment" to meet its hydrogen production target, and Plug "***never*** had enough" such equipment. ¶ 182(a). Given that the liquefaction process involves cooling hydrogen to about negative 420 degrees Fahrenheit, a temperature near absolute zero, ¶ 104, and there is a serious risk of fires when handling such a flammable substance, ¶¶ 90, 142, Defendants' requested inference that they were rash enough to push 15 tons per day of liquid hydrogen through [redacted] is specious.

*Second*, Defendants misread the Chart documents, asserting that the Georgia Plant could produce liquid hydrogen in 2022 because Chart's monthly [redacted] reports purportedly show that a "[redacted]," [redacted]. Br. 7. But [redacted], ¶¶ 104-08, the [redacted]. ¶ 115. Accordingly, while [redacted]

[redacted], it was not "[redacted]," as Defendants assert. Br. 7. [redacted]. *See* Exh. 1 at 9-10; Exh. 3 at 9-10; Exh. 5 at 9-10; Exh. 6 at 9-10; Exh. 7 at 8-9; Exh. 9 at 8-9. Defendants were specifically informed that, [redacted]. *See, e.g.*, Exh. 3 at 9-10 ([redacted]).

Likewise, Defendants wrongly assert that Chart's [redacted] report estimated that [redacted]" Br. 15-16. [redacted]. Exh. 3 at 7-8. The [redacted], as alleged. *Id.* at 9; ¶¶ 113-14. Defendants' errors are no basis for dismissal.

*Third*, Defendants assert that Chart "was broadly tracking" its "[redacted] Br. 7-8. But [redacted]. The same documents show that [redacted] precluded such production by year-end 2022. ¶¶ 104-08, 112-14.

*Fourth*, Defendants' factual assertion that Chart did not "state that any specific construction delays would ensue" from "[redacted]" Br. 8, contradicts the [redacted] Letter:

> [redacted]

Exh. 3 at 22. After tying "[redacted] the Letter [redacted]. *Id.* In addition, Chart informed Plug [redacted]

[redacted]. *See* ¶¶ 121-22. That [redacted], Exh. 3 at 22, does not mean—as Defendants ask the Court to infer, Br. 8, 15—that Chart could complete its work more quickly than [redacted], or that the Georgia Plant could produce liquid hydrogen in 2022. In reality, [redacted]. ¶ 114.

*Fifth*, Defendants incorrectly assert that the Kingsland minutes "did not address plant construction timing[.]" Br. 12. The minutes do address such timing. They state: "Plug Power timeline: first train of Peachtree this year; trains two and three mid 2023," and they specify that "each train" constitutes "1/3 of total Peachtree [*i.e.*, Georgia Plant] buildout." ¶ 96. Plug provided that construction timeline because Kingsland was responsible for treating Plug's wastewater, *cf.* Br. 12, and Plug's construction timing informed Kingsland's provision of that utility. ¶ 95.

*Sixth*, Defendants speculate that "***[i]f*** each 'train' represented 15 TPD in hydrogen production, for a total of 45 TPD of production," then the Kingsland minutes could be interpreted differently. Br. 12. Defendants cite nothing for their 45 TPD figure, and their own words contradict their unsupported speculation: Plug publicly stated that the Georgia Plant was "a 15 TPD liquid plant," ¶ 169, and Defendants concede that 15 TPD was "the figure the Company discussed" for the Georgia Plant, Br. 7. It is thus reasonable to infer that the "total" identified in the minutes was 15 TPD, and that one-third of "a 15 TPD liquid plant" would produce only 5 TPD.

*Seventh*, Defendants ask the Court to infer that Plug could produce 70 TPD without 15 TPD from the Georgia Plant, by simply "look[ing] to other facilities." Br. 13. That presumes that Plug's other planned facilities, which were miles away from completion, could somehow have produced more hydrogen by year-end 2022 than Plug had said those plants were expected to

produce in total. ¶ 190(b). The TAC's well-pleaded allegations contradict that fantasy. The Georgia Plant was the "furthest along" of Plug's planned liquid hydrogen facilities, and "the production of the full 15 TPD of liquid hydrogen by year-end 2022 at the Georgia facility was a lynchpin of Defendants' aggregate 70 TPD target[.]" ¶ 188. In fact, because the Georgia Plant was "intended to be Plug's first liquid hydrogen plant in which hydrogen is produced using Plug's own electrolyzers," Plug described it as a "roadmap" for additional facilities. ¶ 40. There is no basis to infer that Plug's other facilities could have leapfrogged the plant that was supposed to provide a "roadmap" for their construction. And the March 1, 2022 statement that the Georgia Plant was "on schedule to be commissioned by the end of 2022," ¶ 180(d), was false and misleading in any event.

Even setting aside the Georgia Plant, Plug's other planned facilities, which were also integral to the 70 TPD target, were never going to produce liquid hydrogen in 2022. Plug senior management knew by February 2022 that the New York plant was delayed, and by March 1, 2022 (the date of the second set of Statements at Issue), that Plug could not power that plant, and thus could produce no hydrogen there, until November ***2024***. ¶¶ 81, 271. The Louisiana Plant [redacted]. ¶ 130. And the Texas plant site was still at the "dirt work" stage in November 2022. ¶ 80. Plug did not produce ***any*** liquid hydrogen in 2022, only began such production at the Georgia Plant in January 2024, and had not reached 50 TPD (much less 70 TPD) in the aggregate as of February 2025, over two years after the year-end 2022 target date. ¶ 194. This was not a last-minute near-miss. Plug's 70 TPD target was unrealistic from the outset, rendering the Statements at Issue materially false and misleading when made.

### C. The New Allegations Provide Further Support for the May 9, 2022 Misstatements that the Court Previously Sustained

Defendants argue that the Court previously dismissed Plaintiffs' claims based on the May 9, 2022 hydrogen production statements, Br. 16, even though the Order did not address them.

Defendants erroneously assume that, by ordering the parties to select "representative" statements for purposes of the prior round of motion to dismiss briefing, D.I. 65 ¶ 6, the Court silently dismissed the statements not selected—ignoring that, by definition, the representative statements were intended to *represent* similar statements.[5] The Court need not address this issue because the new allegations are more than sufficient to sustain those claims for the reasons set out above; regardless, the May 9 statements are actionable based on the logic of the Order.

The Court sustained the August and November 2022 hydrogen misstatements on at least three grounds: (i) Witness 1 "told Defendant Marsh in May or June that certain facilities were 'three years out in service,' making the goals stated in August and November impossible"; (ii) "Witness 2 claimed that when she left the Company in November 2022, the Georgia facility specifically was two years behind schedule" and "detailed specific deficiencies with the plant"; and (iii) the SAC alleged "myriad setbacks and challenges the Company had been facing with respect to the construction of its hydrogen facilities." Order ¶ 11. The May 9, 2022 misstatements, represented by the August and November 2022 misstatements, used identical or nearly identical language and were false and misleading for the same reasons. *Compare* ¶ 180(e) (May 9, 2022 misstatement) *with* ¶ 190(b) (August 9, 2022 misstatement). There is no basis for Defendants' proposed inference that Witness 1's warning to Defendant Marsh in "May or June" could not have taken place before the May 9, 2022 misstatement, Br. 16-17, and in any event, the "myriad setbacks and challenges" preceded that warning. *See, e.g.*, ¶ 182. When those allegations are considered together with the new allegations that Plug's hydrogen projections were unattainable by January 18, 2022, the TAC readily pleads the knowing falsity of Defendants' May 9, 2022 misstatements.

---

[5] By contrast, in *Cooper Tire*, the district court rejected claims based on *all* the representative statements, so the issue of which additional statements were represented by those statements never arose. *OFI Asset Mgmt. v. Cooper Tire & Rubber,* 834 F.3d 481, 489 (3d Cir. 2016).

**D. The Safe Harbor Does Not Protect the Hydrogen Projection Misstatements**

The statutory safe harbor does not protect the Statements at Issue because they lacked meaningful cautionary language and Defendants had actual knowledge of their falsity.

Defendants identify no cautionary language for the January 19, 2022 misstatement, waiving that argument. *See In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *17 (D. Del. Oct. 4, 2018) (declining to consider cautionary language not raised in opening brief), *report and recommendation adopted*, 2019 WL 1409454, at *1 (D. Del. Mar. 28, 2019). As to the March 1 and May 9 misstatements, the purported cautions in the March 2022 10-K are "meaningless" for the same reason the Court found for later statements: "because they failed to disclose then-existing adverse material facts." Order ¶ 11. The TAC alleges that, by January 18, 2022—weeks before the March 2022 10-K—Plug knew that the Georgia and Louisiana Plants were severely behind schedule and would not be able to produce liquid hydrogen until 2023. ¶¶ 97, 99. These risks had thus already materialized, rendering any cautionary language meaningless. Order ¶ 11; *see also Horsehead Holding Corp.*, 2019 WL 1409454, at *1 (no safe harbor when "Defendants' purported cautionary statements failed to address [company's] known problems"); *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 412 (D.N.J. 2025) ("Cautionary statements are not truly cautionary when the defendant knows that an identified risk has or will occur.").

As detailed below, the TAC also alleges actual knowledge for safe-harbor purposes.

**II. The TAC Pleads Actual Knowledge and Supports a Strong Inference of Scienter**

***Defendants Had Actual Knowledge.*** As the Supreme Court has explained, actual knowledge does not require absolute proof. Rather, actual knowledge can be established through "inference from circumstantial evidence" or a showing of "willful blindness." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189-90 (2020). Accordingly, courts find actual knowledge based on senior executives' access to information. *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia*

*Healthcare Co.*, 808 F. Supp. 3d 828, 839-40 (M.D. Tenn. 2025) (citing *Intel*, summary judgment denied in part due to circumstantial evidence of actual knowledge, including access to information contradicting misstatements); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005) (finding actual knowledge based in part on access to contradictory information).

Consistent with this precedent, this Court previously inferred that Defendant Middleton had "actual knowledge" of the falsity of Plug's revenue projections from the fact that Plug's revenues were "a front-of mind topic for the Company." Order ¶ 15 n.9 (citing *Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017)). The TAC pleads a strong inference of Defendants' actual knowledge that the Statements at Issue were false or misleading when made.

*First*, Defendants Marsh and Shrestha had actual knowledge based on their direct supervision of the development of plants that were central to Plug's vertical integration strategy. ¶¶ 39-41. Marsh personally observed Plug's hydrogen production projects, where he spoke with senior managers who informed him of severe delays. ¶¶ 265, 272. Shrestha, who reported to Marsh, was told by Plug's Project Group that Plug's targets were unattainable. ¶¶ 265, 268. Witnesses stated that Defendants Marsh and Middleton were both aware of severe supply chain issues, and that Mindnich, who reported to Marsh, closely oversaw those issues. ¶¶ 275-79.

Defendants touted their direct supervision of Plug's hydrogen plant construction to investors when describing those projects as crucial to Plug's business. Marsh told investors on May 9, 2022, that "having that hydrogen on is critical to our success. So we're laser-focused on that." ¶ 41. He also told investors that "every day I start out working supply chain" issues impacting plant construction, and that he and Mindnich "work" supply chain issues "every day." ¶ 280.

Further, in an earnings call on March 1, 2022, the same day as the second set of Statements at Issue, Shrestha told investors that Plug's partnerships with two companies, including Atlas—

[redacted]—gave Plug "visibility from a lead time perspective" on plant construction, and that the partnership enabled Plug to "manage" its supply chain. D.I. 74-5 at 18-19; *see also* D.I. 74-8 at 20 (Shrestha on May 9, 2022 telling investors that the Atlas partnership "allows us to control supply chain better").[6] It is reasonable to infer that the individual Defendants were aware of [redacted] concerning Atlas, the very supplier whose partnership in managing supply chain lead times Defendants touted.

*Second*, the new allegations establish that Defendants had actual knowledge of Plug's inability to meet its 70 TPD target no later than January 18, 2022, when Witnesses 1 and 2, who were senior managers at Plug, received the [redacted] Letter [redacted]. ¶ 118. It is reasonable to infer that Chart contemporaneously informed Plug of the delays recorded in the documents, as: (i) Chart sent the [redacted] Letter to Witnesses 1 and 2, *id.*; (ii) in the [redacted] Letter, Chart said that [redacted] Exh. 3 at 22, ¶ 118; (iii) in [redacted] reports from [redacted] ¶ 274; (iv) [redacted], ¶ 110; (v) the [redacted] reports Chart produced to Plaintiffs were [redacted], *id.*; and (vi) [redacted], ¶ 111. Given these well-pleaded facts, Defendants' suggestion that "[t]here is no indication . . . that Chart sent these reports to Plug" (Br. 14) is unfounded.

It is also reasonable to infer that Witnesses 1 and 2—whom the Court previously found

[6] The Court has already taken judicial notice of these documents. Order ¶ 9 n.5; D.I. 74.

reliable for pleading purposes, Order ¶ 11 n.7—shared the critical information that Chart had provided with the individual Defendants, because (i) Witness 2, who oversaw development of all Plug's hydrogen facilities, "interacted extensively with Defendant Shrestha, who reported to Defendant Marsh," ¶ 48; (ii) Witness 1 was a senior member of Plug's Project Management team, ¶ 47, led engineering and construction for all of Plug's East Coast hydrogen production facilities, *id.*, ¶ 72, met monthly with Plug's senior executives, ¶ 84, and spoke on Plug's behalf to government officials about plant construction timelines, ¶ 95; and (iii) Witnesses 1 and 2 warned Marsh and other executives about Plug's inability to meet its hydrogen projections, ¶¶ 84-85, 91.

Also on January 18, 2022, Plug itself informed Kingsland that the Georgia Plant would not be fully operational in 2022. ¶ 97. It is reasonable to infer that the individual Defendants had actual knowledge of key information Plug reported to government officials, particularly in light of their close monitoring of plant development, which they touted to investors. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 894, 902 (E.D. Pa. 2018) (finding actual knowledge when company told government agency information that contradicted statements to investors).

These new allegations supplement existing allegations supporting a strong inference of Defendants' actual knowledge. For example, Witness 2 told Marsh in April or May 2021 that Plug's schedules for developing hydrogen production facilities were not realistic. ¶ 265. According to Witness 2, Plug's senior management knew by February 2022 that the proposed New York facility was behind schedule, and they knew by March 1, 2022 that Plug would not have power at the site—and thus would be unable to produce any hydrogen there—until November 2024. ¶ 271. Witness 2 added that she "knew of no information available to Plug management, and ***never*** gave any information to Plug management, which could have supported Plug's stated hydrogen production target of 70 tons per day." ¶ 85. As the leader of Plug's hydrogen plant development

team, ¶ 48, Witness 2 was in a position to know the Statements at Issue were made with no reasonable basis.

Actual knowledge can also be inferred from Defendants' willful blindness. *See Intel*, 589 U.S. at 189-90. Defendants' dismissal of direct warnings that Plug's hydrogen production timelines were unrealistic (*e.g.*, ¶¶ 265-68) makes any purported ignorance of those timelines willful.[7] Refusing to accept reality is no defense; executives may not mislead investors based on the hope that unspecified future events, *see* Br. 13, will rescue an unrealistic projection at odds with the undisclosed facts on the ground. *See In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *19 (W.D. Pa. May 18, 2023) (management's belief that company could "remedy" concerns did not salvage a statement that "flies in the face of the reality facing the company at the time").[8]

Moreover, the Company's actual knowledge can be based on "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (corporate scienter adequately pleaded through unnamed senior auditors). While the Third Circuit has not adopted a definitive approach to corporate scienter, courts have assumed it would apply an "intermediate or broad approach" in which, at a minimum, an inference of corporate scienter is "cogent" if "any high managerial agent" of the company "tolerated the misrepresentation." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy*

[7] *See, e.g.*, ¶ 265 (when Witness 2 told Marsh that Plug's hydrogen production "schedules were not realistic," Marsh responded, "well, you've got a lot of work to do"); ¶ 266 (senior managers who reported directly to Marsh, including Shrestha, refused to listen to project managers' concerns about cost overruns and delays); *id.* (Witness 1 resigned after senior management rejected the "best realistic schedule regarding hydrogen production targets"); ¶ 267 (Plug executives were "bullying" Project Management to sign off on unrealistic completion dates).

[8] *See also Carlton v. Cannon*, 184 F. Supp. 3d 428, 483 (S.D. Tex. 2016) ("disregarding information" from employees in position to understand plant operations supports scienter); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 907 (D. Minn. 2011) (finding scienter well-pleaded when management's "hope" that conditions would improve grew "untenable").

*Transfer LP*, 532 F. Supp. 3d 189, 236-37 (E.D. Pa. 2021) (finding corporate scienter where the company, like Plug, "had already informed" municipalities of revised development plan that contradicted representations to investors).

Here, that corporate scienter standard for actual knowledge is readily satisfied. Witness 1, who "led engineering and construction for all of Plug's East Coast hydrogen production facilities," ¶ 47, and Witness 2, who led the team "responsible for developing all of Plug's hydrogen production projects," ¶ 48, directly received the [redacted] Letter. Indeed, Witness 1 represented Plug at the Kingsland meeting the same day, making clear that she had authority to speak for the Company and was its agent for corporate scienter purposes. Thus, the actual knowledge of Witnesses 1 and 2 can be attributed to Plug, regardless of the individual Defendants' knowledge.

Finally, Defendants do not dispute that the Statements at Issue concern Plug's "core operations," Br. 20-21, which supports the "logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems" at issue. *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019); *see also In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (scienter pled based on core operations doctrine, "combined with plaintiffs' allegations and circumstantial evidence" of knowledge).[9] Producing hydrogen at these plants was critical to Plug's vertical integration strategy, as the Company was hemorrhaging money by purchasing hydrogen on the open market for customers that used its hydrogen-powered forklifts and other equipment. ¶¶ 39-41. Defendants, in their own words, were "laser-focused" on developing those plants, and so were securities analysts. ¶ 41. In light of these facts, the more compelling inference is that Defendants were aware of the basic

[9] Because the allegations establish a strong inference that Defendants received fraud-related information, Defendants' cited cases, Br. 20-21, involving no such allegations, are inapposite.

timeline of these projects, which was incompatible with the Statements at Issue.

***The TAC Pleads a Strong Inference of Scienter.*** Under *Tellabs*, plaintiffs adequately plead scienter when, taking the allegations "holistically," the inference of scienter is "at least as strong as any opposing inference." 551 U.S. at 326. The inference "need not be irrefutable," a "smoking-gun," or "even the 'most plausible of competing inferences.'" *Id.* at 324. A "tie favors the plaintiff." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023). Because the TAC adequately alleges actual knowledge, it more than supports a strong inference of scienter, including at the lower recklessness standard. *See CorMedix*, 797 F. Supp. 3d at 422 (finding recklessness where defendants had access to contrary information).

***Defendants' Speculation Fails to Overcome the TAC's Strong Inference of Actual Knowledge.*** Defendants attempt to rebut Plaintiffs' showing of actual knowledge by speculating that Witnesses 1 and 2 did not share the key documents with any individual Defendant. Br. 13, 16.

Defendants mistake the requisite showing. Plaintiffs need not show that Witnesses 1 and 2 literally placed these documents in Defendants' hands. Rather, the relevant "knowledge" concerns the critical facts reported in those documents. Actual knowledge of those facts can be inferred from "circumstantial evidence," including "the significance" of certain information to the defendant and the defendant's "experience" with the information. *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 187-88 (2022) (*Intel*'s actual knowledge applies to "civil cases" generally); *see also Shulman v. Weston*, 816 F. Supp. 3d 495, 512 (D.N.J. 2025) (finding "actual knowledge" based on "holistic picture" of allegations); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1023 n.18, 1024-30 (N.D. Cal. 2020) (finding "actual knowledge" based on totality of allegations, including access to information, regular updates, and involvement in core operations).

Defendants' proposed inference that Witnesses 1 and 2 withheld news about [redacted]



4914-7699-6319

from the individual Defendants, Br. 16, is unreasonable in light of Marsh and Shrestha's close monitoring of plant development, as detailed above. Moreover, the TAC makes clear that it was not the practice of Witnesses 1 and 2 to withhold project timeline information. For example, Witness 1 met monthly with members of Plug's senior management before and during the Class Period and told them that Plug's hydrogen production projections were unattainable. ¶¶ 84, 264. After Witness 1 expressed "strong[] disagree[ment]" with Plug's announced 70 TPD target, she resigned in protest, as she "refused to let this all fall on [her]" and told Witness 2 that she "was not going to jail for anybody." ¶¶ 91-92. Witness 2 likewise recounted "frequent disagreements in which Witness 2 and other project managers pushed back against Plug's senior management," made clear that "senior managers, including Defendant Shrestha, did not listen to project managers when they expressed concerns about the plants' cost overruns and delays," and ultimately "left Plug because senior management was not listening to Project Management." ¶¶ 91, 93.

Defendants' requested inference that they were unaware of the timeline Plug told government officials at a formal meeting about the status of one of its most important projects, Br. 13, is likewise unreasonable. There is no reason to believe that Plug's representative was improvising when speaking with Kingsland officials on January 18, 2022, ¶¶ 94-95; rather, she conveyed a timeline that, it is reasonable to infer, had been cleared internally. *See Energy Transfer*, 532 F. Supp. 3d at 237 (rejecting inference that employees' statements were "rogue pronouncement[s]"). Defendants' assertion that they may have had no "actual knowledge of these minutes," Br. 13, is misplaced; the relevant knowledge is not of the minutes themselves, but of the basic construction timeline that Plug's representative conveyed to government officials.[10]

---

[10] Defendants' argument that scienter "requires factual allegations of *both* 'motive and opportunity' to commit fraud *and* conscious misbehavior or recklessness," Br. 17, is wrong.

## III. The TAC Pleads Scheme Liability

The TAC also pleads scheme claims based on multiple deceptive or manipulative acts. For example, Witness 2 stated that Plug "designed the plants" facing delay "so that electrolyzers could be added later, constructing empty frames (with no electrolyzers inside) 'to show progress,'" ¶ 88; Witness 3 was told that "Plug had used trucks to deliver hydrogen to Pathfinder," at the Georgia Plant, "to get good headlines because Pathfinder was supposed to be completed by then," ¶ 89; and each individual Defendant who made misstatements disseminated those misstatements, ¶¶ 166-206. These deceptive acts furthered the fraud by perpetuating the myth that Plug could meet its announced hydrogen target. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16-19 (D.N.J. June 5, 2020) (sustaining scheme claims based on "inherently deceptive conduct" and dissemination of misstatements). And the TAC attributes dissemination of misstatements to specific Defendants, *id.* at *17,[11] contrary to Defendants' assertion. Br. 22.

Nor did Plaintiffs abandon their scheme claims, as Defendants assert. Br. 21-22. The Court's order and the parties' stipulation regarding "representative statements" did not address scheme claims because they are not "statements," D.I. 65 ¶ 6; D.I. 70, but Defendants moved to dismiss those claims, D.I. 73 at 29, and Plaintiffs opposed, D.I. 75 at 30, demonstrating the parties' mutual understanding that the scheme claims remain at issue.

## CONCLUSION

For all of these reasons, Defendants' motion should be denied.[12]

---

*Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal."). The decisions Defendants cite did not dismiss a complaint for lack of motive allegations alone. Br. 18.

[11] Defendants' out-of-circuit cases, *see* Br. 22, do not require deceptive acts beyond "dissemination." *See also Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78 (2019).

[12] Because the TAC pleads § 10(b) claims, it also pleads § 20(a) claims. *Cf.* Br. 20 n.5.

DATED: November 9, 2026

Respectfully submitted,

**FRIEDLANDER & GORRIS, P.A.**

*/s/ David Hahn*
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

*Liaison Counsel for the Class*

**JOHNSON VAN KWAWEGEN LLP**
Chad Johnson (admitted *pro hac vice*)
Noam Mandel (admitted *pro hac vice*)
Jonathan Zweig (admitted *pro hac vice*)
Aasiya Mirza Glover (admitted *pro hac vice*)
485 Madison Avenue, 15th Floor
New York, NY 10022
(646) 836-9630
chad@jvk-law.com
noam@jvk-law.com
jonathan@jvk-law.com
aasiya@jvk-law.com

*Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Nathan A. Hasiuk (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
nhasiuk@ktmc.com
rrusso@ktmc.com

*Additional Counsel for the Class*